## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

BOCA GAS COMPANY HOLDINGS 2,
LLC, a Florida limited liability company,

       Plaintiff,

v.                                                         Case No. 3:23-cv-00366-BJD-PDB

FIRST COAST ENERGY, L.L.P., a
Colorado limited partnership,

       Defendant,

_____/

FIRST COAST ENERGY, L.L.P.,

       Counterclaim Plaintiff,

v.

BOCA GAS COMPANY HOLDINGS 2,
LLC, ABBAS JAFERI, ALI JAFERI,
ATHER JAFERI, HANI BASKARON,
and SALPIE BASKARON, individuals,
ECM-BG2-JACKSONVILLE, FL-1-UT, LLC,
ECM-BG2-JACKSONVILLE, FL-2-UT, LLC,
ECM-BG2-JACKSONVILLE, FL-3-UT, LLC,
ECM-BG2-JACKSONVILLE, FL-4-UT, LLC,
ECM-BG2-JACKSONVILLE, FL-5-UT, LLC,
ECM-BG2-JACKSONVILLE, FL-6-UT, LLC,
ECM-BG2-JACKSONVILLE, FL-7-UT, LLC,
ECM-BG2-ORANGE PARK, FL-1-UT, LLC,
ECM-BG2-ST AUGUSTINE, FL-1-UT, LLC,
ECM-BG2-LAKE CITY, FL-1-UT, LLC,
ECM-BG2-YULEE, FL-1-UT, LLC,
ECM-BG2-ORMOND BEACH, FL-1-UT, LLC,
Utah limited liability companies, and
PALM HOLDING REALTY LLC, a Florida
limited liability company,

       Counterclaim Defendants.

_____/

## FIRST COAST ENERGY'S ANSWER,
## AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant First Coast Energy, L.L.P. ("First Coast") serves its Answer and Affirmative Defenses to the Complaint [D.E. 1] filed by plaintiff Boca Gas Company Holdings 2, LLC ("Boca") as follows:

### THE PARTIES

1.     Admitted that the complaint purports to state claims for declaratory and injunctive relief under the Petroleum Marketing Practices Act ("PMPA") and a state law claim for tortious interference. Otherwise denied.

2.     Admitted.

3.     Admitted.

### JURISDICTION AND VENUE

4.     Admitted.

5.     Admitted that this Court has subject-matter jurisdiction. Otherwise denied.

6.     Admitted that venue is proper. Otherwise denied.

### GENERAL ALLEGATIONS

7.     Admitted that the parties entered into the Fuel Supply Agreement effective on November 22, 2019. Otherwise denied.

8.     Denied. The Fuel Supply Agreement applied to only three locations: 852396 U.S. Highway 17 North, Yulee, Florida 32097; 4524 Forest Hill Boulevard, West Palm Beach, Florida 33415; and 2801 Pembroke Road, Hollywood, Florida

33020. [D.E. 1-2 at 1]. The FSA was terminated as to the Yulee Location and the West Palm Beach Location by an Amendment to Fuel Supply Agreement executed by Boca and First Coast on August 25, 2020. First Coast and Boca executed a Dealer Supply Agreement as to the Yulee Location on August 19, 2020 and a Dealer Supply Agreement as to the West Palm Beach Location on August 25, 2020. Thereafter, the only remaining Location governed by the FSA was the Pembroke Location, until the FSA's termination by First Coast on March 16, 2023. Admitted that the other locations referenced, but not defined, in the complaint are governed by separate Dealer Supply Agreements, all of which were terminated by First Coast on March 16, 2023.

9.     Denied.

10.     Denied. The FSA was terminated on March 16, 2023.

11.     Admitted.

12.     Admitted that a small excerpt of 15 U.S.C. § 2804 is quoted correctly. Otherwise denied, and specifically denied that no exception to the 90-day rule applies. Pursuant to 15 U.S.C. § 2802(b)(2)(A) and (C), First Coast was authorized to terminate the franchise based on Boca's failure to pay First Coast $2,730,968.84 by March 1, 2023 as required by the agreements between the parties [*see* D.E. 1-3 at 2]. This multi-million monetary default satisfies the PMPA's requirements for termination of a franchise on less than 90 days' notice.

13.     Denied. The supply agreements required Boca to purchase a minimum amount of fuel at each location every year and provided for liquidated

damages if Boca failed to meet its minimum fuel purchase requirement (the "Shortfall Obligation"). Boca failed to meet its minimum fuel purchase requirements in 2020 and 2021, thereby resulting in a Shortfall Obligation that Boca did not pay. Accordingly, Boca failed to pay First Coast for fuel Boca was required to—but did not—purchase from First Coast.

14.    Denied. The supply agreements required Boca to purchase a minimum amount of fuel at each location every year or pay the Shortfall Obligation. Boca failed to meet its minimum fuel purchase requirements in 2020 and 2021, thereby resulting in a Shortfall Obligation that Boca did not pay. Accordingly, Boca failed to pay First Coast for fuel Boca was required to—but did not—purchase from First Coast.

15.    Admitted.

16.    Admitted.

17.    Admitted that First Coast provided Boca with less than 90 days' notice of the termination of the franchise and ceased providing fuel to Boca beginning on March 17, 2023. Otherwise denied.

18.    Denied.

19.    Denied.

20.    Denied.

21.    Admitted that ISTE, Inc. filed the motion attached to the complaint as Exhibit C. The motion was granted by the court, which directed First Coast to begin

delivering fuel to ISTE. A copy of the court's First Coast has complied with the court's order. Otherwise denied.

22.    Admitted.

23.    Admitted that ISTE sought a preliminary injunction permitting First Coast to sell fuel directly to ISTE, which the court granted. Otherwise denied.

24.    First Coast lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 24.

25.    Admitted.

26.    First Coast lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 26.

## COUNT I – DECLARATORY JUDGMENT ACTION

First Coast incorporates by reference its responses to paragraphs 1 through 26 above.

27.    Denied.

28.    Denied.

29.    Denied.

30.    Admitted that Boca alleges the existence of a controversy but denied that Boca has demonstrated the existence of sufficiently serious questions on the merits that justify the requested relief.

31.    First Coast lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 31.

32.    Denied.

## COUNT II – TORTIOUS INTERFERENCE

First Coast incorporates by reference its responses to paragraphs 1 through 26 above.

33.    First Coast lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 33.

34.    First Coast lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 34.

35.    Denied.

36.    Denied. First Coast was named as a defendant in the civil action brought by ISTE, Inc. against Boca. ISTE sought—and the court entered—an injunction compelling First Coast to supply ISTE with fuel at the Pembroke Location. First Coast is complying with the court's order.

37.    Denied.

WHEREFORE, First Coast denies any allegation in the complaint not specifically admitted above, denies all liability, and denies that Boca is entitled to any relief whatsoever. Consequently, First Coast respectfully requests entry of judgment in its favor and against Boca on each count of the complaint, and award First Coast its attorneys' fees and costs in this action.

## AFFIRMATIVE DEFENSES

First Coast asserts the following affirmative defenses to the complaint, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how they are characterized in this answer. In

addition to the below affirmative defenses, First Coast specifically reserves all rights to allege additional affirmative defenses that become known through the course of discovery.

## FIRST AFFIRMATIVE DEFENSE

First Coast's termination of its franchise relationship with Boca did not violate the PMPA. First, Boca materially breached the supply agreements by failing to pay all amounts due in a timely matter, including: (1) $1,202,441.47 in deposits required to be made under the supply agreements; and (2) $1,528,527.37 in principal and interest payments owed pursuant to a promissory note [*see* D.E. 1-3 at 2]. Each of these constitutes: an independent failure by a franchisee to comply with a reasonable provision that is of material significance to the franchise relationship under 15 U.S.C. § 2802(b)(2)(A); and the occurrence of an event which is relevant to the franchise relationship under § 2802(b)(2)(C). Second, it was reasonable for First Coast to provide less than 90 days' notice under § 2804(b)(1)(A) because the reasons set forth above are sufficiently exigent to justify termination on less than 90 days' notice. *See Loomis v. Gulf Oil Corporation*, 567 F.Supp. 591, 597 (M.D.Fla. 1983); *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509 (6th Cir. 1989).

First Coast notified Boca of its monetary breaches by certified letter dated March 2, 2023, warning Boca that these multimillion-dollar defaults would justify First Coast's immediate termination of the franchise under PMPA. Boca did not pay all amounts due and told First Coast it was unable to do so. It is unreasonable

7

to require First Coast to continue doing business with a franchisee based on the magnitude of these monetary defaults and stated inability to pay its debts. Accordingly, First Coast terminated the franchise relationship on March 16, 2023.

First Coast incorporates by reference its Response in Opposition to Boca's Emergency Motion for Preliminary Injunction [D.E. 17] and the accompanying declarations of Jennifer Behunin [D.E. 18], Al Jackson [D.E. 19], and Keith Daw [D.E. 20].

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs have failed to demonstrate the existence of sufficiently serious questions on the merits to justify the relief requested in the complaint.

## THIRD AFFIRMATIVE DEFENSE

First Coast did not interfere with the business or contractual relationships between Boca and its operators because First Coast's actions are protected by Florida's protection privilege. First Coast did not employ any improper means by agreeing to deliver fuel to one of Boca's operators, ISTE, in accordance with an injunction order issued by a circuit court in Broward County directing First Coast to do so. First Coast was acting to protect its ongoing financial and business interests, and its compliance with the court's injunction order cannot constitute improper means as a matter of law. *See Weisman v. Southern Wine & Spirits of America, Inc.,* 297 So. 3d 646, 651 (Fla. 4th DCA 2020) (affirming summary judgment of intentional interference claim based on Florida's protection privilege where the defendant was accused of "doing no more than insist upon existent legal

rights in a permissive way.") (citing *Horizons Rehabilitation, Inc. v. Health Care and Retirement Corp.*, 810 So. 2d 958, 964 (Fla. 5th DCA 2002). Here, First Coast would have been subjected to civil contempt proceedings if it refused to comply with the court's injunction. First Coast cannot be subjected to civil liability for complying with a court order.

## FOURTH AFFIRMATIVE DEFENSE

First Coast has learned that Boca has begun purchasing fuel from another supplier in violation of the supply agreements and the Declarations of Fuel Supply Restrictions recorded in the public records of the counties where Boca's gas stations are located. Upon information and belief, Boca has begun distributing adulterated and misbranded fuel at these locations in violation of the supply agreements, the Declarations, and Florida law. This is an additional basis justifying immediate termination of the franchise relationship. First Coast incorporates by reference its Response in Opposition to Boca's Emergency Motion for Preliminary Injunction [D.E. 17] and the accompanying declarations of Jennifer Behunin [D.E. 18], Al Jackson [D.E. 19], and Keith Daw [D.E. 20].

## FIFTH AFFIRMATIVE DEFENSE

Boca breached the supply agreements and note by failing to pay all amounts that were due in March 2022. As a result of Boca's 2022 defaults, the parties entered into a Forbearance and Note Modification Agreement on March 11, 2022. Pursuant to the Forbearance Agreement, Boca: (1) acknowledged the validity and enforceability of the supply agreements and note; (2) acknowledged it had

breached the supply agreements and note by failing to make all payments due; (3) acknowledged the defaults were "a material adverse event in the borrowing relationship" with First Coast; (4) acknowledged that First Coast "is entitled to exercise all rights and remedies available to it" under the supply agreements and note; (5) acknowledged and agreed that Boca's failure or refusal to pay all amounts owed by March 1, 2023 constitutes a default under the supply agreements and note entitling First Coast "to exercise any and all rights and remedies" under the supply agreements, the note, and applicable law; and (6) waived and released "any and all claims, actions, causes of action, suits, proceedings, defenses, counterclaims, contracts, judgments, damages, accounts, reckonings, executions, and liabilities whatsoever of every name and nature … relating to or arising out of any of the Supply Documents and the Loan Documents, or the enforcement of any of First Coast's rights or remedies under the Supply Documents and the Loan Documents."

Accordingly, Boca has waived any defenses with respect to the enforcement of the note and supply agreements, including First Coast's right to terminate the supply agreements on less than 90 days' notice.

## **COUNTERCLAIM**

First Coast Energy, L.L.P. ("First Coast") sues Boca Gas Company Holdings 2, LLC ("Boca"), Abbas Jaferi, Ali Jaferi, Ather Jaferi, Hani Baskaron, and Salpie Baskaron, individuals, and ECM-BG2-Jacksonville, FL-1-UT, LLC, ECM-BG2-Jacksonville, FL-2-UT, LLC, ECM-BG2-Jacksonville, FL-3-UT, LLC, ECM-BG2-Jacksonville, FL-4-UT, LLC, ECM-BG2-Jacksonville, FL-5-UT, LLC, ECM-BG2-

Jacksonville, FL-6-UT, LLC, ECM-BG2-Jacksonville, FL-7-UT, LLC, ECM-BG2-Orange Park, Fl-1-UT, LLC, ECM-BG2-St Augustine, FL-1-UT, LLC, ECM-BG2-Lake City, FL-1-UT, LLC, ECM-BG2-Yulee, FL-1-UT, LLC, ECM-BG2-Ormond Beach, FL-1-UT, LLC, Utah limited liability companies (collectively, the "Embree Entities"), and Palm Holding Realty LLC, a Florida limited liability company, and alleges:

## PARTIES AND JURISDICTION

1.      First Coast is a Colorado limited liability partnership with its principal place of business in Duval County, Florida. First Coast is registered with the Florida Secretary of State and is authorized to conduct business in Florida.

2.      Boca is a Florida limited liability company that owns and operates convenience stores and gas stations in Florida. Boca and First Coast entered into various agreements pursuant to which First Coast sold fuel products to Boca for retail sale at 28 locations in Florida.

3.      Abbas Jaferi, Ali Jaferi, and Ather Jaferi are residents of Palm Beach County, Florida who entered into a Guaranty Agreement with First Coast that required payments to be made and other performance to occur in Duval County, Florida.

4.      Hani Baskaron and Salpie Baskaron are residents of Riverside County, California who entered into a Guaranty Agreement with First Coast that required payments to be made and other performance to occur in Duval County,

Florida. Collectively, Abbas Jaferi, Ali Jaferi, Ather Jaferi, Hani Baskaron, and Salpie Baskaron are referred to as the "Guarantors."

5.     ECM-BG2-Jacksonville, FL-1-UT, LLC is a Utah limited liability company that owns property located at 10716 Atlantic Boulevard, Jacksonville, Duval County, Florida.

6.     ECM-BG2-Jacksonville, FL-2-UT, LLC is a Utah limited liability company that owns property located at 11330 Beach Boulevard, Jacksonville, Duval County, Florida.

7.     ECM-BG2-Jacksonville, FL-3-UT, LLC is a Utah limited liability company that owns property located at 1120 Atlantic Boulevard, Jacksonville, Duval County, Florida.

8.     ECM-BG2-Jacksonville, FL-4-UT, LLC is a Utah limited liability company that owns property located at 6010 Moncrief Road, Jacksonville, Duval County, Florida.

9.     ECM-BG2-Jacksonville, FL-5-UT, LLC is a Utah limited liability company that owns property located at 7752 Lem Turner Road, Jacksonville, Duval County, Florida.

10.     ECM-BG2-Jacksonville, FL-6-UT, LLC is a Utah limited liability company that owns property located at 3020 North Main Street, Jacksonville, Duval County, Florida.

11.    ECM-BG2-Jacksonville, FL-7-UT, LLC is a Utah limited liability company that owns property located at 430 West 8th Street, Jacksonville, Duval County, Florida.

12.    ECM-BG2-Orange Park, FL-1-UT, LLC is a Utah limited liability company that owns property located at 11 Blanding Boulevard, Orange Park, Clay County, Florida.

13.    ECM-BG2-St Augustine, FL-1-UT, LLC is a Utah limited liability company that owns property located at 120 Center Place Way, St. Augustine, St. Johns County, Florida.

14.    ECM-BG2-Lake City, FL-1-UT, LLC is a Utah limited liability company that owns property located at 3317 West U.S. Highway 90, Lake City, Columbia County, Florida.

15.    ECM-BG2-Yulee, FL-1-UT, LLC is a Utah limited liability company that owns property located at 8253 U.S. Highway 17 North, Yulee, Nassau County, Florida.

16.    ECM-BG2-Ormond Beach, FL-1-UT, LLC is a Utah limited liability company that owns property located at 201 West Granada Boulevard, Ormond Beach, Volusia County, Florida.

17.    Palm Holding Realty LLC is a Florida limited liability company that owns property located at 320 Palm Coast Parkway, Palm Coast, Flagler County, Florida.

18.    This court has jurisdiction because each of the defendants (a) operates, conducts, engages in, or carries on a business or business venture in this state or has an office or agency in this state, (b) breached a contract in this state by failing to perform acts required by the contract to be performed in this state, (c) owns, uses, or possesses real property within this state, or (d) is engaged in substantial and not isolated activity in Florida.

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because a substantial portion of this action arises out of 28 U.S.C. §2201 and pertains to questions involving the PMPA. Moreover, jurisdiction over the state law claims in this action is proper under 28 U.S.C. §1367 because the claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

20.    Venue is proper because the Supply Agreements, Supplemental Agreements, Note, Guaranties, and Declarations that are the subject of this action provide that venue for this action is proper in this judicial district.

## FACTUAL ALLEGATIONS

21.    First Coast is in the convenience store business. It owns and operates retail convenience stores throughout the state, including through its DAILY'S brand. It also operates a wholesale business through which it serves as a marketer of high-quality petroleum products that it distributes to petroleum retailers in Florida.

22.    In 2019, First Coast began marketing a portfolio of its retail stores for sale, located at the following addresses:

| Store | Address |
|-------|---------|
| 7137 | 3850 Newberry Road, Gainesville, FL |
| 7138 | 3831 NW 13th Street, Gainesville, FL |
| 7140 | 3330 SW Archer Road, Gainesville, FL |
| 7141 | 11 Blanding Boulevard, Orange Park, FL |
| 7142 | 3317 West U.S. 90, Lake City, FL |
| 7143 | 10716 Atlantic Boulevard, Jacksonville, FL |
| 7144 | 11330 Beach Boulevard, Jacksonville, FL |
| 7145 | 430 West 8th Street, Jacksonville, FL |
| 7146 | 1120 Atlantic Boulevard, Jacksonville, FL |
| 7147 | 6010 Moncrief Road, Jacksonville, FL |
| 7148 | 7752 Lem Turner Road, Jacksonville, FL |
| 7149 | 3020 North Main Street, Jacksonville, FL |
| 7150 | 320 Palm Coast Parkway, Palm Coast, FL |
| 7151* | 8523 Highway 17 North, Yulee, FL |
| 7152 | 120 Center Place Way, St. Augustine, FL |
| 7153 | 201 West Granada Boulevard, Ormond Beach, FL |
| 7715 | 5980 Okeechobee Road, West Palm Beach, FL |
| 7716 | 1301 Hypoluxo Road, Lantana, FL |
| 7717 | 7290 Central Industrial Boulevard, Riviera Beach, FL |
| 7718* | 4524 Forest Hill Boulevard, West Palm Beach, FL |
| 7830 | 890 NW 50th Street, Ft. Lauderdale, FL |
| 7831 | 4701 West Sunrise Boulevard, Plantation, FL |
| 7832 | 5001 North State Road 7, Tamarac, FL |
| 7833 | 2090 W. Oakland Park Boulevard, Ft. Lauderdale, FL |
| 7834 | 1901 NW 40th Avenue, Lauderhill, FL |
| 7835 | 301 East Sample Road, Deerfield Beach, FL |

| 7836  | 815 North Federal Highway, Hollywood, FL |
| 7837* | 2801 Pembroke Road, Hollywood, FL |

Each of the properties may be referred to as a "Facility," and collectively as the "Facilities."

23.    Boca expressed interest in the portfolio and the parties began negotiating the terms of a potential sale. Ultimately, the parties reached an agreement on the terms of a sale transaction.

## I.    First Coast and Boca enter into a number of agreements in connection with the sale of the Facilities.

24.    To accommodate Boca's ability to close on a deal of this size and complexity, including its ability to secure financing to fund the acquisition, the sale was split into two transactions, each governed by a separate purchase and sale agreement. The first transaction related to 17 Facilities and closed on November 26, 2019. The second related to 11 Facilities and closed on February 11, 2020. Copies of the purchase and sale agreements are attached to this Counterclaim as **Exhibits 1-2**.

25.    The parties entered into a number of agreements in connection with these transactions, which are described in greater detail below.

### A.    The Supply Agreements

26.    As consideration for the sale of the Facilities, First Coast and Boca entered into 25 Dealer Supply Agreements and one Fuel Supply Agreement for the supply of fuel at the Facilities. The Fuel Supply Agreement related to Stores 7151,

7718, and 7837, but was later amended to remove Stores 7151 and 7718, and the parties entered into Dealer Supply Agreements for those locations.

27.    At the time the franchise was terminated, the operative supply agreements were therefore one Fuel Supply Agreement (relating to Store 7837) and 27 Dealer Supply Agreements (relating to the remaining facilities). Collectively, these 28 documents are referred to as the "Supply Agreements." Copies of the Supply Agreements are attached to the Declaration of Keith Daw as Exhibits 1-28 [D.E. 21-1 through 21-10, 22-1 through 22-10, and 24-1 through 24-8].

28.    By their execution of the Supply Agreements, First Coast and Boca established a franchise relationship pursuant to the PMPA. The Supply Agreements incorporated by reference the grounds for terminating the franchise relationship set forth in Section 2802 of the PMPA.

29.    The Supply Agreements[1] required Boca to post a deposit of $1,599,999.52 to secure the timely payment of all amounts due. This deposit was divided into two equal installments: an initial cash deposit of $799,999.76 was due on the effective date of the Supply Agreements and a second deposit of equal amount was due two years after their effective dates. 17 of the second installment deposits were therefore due in November 2021, and 11 were due in February 2022.

30.    The Supply Agreements permitted First Coast to satisfy any amounts outstanding under those agreements by applying the deposit. In the event the

---

[1] This requirement is found in Section 12 of the Dealer Supply Agreements and Section 9 of the Fuel Supply Agreement.

deposit was reduced by First Coast's application of deposited funds to cover amounts due, Boca was required to replenish the deposit such that it remained fully funded at $1,599,999.52.

31.    The Supply Agreements[2] also required Boca to purchase from First Coast a minimum quantity of motor fuels at each Facility each year. The minimum required volume is different for each Facility and is established based on a percentage of First Coast's historical gallonage sales at each Facility.

32.    If Boca failed to meet its minimum purchase obligation in a given year, upon written demand Boca was required to pay First Coast liquidated damages calculated as four cents for each gallon less than the minimum volume requirement at each Facility (the "Shortfall Obligation").

33.    The Supply Agreements also required that the tanks, pumps, and other storage and dispensing equipment, and all of First Coast's—and First Coast's suppliers'—trademarks, names, and colors, were to be used solely for dispensing fuel supplied by First Coast.

**B.    The Supplemental Agreements**

34.    First Coast and Boca entered into 28 Supplemental Agreements (the "Supplemental Agreements"). By its execution of the Supplemental Agreements, Boca acknowledged and confirmed a present and existing indebtedness to First

---

[2] This requirement is found in Section 9 of the Dealer Supply Agreements and Section 6 of the Fuel Supply Agreement.

Coast in the total amount of $26,500,000.00. Copies of the Supplemental Agreements are attached to this Counterclaim as **Exhibits 3-30**.

35.    This debt served as additional consideration for the sale and was intended as a financing mechanism to reduce the amount of cash required by Boca to purchase the Facilities. First Coast paid documentary stamp taxes on the debt evidenced by the Supplemental Agreements.

36.    The debt was designed to be amortized over the life of the franchise during years six through twenty of the Supply Agreements. Beginning in year six, each month the Supplemental Amount for each Facility would be reduced by a prorated amount of 1/180 of the initial Supplemental Amount, provided that the Supply Agreements remained in effect. If the Supply Agreements were terminated, Boca would owe the unamortized amount of the debt as of the date of termination. If the Supply Agreements were terminated before year six, Boca would owe the full initial Supplemental Amount.

### C.    The Declarations of Fuel Supply Restriction

37.    The sale transactions also contemplated that First Coast would execute a Declaration of Fuel Supply Restriction that restricted the use of the Facilities so that for a period of 10 years after the sale of the Facilities, if fuel was sold at any of the Facilities it must be purchased from First Coast (the "Declarations").

38.    The Declarations provided First Coast with the exclusive right to supply fuel to the Facilities, regardless of who owned or operated them.[3] Boca and the Embree Entities executed the Declarations to evidence their agreement to be bound by their terms.

39.    First Coast recorded the Declarations in the public records of each county in which a Facility was located. The Declarations run with the land and are binding on First Coast, Boca, the Embree entities, their successors in title, and all persons or entities occupying or operating any of the properties. Copies of the Declarations relating to the Facilities located in this judicial district are attached to the Declaration of Keith Daw as Exhibits 29-56 [D.E. 23-1 through 23-10, 24-9 through 24-10, 25-1 through 25-10, and 26-1 through 26-6].

**D.    The Promissory Note**

40.    First Coast also agreed to accept a promissory note as partial consideration for the sale. Accordingly, on February 11, 2020, Boca made and executed a Promissory Note that it delivered to First Coast in the original principal amount of $2,000,000.00 (the "Note"). A copy of the Note is attached to the Declaration of Keith Daw as Exhibit 57 [D.E. 26-7].

---

[3] This was important because the parties understood that Boca would be immediately selling all 28 properties to special purpose entities affiliated with The Embree Group, including the Embree Entities. As part of its sale transactions with the Embree Entities, Boca leased back the facilities, which it then subleased to other entities to operate. Boca's only role in the operation of the facilities was as a middleman for the fuel purchased from First Coast and supplied to the facilities, for which Boca charged the operators.

41.    The Note required that Boca make monthly payments of principal and interest, with a balloon payment due on the initial maturity date of March 1, 2022.

### E.    The Personal Guaranties

42.    The Supply Agreements, the Supplemental Agreements, and the Note were secured by 27 Personal Guaranties (the "Guaranties") executed by Abbas Jaferi, Ali Jaferi, Ather Jaferi, Hani Baskaron, and Salpie Baskaron (the "Guarantors"). Pursuant to the Guaranties, each of the Guarantors personally guaranteed Boca's payment and performance under the Supply Agreements, the Supplemental Agreements, and the Note. Copies of the Guaranties are attached as **Exhibits 31-57**.

## II.    Boca breaches the agreements in March 2022 by failing to make required payments.

43.    The second deposit installments under the Supply Agreements became due in November 2021 and March 2022, but Boca failed to make the required payments totaling $799,999.76.

44.    First Coast had also applied part of the initial deposit to cover amounts owed by Boca, but Boca failed to replenish the deposit after it was depleted.

45.    On March 1, 2022, the Note matured and became fully due and owing. Boca failed to make the balloon payment due on March 1.

46.    Accordingly, by March 2, 2022 Boca had materially breached the Note and Supply Agreements and was facing the potential termination of its franchise.

47.     To avoid termination, the parties began negotiating a potential resolution of these defaults. These negotiations culminated in the execution of a Forbearance and Promissory Note Modification Agreement on March 11, 2022 (the "Forbearance Agreement"). A copy of the Forbearance Agreement is attached to the Declaration of Keith Daw as Exhibit 58 [D.E. 26-8].

48.     In exchange for First Coast's agreement to forbear from pursuing its contractual rights, the defendants acknowledged that the defaults had occurred and were ongoing; the outstanding amounts were validly due and owing; and that the defendants had no offset, defense, deduction, claim, or counterclaim with respect to the Supply Agreements, the Supplemental Agreements, or the Note. In short, the Forbearance Agreement established that the parties' agreements had been breached and were valid and enforceable against the defendants.

49.     The defendants agreed to pay $30,000 per month to reduce the balance due under the Note. The parties also agreed to extend the Note's maturity date to March 1, 2023, by which all outstanding amounts would be due.

50.     The defendants also agreed to fully fund the total amount of the security deposits under the Supply Agreements by March 1, 2023.

51.     If the defendants failed to get current on their monetary obligations by the Forbearance Agreement's termination date of March 1, 2023, First Coast would be entitled to pursue all remedies available under the agreements. Boca therefore had a year's notice that it would face significant consequences, including

the termination of its franchise, if it failed to make the payments required by the parties' agreements.

### III.   Boca breaches the agreements again in March 2023 by failing to make required payments.

52.   Unfortunately, Boca's pattern of failing to meet its monetary obligations to First Coast continued. Boca again breached the Supply Agreements and the Note by failing to pay all amounts due by March 1, 2023 (the maturity date as extended by the Forbearance Agreement). Specifically, Boca failed to make the deposit required by the Supply Agreements and failed to pay the outstanding principal and interest under the Note.

53.   As of March 1, 2023, Boca owed $1,202,441.47 in unpaid deposits under the Supply Agreements and $1,528,527.37 in principal and interest under the Note.

54.   On March 2, 2023, First Coast sent Boca a letter notifying Boca of the defaults and demanding immediate payment. First Coast's notice stated that "Boca's failure to pay all amounts due under the Supply Agreements and the Note when due constitute separate events which are relevant to the franchise relationship and thus would for a reasonable basis to justify the Supply Agreements' immediate termination under Section 2802 of the Petroleum Marketing Practices Act ("PMPA")." First Coast demanded immediate payment of all outstanding amounts "to avoid termination of the franchise relationship."

55.     Nevertheless, Boca failed to respond to First Coast's default notice or
to pay the amounts it owed to First Coast. Accordingly, on March 16, 2023 First
Coast sent Boca a notice of termination that the franchise would be terminated at
11:59 p.m. that evening. The two bases provided in the termination notice were
Boca's failure to make required deposits under the Supply Agreements and its
failure to pay all amounts due under the Note. A copy of First Coast's notice of
termination is attached to the Declaration of Keith Daw as Exhibit 61 [D.E. 26-11].

56.     First Coast's termination of the Supply Agreements triggers Boca's
obligation of Boca to pay liquidated damages (the "Shortfall Obligation"). As of
March 16, 2032, the Shortfall Obligation was $19,348,040.44.

57.     First Coast's termination of the Supply Agreements is an event that
triggers Boca's obligation to pay the unamortized balance of the Supplemental
Agreements. Because Boca's franchise did not reach the amortization period, that
amount is $26,500,000.00.

58.     As of March 2, 2023, the deposit held by First Coast had been reduced
to $398,558.05.

59.     As a result of Boca's material breaches of its agreements with First Coast and the resulting termination of the franchise relationship, Boca owes First Coast the total amount of $46,978,009.76, calculated as follows:

| | |
|---|---:|
| Supply Agreements (Shortfall Obligation) | $19,348,040.44 |
| Promissory Note | $1,528,527.37 |
| Supplemental Agreements | $26,500,000.00 |
| Subtotal | $47,376,567.81 |
| Less Application of Deposit | ($398,558.05) |
| **Total** | **$46,978,009.76** |

This amount is exclusive of any attorneys' fees and costs that may be incurred by First Coast, which are also recoverable under the Supply Agreements, Note, Forbearance Agreement, Guaranties, and Declarations.

## IV.    Boca defies its contractual obligations and Florida law by selling misbranded fuel at the Facilities.

60.     Following the termination of the franchise, First Coast discontinued fuel deliveries to the Facilities. In response, Boca immediately began purchasing, adulterating, and selling misbranded fuel.

61.     First Coast learned about this on March 20, 2023, when First Coast's fuel management system identified that Boca had received deliveries of 26,000 gallons of fuel at six locations that First Coast did not supply. After First Coast notified Boca that it was aware of Boca's misbranding, Boca disabled First Coast's remote monitoring equipment at the Facilities.

62.     On March 23, 2023, Boca's COO Ali Jaferi notified First Coast that Boca would "resume our own supply" at the Facilities that day, meaning that Boca

would begin supplying the Facilities with fuel purchased from a supplier other than First Coast.

63.    Thereafter, First Coast performed visual inspections of the Facilities and confirmed that Boca was: (a) selling fuel not purchased from First Coast at the Facilities, and (b) continuing to use Shell trademarks (V-Power, Nitro), colors, and names to sell adulterated and misbranded gasoline. First Coast documented Boca's misbranding through photographs taken during these inspections.

64.    On March 27, 2023, Tropic Oil, another fuel supplier, confirmed to First Coast that it had delivered fuel to some of the Facilities operated by Boca and subject to the Supply Agreements and Declarations between March 23-27, 2023 in response to orders placed by Boca. Tropic Oil was unaware of the existence of the Declarations at the time it made these deliveries.

65.    The same day, Boca's Controller Robbie Panter and its outside counsel Mark Roher advised at least one of Boca's operators that it was "switching brand" and had "obtain[ed] a new fuel supplier (Exxon)" at "all of Boca Gas 2['s] locations."

66.    First Coast retained independent fuel authentication firm Authentix, Inc. to perform sampling and testing of the fuel being sold at the facilities. Authentix confirmed that the fuel being sold at Boca's locations was not Shell-branded fuel supplied by First Coast.

67.     Boca's ongoing sale of fuel at these locations is creating confusion with First Coast's retail and wholesale customers. First Coast has received customer complaints of confusion resulting from Boca's ongoing sale of non-First Coast supplied fuel at its Broward County locations. For example, on April 7, 2023, a customer complained that her Shell credit would no longer work to purchase fuel from the one of the facilities operated by Boca in Broward County, Florida.

68.     On April 8, 2023, a carrier delivered Marathon-branded fuel ordered by Boca to a non-Boca-operated site supplied by First Coast located at 4701 West Sample Road, Coconut Creek, Florida. The carrier mistakenly delivered this fuel to the wrong location, likely intending to deliver it to the Boca-operated locations at either 4701 West Sunrise Boulevard, Plantation (having the same street number) or 301 NE Sample Road, Pompano Beach (same street name). This was the carrier's mistake but was caused by Boca's ongoing misbranding efforts. This location had to be temporarily shut down so that the misbranded fuel could be removed from the location's underground storage tank.

69.     Selling misbranded fuel in Florida is a crime pursuant to FLA. STAT. §§ 526.01(5) and 526.11.

70.     This is an action brought by First Coast for injunctive relief and damages.

71.     All conditions precedent to this action have been performed, have been waived, or have occurred.

## COUNT I
## <u>BREACH OF CONTRACT – SUPPLY AGREEMENTS</u>

72.    First Coast incorporates by reference the allegations of paragraphs 1 through 71 above.

73.    First Coast and Boca entered into the Supply Agreements.

74.    Boca materially breached the Supply Agreements by failing to pay all amounts due in a timely manner.

75.    First Coast has suffered damages as a direct result of Boca's breaches of the Supply Agreements.

WHEREFORE, First Coast demands judgment against Boca Gas Company Holdings 2, LLC for damages, interest, attorneys' fees, and costs.

## COUNT II
## <u>BREACH OF CONTRACT – SUPPLEMENTAL AGREEMENTS</u>

76.    First Coast incorporates by reference the allegations of paragraphs 1 through 71 above.

77.    First Coast and Boca entered into the Supplemental Agreements.

78.    Boca materially breached the Supplemental Agreements by failing to pay all amounts due in a timely manner.

79.    First Coast has suffered damages as a direct result of Boca's breaches of the Supplemental Agreements.

WHEREFORE, First Coast demands judgment against Boca Gas Company Holdings 2, LLC for damages, interest, attorneys' fees, and costs.

**COUNT III**
**BREACH OF CONTRACT – PROMISSORY NOTE**

80.    First Coast incorporates by reference the allegations of paragraphs 1 through 71 above.

81.    Boca made and executed the Note and delivered it to First Coast.

82.    First Coast is the owner and holder of the Note.

83.    Boca materially breached the Note by failing to pay all amounts due in a timely manner.

84.    First Coast has suffered damages as a direct result of Boca's breach of the Note.

WHEREFORE, First Coast demands judgment against Boca Gas Company Holdings 2, LLC for damages, interest, default interest, attorneys' fees, and costs.

**COUNT IV**
**BREACH OF CONTRACT – PERSONAL GUARANTIES**

85.    First Coast incorporates by reference the allegations contained in paragraphs 1 through 71 above.

86.    The Guarantors executed the Personal Guaranties.

87.    The Guarantors materially breached the Guaranties by failing to pay all amounts due to First Coast under the Supply Agreements, the Supplemental Agreements, the Forbearance Agreement, and the Note in a timely manner.

88.    First Coast has suffered damages as a direct result of the Guarantors' breaches of the Guaranties.

WHEREFORE, First Coast Energy, L.L.P. demands judgment against Abbas Jaferi, Ali Jaferi, Ather Jaferi, Hani Baskaron, and Salpie Baskaron for damages, interest, default interest, attorneys' fees, and costs.

## COUNT V
## BREACH OF CONTRACT – FORBEARANCE AGREEMENT

89.    First Coast incorporates by reference the allegations of paragraphs 1 through 71 above.

90.    The parties entered into the Forbearance Agreement.

91.    Boca materially breached the Forbearance Agreement by failing to pay all amounts due under the Supply Agreements and Note in a timely manner.

92.    First Coast has suffered damages as a direct result of Boca's breach of the Forbearance Agreement.

WHEREFORE, First Coast demands judgment against Boca Gas Company Holdings 2, LLC, for damages, interest, attorneys' fees, and costs.

## COUNT VI
## BREACH OF CONTRACT –
## DECLARATION OF FUEL SUPPLY RESTRICTION

93.    First Coast incorporates by reference the allegations of paragraphs 1 through 71 above.

94.    This count relates specifically to the properties located at the following addresses:

a.  10716 Atlantic Boulevard, Jacksonville, FL

b.  11330 Beach Boulevard, Jacksonville, FL

     c.  430 West 8th Street, Jacksonville, FL

     d.  1120 Atlantic Boulevard, Jacksonville, FL

     e.  6010 Moncrief Road, Jacksonville, FL

     f.  7752 Lem Turner Road, Jacksonville, FL

     g.  3020 North Main Street, Jacksonville, FL

     h.  11 Blanding Boulevard, Orange Park, FL

     i.  3317 West U.S. 90, Lake City, FL

     j.  320 Palm Coast Parkway, Palm Coast, FL

     k.  8523 Highway 17 North, Yulee, FL

     l.  120 Center Place Way, St. Augustine, FL

     m. 201 West Granada Boulevard, Ormond Beach, FL

95.    While it owned the above-referenced Facilities, First Coast executed and recorded the Declarations in the public records of the counties in which the Facilities were located.

96.    The Declarations imposed the following use restrictions on each of the above-referenced Facilities:

described in Exhibit A to this Declaration (the "Property"). First Coast hereby restricts the use of the Property and all portions of the Property so that through and until November 30, 2029, if any gasoline or other vehicular motor fuel is stored, advertised or sold at, on, or from the Property, such gasoline or motor fuel must be purchased from or through First Coast pursuant to supply agreements in the form or forms required by First Coast (the "Supply Agreements"). After November 30, 2029, such restriction shall be void and of no further force and effect. The foregoing restriction shall run with the land and shall be binding upon First Coast, First Coast's successors in title, and all persons and entities occupying or operating the Property, or any portion thereof, for, under or through First Coast or its successor(s) in title.

97.    Boca executed the Declarations and acknowledged it would be bound by them.

98.    Boca has breached and/or stated its immediate intention to breach the Declarations' use restriction by purchasing fuel from other distributors for sale at the referenced Facilities.

99.    First Coast is likely to suffer irreparable harm if preliminary and permanent injunctions are not entered to prohibit Boca, the Embree Entities, their successors in title, and all persons or entities occupying or operating any of the properties from selling fuel purchased from any source other than First Coast until the expiration of the Declarations.

100.    The use restriction imposed by the Declarations is of such a special, unique, and extraordinary nature that any breach of the Declarations' terms would result in irreparable injury to First Coast, including but not limited to the interruption of customer behavior patterns, reduced customer experiences, and diminished brand perception:

> The use restriction imposed by this Declaration (including full compliance with the Supply Agreements) is of a special, unique and extraordinary character, and any breach of the terms of this Declaration will cause First Coast irreparable injury for which an adequate remedy at law is not available, including but not limited to the interruption of customer behavior patterns, reduced customer experiences, and diminished brand perception. Accordingly, First Coast shall be entitled to an injunction, restraining order or other equitable relief to prevent breaches of the provisions of this Declaration and to enforce specifically its terms and provisions in the state or federal courts located in the Florida county where the Property is located, which shall have exclusive jurisdiction of any claims relating to the enforcement of this Declaration. These rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to First Coast. In connection with any legal action or proceeding arising out of or relating to the breach of this Declaration, the prevailing party shall be entitled to recover its attorneys' fees and costs against the non-prevailing party.

32

101.    The use restriction set forth in the Declarations: (i) is not contrary to public policy or any law; and (ii) is clear and reasonable.

102.    By their execution of the Declarations, Boca and the Embree Entities agreed that First Coast is entitled to an injunction to prevent the breach of and to enforce the Declarations' terms.

103.    First Coast does not have any available adequate remedy at law.

104.    First Coast has a substantial likelihood of success on the merits.

105.    The threatened injury to First Coast outweighs any possible harm to Boca, the Embree Entities, their successors in title, and all persons or entities occupying or operating any of the properties.

106.    Granting the requested injunctive relief will serve the public interest by enforcing the right of property owners to control the development and use of property owned by them and by preventing the fraudulent and illegal sale of misbranded fuel.

107.    Pursuant to the Declarations, First Coast is entitled to recover its attorneys' fees and costs in bringing this action.

WHEREFORE, First Coast requests the Court to: (1) enter and injunction enforcing the terms of the Declaration by prohibiting any person or entity from selling fuel that was not purchased from or through First Coast at the Facilities until the expiration dates set forth in the Declarations; and (2) award First Coast its attorneys' fees and costs in bringing this action.

**COUNT VII**
**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF –**
**BRAND COVENANT IN DEALER SUPPLY AGREEMENTS**

108.    First Coast incorporates by reference the allegations contained in paragraphs 1 through 71 above.

109.    In the Supply Agreements, Boca agreed that all tanks, pumps, storage, and dispensing equipment shall be used exclusively for the storing, handling, dispensing, and advertising of products purchased from First Coast.

110.    Additionally, Boca agreed that all of the trademarks, names and colors of First Coast's—and all of First Coast's suppliers, *i.e.* Shell, Sunoco, and 76—shall only be used during the term of the Supply Agreements. Upon the termination of the Supply Agreements, Boca's right to use the trademarks, names, and colors expired and Boca became obligated to remove or paint out any such marks, names, and colors from each facility.

111.    If Boca has not fully de-branded the Facilities within 30 days of the date the Supply Agreements are terminated, First Coast has the right, and a license, to enter the properties and perform all necessary de-branding itself. In that event, Boca is obligated to reimburse First Coast for all of First Coast's expenses in doing so.

112.    Boca agreed that under no circumstances would it use First Coast's trademarks, names, or colors to identify, market, or sell any products not purchased from First Coast.

34

113.    First Coast is likely to suffer irreparable harm if preliminary and permanent injunctions are not entered to prohibit Boca and all persons or entities occupying or operating any of the properties from using any of First Coast's, or First Coast's suppliers'—trademarks, colors, or names in connection with the marketing or sale of fuel at any of these locations.

114.    Boca's right to use First Coast's—and First Coast's suppliers'—trademarks, colors, or names in connection with its business is reasonably limited to the term of the Supply Agreements. Upon the termination of the Supply Agreements, Boca's right to the continued use of these intellectual property rights was also terminated.

115.    The breach of the Supply Agreements' prohibition against Boca's right to the continued use of this intellectual property would cause irreparable injury to First Coast, including but not limited to the confusion of customers, interruption of customer behavior patterns, reduced customer experiences, and diminished brand perception.

116.    Moreover, the sale of misbranded fuel is a crime in Florida. FLA. STAT. §§ 526.01(5) and 526.11.

117.    Boca is purchasing and selling fuel from a competitor of First Coast in violation of Florida criminal law and the Supply Agreements.

118.    Granting the requested injunctive relief will serve the public interest by preventing Boca from deceiving the public, violating Florida law, committing criminal acts, and breaching its Supply Agreements with First Coast.

119.    First Coast does not have any available adequate remedy at law.

120.    First Coast has a substantial likelihood of success on the merits.

121.    First Coast is entitled to its attorneys' fees and costs in bringing this action under the Supply Agreements.

WHEREFORE, First Coast requests the Court to: (1) enter an injunction enforcing the terms of the Supply Agreements by requiring Boca to immediately de-brand all of the Facilities by removing and discontinuing the use of all trademarks, colors, and names of First Coast and First Coast's suppliers; and (2) award First Coast its attorneys' fees and costs in bringing this action.

## DEMAND FOR ATTORNEYS' FEES AND COSTS

Pursuant to 15 U.S.C. § 2805(d), Paragraph 22 of the Fuel Supply Agreement, Paragraph 27 of the Dealer Supply Agreements, Paragraph 18 of the Forbearance Agreement, the first unnumbered paragraph of the Guaranties, and the second unnumbered paragraph of the Declarations, First Coast is entitled to recover its attorneys' fees and costs in this action. First Coast has retained the undersigned law firm and is obligated to pay that firm's attorneys' fees and costs incurred in connection with this action. If First Coast is the prevailing party in this action, it is entitled to a judgment for First Coast's fees and costs.

NELSON MULLINS RILEY &
SCARBOROUGH LLP


By: /s/ Lee D. Wedekind, III

Lee D. Wedekind, III
Florida Bar No. 670588
John P. McDermott, Jr.
Florida Bar No. 1025565
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
lee.wedekind@nelsonmullins.com
john.mcdermott@nelsonmullins.com
allison.abbott@nelsonmullins.com

Attorneys for First Coast Energy, L.L.P.

4867-3764-8220