# EXHIBIT 2

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

# PURCHASE AND SALE AGREEMENT
## [For Continuing Petroleum Use]

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made as of the Effective Date (as defined below) by and between **FIRST COAST ENERGY, L.L.P.**, a Colorado limited liability partnership ("**Seller**"), and **BOCA GAS COMPANY HOLDINGS 2, LLC,** a Florida limited liability company, or its permitted assign ("**Buyer**").  As used in this Agreement the term "**Effective Date**" shall mean the date upon which the last Party to sign this Agreement executes the same.

In consideration of the mutual covenants and representations contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Buyer agree as follows:

## 1.
## PURCHASE AND SALE

1.1.    **Purchase and Sale of Assets**.    Subject to the terms and conditions of this Agreement, by their execution of this Agreement, Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following described property (collectively called the "**Property**" in this Agreement):

(a)    Land.  Fee simple title to those certain tracts or parcels of land (collectively, the "**Land**;" each parcel of Land, a "**Location**" and all parcels of Land, the "**Locations**") located in Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida, each parcel of Land being more particularly described on **Exhibits A-1 through A-23** attached to this Agreement and made a part of this Agreement (a list of the Locations is attached as **Exhibit A-24**);

(b)    Easements.  All of Seller's assignable and transferable right, title and interest in and to all easements, if any, benefiting the Land or the Improvements (as defined below);

(c)    Rights and Appurtenances.  All of Seller's assignable and transferable right, title and interest in and to all rights and appurtenances pertaining to the Land, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way;

(d)    Improvements.  Fee simple title to (i) all buildings and other improvements in and on the Land; and (ii) any UST System currently located on the Land (collectively, the "**Improvements**");

(e)    Tangible Personal Property.    All equipment and personal property (excluding inventory except as provided pursuant to Section 1.1(f) below) owned by Seller located on or in the Land or Improvements (and not owned

by any third-party), which is described in general categories on **Exhibit C** attached to this Agreement (the "**Tangible Personal Property**");

(f)  Inventory.  All refined petroleum products inventory owned by Seller and located in the UST System located in or on the Land as of the Closing Date (the "**Inventory**"), the amount of and price for which shall be determined as provided in Section 2.1A, and all other inventory of retail products (other than the Inventory) owned by Seller and held for resale in the ordinary course of Seller's business on the Property and located on or in the Improvements as of the Closing Date (the "**Other Retail Inventory**"), the amount of which and price for which shall be determined as provided in Section 2.1B.

1.2.  **Excluded Assets**.  Notwithstanding Section 1.1 and for the avoidance of doubt, the following shall not be included in the Property that Seller shall sell to Buyer:

(a)  any permit for the Property, including, without limitation any permit regarding the sale or ownership of alcoholic beverages and any permit regarding the sale of lottery tickets or presence of gaming equipment;

(b)  any asset located on the Property that is not owned by Seller or any personal property or fixtures removed from the Property by Seller prior to Closing, or any personal property or equipment described generically on **Exhibit C** that was not on the Property on the Effective Date of this Agreement;

(c)  any groundwater monitoring wells or other environmental equipment on the Property on the Closing Date, or installed before or after the Closing Date by Seller or any third party engaged in environmental remediation or environmental monitoring of the Property;

(d)  any automatic teller machines, back office computer equipment and telecommunication equipment on the Property, including satellite communications equipment;

(e)  any back-office software programs that track sales information on the Property, any polling activity software used to obtain petroleum products inventory, and any software that is not freely transferable;

(f)  any proprietary health, safety, security and operating procedure information, manuals or summaries at the Property;

(g)  any right, title or interest in any logo, trade name, trademark, service mark, house mark, domain name, web site or company name, including without limitation, to the extent it contains or consists of the word "Daily's," "Shell", "SOPUS", "Select", "Shell Rapid Lube", "Pennzoil", or "Quaker State" emblem or any other emblem, logo or other mark in which "Shell",

"SOPUS", "Select", "Pennzoil" or "Quaker State" or any of them appears in translational or transliteral form or any third party logo, trade name, trademark, service mark, house mark, domain name, web site or company name used in connection with the Property (rights to use the "Shell" marks/names being granted pursuant to, and subject to the conditions of the Supply Agreement); and

(h)    any inventory of the business operated on the Property, except the Inventory and Other Retail Inventory, if any.

1.3.    **Definitions**.  Unless otherwise defined in this Agreement, or unless the context shall otherwise require, terms used and not defined in this Agreement shall have the meanings set forth on **Exhibit B** attached to this Agreement.

1.4.    **Removal of Personal Property.**  Seller shall have the right (but no obligation) to remove from the Property prior to Closing, any inventory that is not a portion of the Inventory, or any other personal property not included in the property to be conveyed pursuant to this Agreement.  Any personal property or fixtures not removed shall be conveyed to Buyer at Closing.

## 2.
## PURCHASE PRICE

2.1.    **Purchase Price for all Property other than Inventory**.  The purchase price for the Property (excluding Inventory and Other Retail Inventory, the price of which shall be separately determined and paid as provided Sections 2.1A and 2.1B of this Agreement) shall be FORTY-NINE MILLION ONE HUNDRED FORTY-EIGHT THOUSAND THREE HUNDRED FIFTY-FOUR and NO/100 Dollars ($49,148,354.00) (the "**Purchase Price**"); an allocation of the Purchase Price by Location is provided on **Exhibit A-24**.  The Purchase Price shall be paid in cash by Buyer to Seller at the Closing (as defined in Section 6.1 of this Agreement) by wire transfer in immediately available funds in accordance with wire transfer instructions to be provided by Seller.

2.1A    **Purchase Price for Inventory**. On the Closing Date Seller shall conduct a physical inventory of the Inventory.  Buyer (or its representative) at its option and expense, may accompany Seller or its representative to conduct the physical inventory.  At the time the physical inventory is taken, Seller shall prepare an inventory statement (the **"Inventory Statement"**) setting forth the amount of the Inventory on the Closing Date.  The Inventory Statement shall also reflect the corresponding value for the Inventory, which shall be calculated based on the rack price established by Seller for the applicable grades of motor fuel on the Closing Date at the primary terminal used for the business conducted on the Land prior to Closing, plus one and one half cents ($0.015) per gallon, plus freight and freight-related charges and costs incurred with the transportation and delivery of products to the facility (without limitation fuel surcharges if applicable).  All applicable federal, state and local taxes and fees relating to the Inventory shall be paid by Seller and shall be billed by Seller to Buyer as part of the purchase price for the Inventory. Payment for the value of the Inventory in the amount set forth on the Inventory Statement shall be made by Buyer to Seller within three (3) days of Buyer's receipt of the Inventory Statement and shall be paid in U.S. Dollars by wire transfer of immediately available funds to a bank account

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

designated by Seller in writing to Buyer. Buyer's obligations under this Section 2.1A shall survive the Closing. If not paid within three (3) days of Buyer's receipt of the Inventory Statement, the amount due from Buyer for purchase of the Inventory shall bear interest at the rate of eighteen (18%) percent per annum from the due date until paid.

2.1B    **Other Retail Inventory**. On the Closing Date Seller shall conduct a physical inventory of the Other Retail Inventory. Buyer (or its representative) at its option and expense, may accompany Seller or its representative to conduct the physical inventory. At the time the physical inventory is taken, Seller shall prepare an inventory statement (the "**Retail Inventory Statement**") setting forth the amount of the Other Retail Inventory on the Closing Date. The Retail Inventory Statement shall also reflect the corresponding value for the Other Retail Inventory, which shall be calculated based on (a) for cigarettes, beer, "take-home" packages (8, 12 or 18 packs) of Coca-Cola branded products and "take home" packages (8, 12 or 18 packs) of Pepsi branded products, the cost of same as reflected on Seller's books as of the Closing Date, and (b) for all inventory items other than cigarettes, beer, "take-home" packages (8, 12 or 18 packs) of Coca-Cola branded products and "take home" packages (8, 12 or 18 packs) of Pepsi branded products, an amount equivalent to seventy percent (.70) of Seller's actual or posted retail price as of the Closing Date. Any applicable federal, state and local taxes and fees relating to the Other Retail Inventory, if any, shall be paid by Seller and shall be billed by Seller to Buyer as part of the purchase price for the Other Retail Inventory. Payment for the value of the Other Retail Inventory in the amount set forth on the Retail Inventory Statement shall be made by Buyer to Seller within thirty (30) days of Buyer's receipt of the Retail Inventory Statement and shall be paid in U.S. Dollars by wire transfer of immediately available funds to a bank account designated by Seller in writing to Buyer. Buyer's obligations under this Section 2.1B shall survive the Closing. If not paid within thirty (30) days of Buyer's receipt of the Retail Inventory Statement, the amounts due from Buyer for purchase of the Other Retail Inventory shall bear interest at the rate of eighteen (18%) percent per annum from the due date until paid.

2.2.    **Additional Consideration**. As additional consideration for the sale of the Property to Buyer, Buyer covenants and agrees with Seller as follows:

2.2.1    **Dealer Supply Agreement**. Buyer shall execute and deliver to Seller a Dealer Supply Agreement (the "**Supply Agreement**") for each Location, in form acceptable to Seller, pursuant to which Buyer will be required, for an initial term of not less than twenty (20) years, to purchase motor fuels from Seller for resale at and from the Location. In addition to other terms, conditions, and provisions contained in Seller's standard dealer contracts, the Supply Agreement shall (a) specify a purchase price for motor fuels equal to the rack price established by Seller for the particular product involved plus one and one half cents ($0.015) per gallon plus applicable taxes and all freight and freight-related charges and costs incurred with the transportation and delivery of products to the facility (without limitation fuel surcharges, if applicable), (b) provide for a minimum annual purchase requirement, in gallons of motor fuels during each year at each Location during the entire term of the Supply Agreement (with the required gallonage

4

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

requirement by Location being set forth for that Location on **Exhibit K-1**), (c) provide for the recovery by Seller of damages in an amount equivalent to four cents ($0.04) per gallon for any shortfall below the minimum annual purchase requirement referenced above for any contract year during the entire term of the Supply Agreement; and (d) provide that the motor fuels required to be purchased under the Supply Agreement and sold from the Property may be any branded or non-branded motor fuels (as determined and selected by Seller in its sole election) consistent with the Supply Agreement.   The Supply Agreement shall be in form substantially similar to **Exhibit K** attached to this Agreement, and shall be deemed to include all Exhibits, Riders, Rental Agreements, Guaranties, Credit Agreements, Dealer Deposit Receipt Agreements and other agreements attached to the form of Supply Agreement in **Exhibit K** or to or in furtherance of the final form of Supply Agreement actually executed between the Parties to this Agreement.   In connection with the Supply Agreement, Buyer (i) initially shall post a cash deposit in the amount of $28,571.42 for each Location, (ii) within two years of the Closing Date shall increase such cash deposit to $57,142.84, and (iii) thereafter shall maintain with Seller such cash deposit (the "**Fuel Deposit**"), all as more specifically referenced in or from time-to-time required by Supply Agreement and the Cross Deposit Agreement that is an attachment to the Supply Agreement to stand as security for Buyer's full and timely performance under the Supply Agreement.  The Fuel Deposit shall be held, handled, applied and disbursed in accordance with a separate written deposit agreement in the standard form customarily used by Seller.

2.2.2.  **Supplemental Agreement**.

(i)     At the Closing, Buyer shall execute and deliver to Seller a Supplemental Agreement (the "**Supplemental Agreement**") for each Location creating an obligation on the part of Buyer to re-pay to Seller the sum set forth for that Location on **Exhibit L-1**, which amount shall be amortized (without interest) on a straight-line basis during years six (6) through twenty (20) of the term of the Supply Agreement by Buyer's operation of the Property as a retail motor fuel facility in full and strict compliance with the Supply Agreement.  The Supplemental Agreement shall require Buyer to immediately repay to Seller the full unamortized balance due thereunder in the event that Buyer ceases to operate the Property in full and strict compliance with the Supply Agreement prior to the expiration of the term of the Supply Agreement.  Buyer specifically acknowledges and confirms that the obligation created by the Supplemental Agreement is a material part of the consideration for Seller's sale of the Property to Buyer at the Purchase Price and that, in the absence of a legally-binding commitment on the part of Buyer to purchase motor fuels from Seller for re-sale at and from the

5

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

Property for the full term of the Supply Agreement, Seller would not agree to convey the Property to Buyer for the Purchase Price. The obligation evidenced by the Supplemental Agreement includes the amount of any supplier incentives and/or re-imaging costs that Seller may be required to repay in the event that Buyer fails to operate and maintain the Property as a retail motor fuel facility in compliance with the Supply Agreement for the full term of that agreement. The Supplemental Agreement shall be in form substantially similar to **Exhibit L** attached to this Agreement.

(ii)    At Closing, Buyer shall execute and deliver to Seller a Fuel Supply Covenant (the "**Fuel Supply Covenant**") in recordable form in favor of Seller as grantee of such covenant and acceptable to Seller in Seller's sole discretion, encumbering the Locations and providing that for ten (10) years from and after the Closing Date any gasoline or other motor fuel that is stored, advertised or sold at, on, or from the Locations must be purchased from or through Seller.

(iii)    If Buyer is an entity (rather than a natural person), each officer, partner, director or member of Buyer, as well as his or her spouse (if married), (and the spouse of Buyer, if Buyer is a natural person) shall execute and deliver to Seller a Personal Guaranty (in form acceptable to Seller) pursuant to which the guarantors absolutely and unconditionally guaranty Buyers' payment and performance under the Supply Agreement and the Supplemental Agreement.

2.3    **Seller's Obligations Contingent on Sale of all Property and on Sale of Other Locations**. Buyer acknowledges that Seller would not sell any of the Property to Buyer on the terms set forth in this Agreement but for Buyer's agreement to purchase on such terms both (i) all of the Property and (ii) certain real and personal property at certain other locations listed in **Exhibit A-24** (such real and personal property, the "**Other Locations**") on the terms set forth in an agreement between Buyer and Seller for such sale and purchase that is executed simultaneously with the execution of this Agreement. Notwithstanding any provision of this Agreement to the contrary, Buyer agrees that Seller's obligation under this Agreement to close the sale of the Property is conditioned upon Buyer simultaneously completing the purchase of all of the Property and of the Other Locations. Except as provided in Section 4.1.1, if Buyer fails for any reason (other than solely as a result of Seller's default) to simultaneously purchase all of the Property and all of the Other Locations, in addition to any rights of Seller under the agreement with Buyer for the sale and purchase of the Other Locations, Seller shall have the right to terminate this Agreement and to receive the Deposit as Seller's liquidated damages or to enforce any and all other remedies of Seller under this Agreement triggered by such Buyer default. The contingency set forth in this Section 2.3 is solely for the benefit of Seller and may be waived by Seller in writing but only in Seller's sole and absolute discretion.

6

3.
EARNEST MONEY

3.1.    **Earnest Money**.  Within five (5) business days after the Effective Date (as defined in the introductory paragraph of this Agreement), Buyer shall deliver (i) by wire transfer to Gibraltar Title Services ("**Escrow Agent**"),the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "**Earnest Money**") and (ii) directly to Seller an unconditional irrevocable bond from an A+ rated insurance company in the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), in form acceptable to Seller (the "**Bond**") (which Bond shall be payable without condition upon Buyer's failure to timely close the transaction contemplated by this Agreement).  All monetary amounts paid under or referenced in this Agreement shall be remitted in or understand to refer to the currency of the United States of America.

Seller shall have the option of terminating this Agreement if the full amount of Earnest Money is not delivered to Escrow Agent and the Bond is not delivered to Seller as prescribed in this Section 3.1 for any reason other than failure of a wire transfer for reasons beyond the control of Buyer.  Upon remittance to Escrow Agent, any Earnest Money shall become fully earned by Seller and completely non-refundable to Buyer except as specifically provided in this Agreement to the contrary; in all other events, if Buyer terminates this Agreement or fails to close this transaction, the Earnest Money shall be forfeited and paid to Seller, not as a penalty, but as liquidated damages for Buyer's failure to close; the Parties agreeing that the actual damages in such event would be impossible to ascertain.  Buyer agrees to deliver to Seller copies of all Reports (as defined in Section 4.2 of this Agreement) at the time the notice to terminate this Agreement is given.  The obligations to deliver the Reports shall survive the termination of this Agreement.  If the sale of the Property is consummated under this Agreement, the Earnest Money shall be applied to the Purchase Price at Closing.

3.2.    **Appointment of Escrow Agent**.  The Parties to this Agreement by execution of this Agreement appoint Gibraltar Title Services, 4190 Belfort Road, Suite 475, Jacksonville, Florida 32216 (Phone (904) 296-3100; Fax: (904) 296-3500) as the "**Escrow Agent**" and closing agent in its capacity as issuing agent for Chicago Title Insurance Company (the "**Title Company**"). This Agreement shall serve as escrow instructions and shall be subject to the usual conditions of acceptance of the Escrow Agent, insofar as the same are not inconsistent with any of the terms of this Agreement.  If Purchaser wishes the Earnest Money and any other deposits made pursuant to this Agreement to be placed in an interest bearing account, it shall, together with the Earnest Money, deliver a completed Internal Revenue Service form W9 and, if required by the Escrow Agent, any documents that may be required by Escrow Agent or its depository institution pursuant to the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, or otherwise, to open an interest bearing escrow account.  Escrow Agent shall not be required to transfer the deposit to an interest bearing account until the information described above and any additional information required by the depositary institution has been received and approved by Escrow Agent's depository institution. Interest on the Earnest Money and any other deposits made under this Agreement, if

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

any, shall be paid to the Party entitled to receive disbursement of the Earnest Money pursuant to this Agreement.

3.3. **Conditions of Acceptance of Escrow Agent**. Seller and Buyer understand and agree that Escrow Agent is holding the Earnest Money in escrow as agent of the Parties, collectively and not individually. Escrow Agent undertakes and agrees to perform only such duties as expressly set forth in this Agreement. The duty of Escrow Agent under this Agreement shall be limited to the safekeeping of the Earnest Money and the disposition of same in accordance with the provisions of this Agreement. Escrow Agent may act in reliance upon any writing or instrument or signature that it, in good faith, believes to be genuine. Escrow Agent may assume that any person purporting to give any writing, notice, advice or instructions in connection with the provisions of this Agreement, has been duly authorized to do so. Escrow Agent shall have the right, but not the obligation, to require a written statement signed by all Parties to this Agreement confirming satisfaction of all conditions precedent to disbursement of funds under this Agreement and authorizing disbursement of said funds, together with accrued interest, if any. In the event instructions from either Buyer or Seller would require Escrow Agent to expend any monies or to incur any cost, Escrow Agent shall be entitled to refrain from taking any action until it receives payment for such costs. Simultaneously with final disbursement of the Earnest Money pursuant to this Agreement, Escrow Agent shall be released of all liability and responsibility under this Escrow Agreement. Seller and Buyer acknowledge and agree that nothing in this Agreement shall prohibit Escrow Agent from serving in a similar capacity on behalf of others.

Seller and Buyer acknowledge that Escrow Agent has entered into this Agreement at their specific request and, in order to induce Escrow Agent to accept said escrow, do by their execution of this Agreement agree to indemnify and hold Escrow Agent harmless from any loss, cost and expense, including reasonable attorneys' fees and court costs, that it may suffer or incur as a result of acting as Escrow Agent under this Agreement except for such losses that Escrow Agent may incur as a result of its gross negligence or willful disregard for the terms of this Agreement. In the event of any dispute as to the disbursement of the Earnest Money or any claim to such Earnest Money by any Party or persons, Escrow Agent shall have the right to bring a suit in interpleader in the Circuit Court for Duval County, Florida naming the Parties to this Agreement and any other parties as may be appropriate in the opinion of Escrow Agent. Seller and Buyer shall indemnify and hold Escrow Agent harmless from all costs, including attorneys' fees, in connection with such interpleader action. Escrow Agent shall be entitled to recover from the non-prevailing Party a sum equal to all costs (including attorneys' fees) incurred by Escrow Agent in filing such interpleader action prior to placing the balance of the Earnest Money in the registry of the court. Upon filing of said suit and placing of the balance of the Earnest Money in the registry of the court, Escrow Agent shall have the right to withdraw from said suit and all obligations of Escrow Agent shall cease and terminate.

4.
CONDITIONS TO CLOSING

4.1. **Seller's Obligations**. Seller previously has provided, among other information, the following:

8

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

(a)    Title.  A copy of any title policies regarding the Locations in the possession of Seller; and

(b)    Survey.  The most recent survey of each Location in the possession of Seller.

Buyer requires no further information from Seller.

4.1.1.  **Buyer's Satisfaction**.  Buyer has completed all due diligence that Buyer requires with respect to the Locations and by its execution of this Agreement, Buyer waives any further inspection or due diligence.  Buyer is satisfied with all aspects of the Property.  If used in this Agreement, the term "**Inspection Period**" shall mean the period commencing and concluding on the day before the Effective Date.  Buyer shall have until August 23, 2019 at 5:00 p.m. EDST to provide the written objection of its lender to a material defect in the title or environmental condition of any Location.  If Buyer and Seller are not able within seven (7) calendar days of such objection to resolve the same to the satisfaction of both Buyer and Seller, the Earnest Money and Bond shall be returned to Buyer, this Agreement shall be terminated and neither Party shall have any further obligation under this Agreement to the other, except the Surviving Obligations.

4.1.2.  **Title Commitment and Survey.**

(a)    Seller shall convey title to Buyer and Buyer shall accept title to the Land subject to the Permitted Encumbrances (as defined below).  Buyer previously has obtained through Escrow Agent and a commitment for an Owner's Policy of Title Insurance covering the Land (with copies of all recorded documents referenced in that commitment), issued by First American Title Insurance Company (the "**Title Company**"), in the amount of the portion of the Purchase Price allocated to Land and Improvements (the "**Title Commitment**").  Buyer may, at its own cost and expense obtain an update of any existing survey provided by Seller to Buyer pursuant to Section 4.1 above, or obtain a new survey of the Land, adequate and acceptable to the Title Company to remove any general survey exception from the Title Commitment (the "**Survey**").  If Buyer does not obtain a Survey (by updating the existing survey or obtaining a new survey) satisfactory to the Title Company to remove the general survey exception that is part of the printed exceptions on Schedule B-II of the Title Commitment, then that general survey exception appearing in the Title Commitment shall also be part of the Permitted Encumbrances. Seller shall have no obligation to eliminate or to cure or to take any steps or bring any action or proceeding or otherwise to incur any expense whatsoever to

9

eliminate or modify any of the matters disclosed in the Title Commitment, other than the Monetary Liens as defined below (which shall be released prior to Closing.) As to all other matters disclosed in the Title Commitment, Buyer shall be deemed to have accepted the same and to have agreed to take title subject to the same. Buyer waives any right Buyer may have to advance as an objection to title, or as grounds for refusal to close the transaction, any matters disclosed in the Title Commitment. In the event that any update to the Title Commitment indicates the existence of any liens, encumbrances or other defects or exceptions which were not shown in the Title Commitment as issued to Buyer (and which are not otherwise Permitted Encumbrances) and which are unacceptable to Buyer (the "**Unacceptable Encumbrances**"), Buyer shall within five (5) business days after receipt of any such update to the Title Commitment notify Seller in writing of its objection to any such new Unacceptable Encumbrances. Buyer by execution of this Agreement waives any right Buyer may have to advance as an objection to title or as grounds for Buyer's refusal to close this transaction any Unacceptable Encumbrances of which Buyer does not timely notify Seller within such five (5) business day period after receipt of such updated Title Commitment, provided that this sentence shall not relieve Seller from its obligation to cure Monetary Liens. In the event Seller is unable or unwilling to eliminate or modify all of the Unacceptable Encumbrances at up to three Locations that arise after the date of the original Title Commitment furnished to Buyer that are not otherwise waived by Buyer pursuant to the terms of this Agreement to the reasonable satisfaction of Buyer, Buyer may (as its sole and exclusive remedy) terminate this Agreement with respect to any such of up to three Locations by delivering notice of such termination in writing to Seller by the earlier to occur of (i) the Closing Date, or (ii) five (5) business days after Seller's written notice to Buyer of Seller's intent not to cure one or more of such Unacceptable Encumbrances, in which event (i) the Purchase Price shall be reduced by the amount allocated to each such removed Location by the amount allocated to such removed Location as indicated on Exhibit A-24, provided, that, for each Location so terminated by Buyer, Seller may remove a Location from the Locations it is selling to Buyer, also with a resulting reduction of the Purchase Price accordingly by the amount allocated to such removed Location as indicated on Exhibit A-24, and following such termination and removal of Locations from the purchase and sale, the transaction contemplated by this Agreement shall proceed to Closing under this Agreement as provided in this Agreement; provided, further, that the foregoing sentence shall not relieve Seller from its obligation to cure Monetary Liens, as defined

below, at remaining Locations. Notwithstanding anything to the contrary contained in this Agreement, Seller shall have no obligation to cure or to take any steps or bring any action or proceeding or otherwise to incur any expense whatsoever to eliminate or modify any of the matters disclosed in the Title Commitment or any Unacceptable Encumbrances as defined above, except that Seller shall, prior to Closing, eliminate or cause the Property to be released from (i) construction liens upon the property as a result of work undertaken by or at the direction of Seller during Seller's period of ownership of the Property, or (ii) monetary judgments against Seller during the period of its ownership of the Property, or (iii) other title exceptions consented to in writing by Seller after the Effective Date (collectively the "**Monetary Liens**".)

Notwithstanding anything to the contrary contained in this Agreement (and whether or not disclosed in the Title Commitment), Seller shall have no obligation to pay or cause to be released any liens, claims of lien or unpaid assessments against the Property (other than ad valorem real estate taxes) that are assessed by or due to any private entity or public authority, including without limitation property owners associations, developers or successor developers, utility providers, municipal or other governmental entities or authorities, including any assessments which are due as a matter of law, ordinance or regulation or which are due under any instruments disclosed in the Title Commitment (or whose payment or satisfaction is required by Section B-I of the Title Commitment) or which may arise under any instrument disclosed in the Title Commitment, whether known or unknown (collectively "**Public or Private Assessments**"). If Schedule B-I of the Title Commitment requires an estoppel letter from any party having a right to a Public or Private Assessment, Buyer shall be responsible for obtaining such estoppel letter. If any recorded document which is disclosed in the Title Commitment requires the consent of any third party to a conveyance of the Property (other than the holder of the Monetary Liens to be satisfied by Seller), Buyer shall be responsible for obtaining such consent. Public or Private Assessments do not include any construction liens upon the Property as a result of work undertaken by or at the direction of Seller during its period of ownership of the Property (from which Seller will cause the Property to be released at Closing.) As to any such Public or Private Assessments, the Property shall be conveyed subject to such Public or Private Assessments, and if such Public or Private Assessments exist and are not paid by Buyer at Closing, then the lien for such Public or Private Assessments shall be a Permitted Encumbrance and an exception in the title insurance policy issued to Buyer,

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

notwithstanding anything to the contrary contained in this Agreement or any instrument delivered pursuant to this Agreement. The terms of this <u>Section 4.1.2(a)</u> with respect to Public or Private Assessments shall survive the Closing of the transaction pursuant to this Agreement and shall not merge with Seller's Deed or any Closing documents.

(b)    The term "**Permitted Encumbrances**" as used in this Agreement includes:  (i) all exceptions set forth in Schedule B, Part II, of the Title Commitment other than any "gap" exception and other than any standard exception (such as those typically appearing in commitments of the Fidelity National Title Insurance Company as Exceptions B II 3A - 3D) except the following: taxes for the year of Closing that are not then due and payable, and the general survey exception, unless Buyer provides an updated or new Survey acceptable to Title Company to remove the general survey exception (subject to adding any matters disclosed by such survey); (ii) any easement, right of way, encroachment, conflict, discrepancy, overlapping of improvements, restriction, condition, covenant, exception or other matter with respect to the Property that is shown on the existing survey delivered by Seller to Buyer or any updated or new Survey obtained by Buyer; (iii) the lien of any Public or Private Assessments not paid by Buyer at Closing; (iv) any Unacceptable Encumbrance that remains uncured, for whatever reason, at the earlier to occur of (A) Closing or (B) five (5) business days after Seller notifies Buyer that Seller is unwilling or unable to cure or modify such Unacceptable Encumbrance to the reasonable satisfaction of Buyer; and (v) any requirement or action which Buyer is obligated to perform under this Agreement or pursuant to the Title Commitment, which Buyer fails to perform. Notwithstanding the foregoing, in no event shall the Monetary Liens and other title exceptions created, or consented to in writing, by Seller after the Effective Date constitute Permitted Encumbrances.

4.2.    **Reports**.  All information provided by Seller to Buyer or obtained by Buyer relating to the Property in the course of Buyer's review, including, without limitation, any environmental assessment or audit (collectively, the "**Reports**") shall be treated as confidential information by Buyer and Buyer shall instruct all of its employees, agents, representatives and contractors as to the confidentiality of all such information provided that Buyer may make disclosures required by law.  If Buyer damaged the Property during its inspections of the Property, Buyer shall restore the portion of the Property so damaged to its condition existing immediately prior to Buyer's inspection of the Property, and Buyer shall be liable for all damage or injury to any person or property resulting from, relating to or arising out of any such inspection, whether occasioned by the acts of Buyer or any of its employees, agents, representatives or contractors, and Buyer shall indemnify and hold harmless Seller and its agents, employees, officers, directors, affiliates and

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

asset managers from any liability resulting from such damage or injury.  This indemnification by Buyer shall survive the Closing or the termination of this Agreement, as applicable.

4.3.    **Buyer's Representations, Warranties and Covenants**.

(a)  <u>Buyer's Representations and Warranties</u>.  Buyer represents and warrants to Seller that:

(i)      Buyer is a limited liability company duly organized and in good standing under the laws of the State of Florida, has the power to enter into this Agreement, to execute and deliver this Agreement, and to perform all duties and obligations imposed upon it under this Agreement, has obtained all necessary company authorizations required in connection with the execution, delivery and performance contemplated by this Agreement, and has obtained the consent of all entities and parties necessary to bind Buyer to this Agreement;

(ii)     neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated by this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Buyer, or any company or related entity or affiliate of Buyer, is a party or by which Buyer, any company or related entity or affiliate of Buyer, or any of Buyer's assets is bound;

(iii)    with respect to each source of funds to be used by it to purchase the Property (respectively, the "Source"), at least one of the following statements shall be accurate as of the Closing Date: (A) the Source does not include the assets of (1) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to Title I of ERISA, or (2) a "plan" as defined in Section 4975(a) of the Internal Revenue Code of 1986, as amended ("Code"), or (B) the Source includes the assets of (1) an "employee benefit plan" as defined in Section 3(3) of ERISA or (2) a "plan" as defined in Section 4975 of the Code (each of which has been identified to Seller in writing pursuant to this Section 4.3 at least ten (10) business days prior to the Closing Date), but the use of such Source to purchase the Property will not result in a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code; and

(iv)     neither Buyer nor any party holding any interest in Buyer is listed on a watch list or other list promulgated by the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Person List) or promulgated pursuant to any other statute or executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism).

(v)     Buyer has freely and voluntarily entered into this Agreement after an adequate opportunity to review and discuss the terms and conditions and all relevant factual and legal matters with counsel freely and independently chosen by Buyer and this Agreement is being executed without fraud, duress, undue influence or coercion of any kind or nature whatsoever having been exerted by or imposed upon Buyer by any person or entity.

(vi)    the amounts paid by Buyer to Seller pursuant to this Agreement, specifically including but not limited to the Purchase Price (as allocated in Exhibit A-24) and the amounts set forth in the Inventory Statement and the Retail Inventory Statement, and the Supplemental Amounts represent the fair market value of the real and personal property being conveyed by Seller to Buyer as of the Closing Date.

Buyer agrees to provide Seller, not less than ten (10) day prior to Closing, with such information as Seller may require in order to verify the accuracy of the representations set forth in subsection (iv) above (including, without limitation, names, addresses and taxpayer identification numbers for all persons having an interest in Buyer).  Buyer's representations and warranties set forth in this Section 4.3(a) shall survive the Closing or termination of this Agreement.  Buyer's representations and warranties contained in this Agreement must be true and correct through the Closing Date.  Any and all representations and warranties of Buyer as contained in this Agreement shall be terminated and of no further force or effect whatsoever from and after twelve (12) months from the Closing Date.  Anything in this Agreement to the contrary notwithstanding, Seller's sole remedy for any breach of any representation and warranties set forth in this Section 4.3(a) shall be to seek recovery of its actual damages (but not special, speculative, punitive or other damages) including all of Seller's reasonable attorney's fees, costs, expert witness fees and court costs.

(b)     Buyer's Covenants.  Buyer covenants and agrees, for the benefit of Seller, as follows:

(i)     Buyer agrees at Closing to execute an Access Agreement in favor of Seller for each Location required in the form attached to this Agreement as Exhibit H (the "**Access Agreement**") that shall be recorded, together with the Deed, in the public records of the county where the Location is located and shall be binding upon Buyer, its successors and assigns.  Following notice to Buyer as may be provided in the Access Agreement, the Access Agreement grants, on behalf of Buyer, its heirs, successors and assigns, the right of ingress, egress and access to the Property at the Location (including any building or facilities located thereon) to Seller and to its employees, authorized agents and contractors, and use of the lands and utilities, including, but not limited to, electricity and water as needed by Seller to conduct any activities required or permitted by this Agreement to be conducted on the Property by Seller after the Closing Date.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

(ii)    The covenants of Buyer set forth in this <u>Section 4.3(b)</u> shall survive Closing and be included in the Deed from Seller to Buyer, whether or not shown on the form attached to this Agreement as Exhibit E, and be deemed part of the Permitted Exceptions, as defined in this Agreement.

4.4.    **Seller's Representations and Warranties**.  Seller represents and warrants to Buyer that, as of the date of this Agreement: (a) Seller is a limited liability partnership, duly organized and in good standing under the laws of the State of Colorado and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all duties and obligations imposed upon it under this Agreement, and Seller has obtained all necessary company authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Seller to this Agreement, and Seller has the full limited liability partnership right, power, and authority, without the joinder of any other person or entity, to enter into, execute and deliver this Agreement, and to perform all duties and obligations imposed on Seller under this Agreement; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated by this Agreement, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Seller is a party or by which Seller or any of Seller's assets is bound; (c) there is no litigation pending, or to Seller's knowledge threatened, with respect to the Property (other than tort claims that are covered by insurance, which shall remain the sole responsibility of Seller); (d) Seller is not a "foreign person" within the meaning of Section 1445 and 7701 of the Internal Revenue Code of 1986, as amended; and (e) Seller has not received, with respect to the Property, written notice from any governmental authority regarding any condemnation proceeding.

It is a condition to Buyer's obligations under this Agreement that Seller's representations and warranties contained in this Agreement be true and correct through the Closing Date.

4.4A    **Seller's Covenants**.    Seller covenants that it will reimage the Locations to the Shell RVIe standards or to such other brand standards as required for the brand to be sold from such Location, if any, by December 31, 2019; <u>provided</u>, that if Buyer would like to convert a Location to LED canopy lighting at the time of Seller's reimaging of a Location, all such conversion costs shall be borne by Buyer.

4.5.    **UST System Matters**.

4.5.1.    **UST System to be Conveyed to Buyer**.  Seller shall convey and deliver the Land to Buyer with the currently existing UST System remaining in place.

4.5.2.    **Buyer's Responsibility Post Closing**.    Except as otherwise provided in <u>Section 4.6.1</u> (*Seller's Environmental Indemnification*), as of and following the Closing, Seller shall have no further duties, responsibilities or liability with respect to (and Buyer by its execution of this Agreement agrees to

assume liability for) the current and any future UST System, the storage, handling or dispensing of motor fuels on the Property, or any pollution or contamination thereafter discovered in the soil or groundwater on or under the Property; except that Seller agrees (at no cost, risk or expense to Seller) to cooperate with and assist Buyer in the assertion of any claims or proceedings for the recovery of insurance proceeds or state-funded clean-up or remediation funds in connection with any petroleum-based contamination that was present on or under the Property prior to the Closing. Buyer agrees that, if any such pre-Closing petroleum-based contamination exists on the Property, Buyer will grant to the party responsible for cleaning up/remediating such contamination a reasonable right of access to the Property for purposes of completing the clean up/remediation process. The provisions of this <u>Section 4.5.2</u> shall survive the Closing of the transaction contemplated by this Agreement.

4.5.3.  **No Warranty as to UST Systems**.  Buyer acknowledges that Seller makes (a) no representation or warranty, express or implied, that the UST System and other equipment currently at the Locations are free of oil, nonmerchantable petroleum residue, water or hazardous substance; or (b) no representation or warranty, express or implied, with reference to the present condition or state of repair or merchantability or fitness for a particular purpose or suitability for Buyer's intended use (or for any use whatsoever) of any UST Systems, including, but not limited to, the tank lines, secondary containment equipment, spill buckets and under dispenser containment equipment. Buyer understands and acknowledges that (a) any UST System may have or develop certain deficiencies, related but not limited to, the UST's reliability factor; the UST's wall strength; and the UST's striker plate, if any, such that this may result in the USTs buckling, creeping, deflecting, cracking, breaking, or failing and resulting in UST System or line leaks; (b) if any UST was manufactured during or prior to 1986, such UST may not be compatible with certain types of fuel, fuel additives or chemicals, including, but not limited to, ethanol or methyl-tertiary-butyl ether; and (c) fiberglass underground storage tanks installed prior to 1981 have not been warranted by the manufacturer against internal corrosion when exposed to ethanol blended fuels and, as a result, tank operators should consult with manufacturers as to the suitability of said tanks prior to introduction of ethanol blended fuels.

4.5.4.  **Compliance With Laws**.  Buyer acknowledges that Buyer will not acquire from Seller any permits that may be necessary for Buyer to operate the Property as operated by Seller, including without limitation, any permits necessary for the sale of alcoholic beverages or lottery tickets.  SELLER MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE COMPLIANCE OR NONCOMPLIANCE, AS THE CASE MAY BE, OF ANY OF THE PROPERTY WITH (OR WHETHER SUCH ASSETS OR PROPERTY ARE REQUIRED TO COMPLY WITH), THE STANDARDS OR PROVISIONS OF THE AMERICANS WITH DISABILITIES ACT. BUYER ACKNOWLEDGES THAT SELLER MAKES NO REPRESENTATION OR

16

WARRANTY THAT DISPENSERS CONSTITUTING THE ASSETS AT THE PROPERTY CONTAIN EQUIPMENT DESIGNED TO COMPENSATE FOR TEMPERATURE VARIATIONS.

4.6.  **Environmental Matters**.

4.6.1  **Seller's Environmental Indemnification**.  Seller shall be deemed to have notified Buyer of any and all Environmental Conditions, if any, that Buyer could have identified by research of publicly available information using the Environmental Identification Information, including, without limitation, the Environmental Reports.  Seller shall indemnify, defend, discharge, release, save and hold harmless Buyer Indemnified Parties from and against any of the losses asserted against, resulting to or imposed upon or incurred by Buyer Indemnified Parties with respect to any Remediation to the extent such Remediation arises as a result of the Environmental Conditions identified in the Environmental Reports, provided that any Remediation to the extent arising as a result of known Environmental Conditions (of which Buyer is deemed to be notified as provided above) that arise as a result of a violation or alleged violation of Environmental Law in effect and as customarily enforced on the Closing Date, provided that:

(i)    there is a Known Remediation Order for such known Environmental Conditions existing as of the Effective Date requiring Seller to perform Remediation with respect to the Property relating to such known Environmental Conditions; and

(ii)    the Remediation reference in section (i) is not fully funded through state funds; and

(iii)    Seller's indemnification obligations under this Section 4.6.1 shall be limited as provided in Section 4.6.3 (*Time Limitations on Seller's Environmental Indemnification*), Section 8.3 (*No Punitive or Consequential Damages*), and Section 10.1 (*Control and Completion of Activities Regarding Known Remediation Order*).

Except as otherwise provided or limited in this Agreement, the provisions of this Section 4.6.1 shall survive Closing of the transaction contemplated by this Agreement.

4.6.2  **Buyer's Environmental Indemnification**.  Subject only to Seller's indemnification of Buyer with respect to Known Remediation Orders existing as of the Effective Date requiring Seller to perform Remediation with respect to the Property (as set forth in Section 4.6.1 above), Buyer agrees to take title to the Property subject to all Environmental Conditions, known or unknown, and subject to all Remediation now or hereafter required.  Buyer shall indemnify, defend, discharge, release, save and hold harmless Seller Indemnified Parties, from and

17

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

against all losses asserted against, resulting to or imposed upon or incurred by Seller Indemnified Parties relating to the Property, and resulting from:

> (a)      any Environmental Condition arising from events or conditions on or after the Closing Date;

> (b)      any Remediation arising from events or conditions on or after the Closing Date (other than a Remediation conducted by Seller); and

> (c)      any Environmental Condition or Remediation to the extent arising from events occurring prior to the Closing Date or conditions existing prior to the Closing Date, to the extent not indemnified by Seller as set forth in <u>Section 4.6.1</u> (*Seller's Environmental Indemnification*) set forth above, whether or not arising from the sole negligence, concurrent negligence, gross negligence, intentional conduct or other fault of an indemnified party;

<u>provided</u> that Buyer's indemnification obligation under this <u>Section 4.6.2</u> shall be limited as provided in <u>Section 8.3</u> (*No Punitive or Consequential Damages*).  The provisions of this <u>Section 4.6.2</u> shall survive the Closing of the transaction contemplated by this Agreement.

### 4.6.3    <u>Time Limitation on Seller's Environmental Indemnification</u>.

(a)      <u>Termination Date to Seller's Indemnification for Property Other Than Florida Eligible Premises</u>.  Unless sooner terminated pursuant to <u>Section 4.6.4</u> (*Termination of Seller's Environmental Indemnification),* Seller's obligation pursuant to <u>Section 4.6.1</u> to indemnify, defend, save and hold harmless any Buyer Indemnified Party in respect of a Known Remediation Order at the Property (if it is not a Florida Eligible Premises) shall terminate on the earlier to occur of:

> (i)      the **Remediation Completion Date;** or

> (ii)      with respect to each Location, two years from the date on which the Deed conveying the Land at such Location is recorded.

(b)      <u>Termination Date for Florida Eligible Premises</u>.  Seller's obligations in respect of a Known Remediation Order at a Florida Eligible Premises shall terminate on the earlier to occur of:

> (i)      the **Remediation Completion Date;** or

> (i)      the **Florida Known Remediation Termination Date,** as defined in subparagraph (c) below.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

(c)　　Florida Known Remediation Termination Date.

(i)　　If the Property is a Florida Eligible Premises, Seller may request that its obligations in respect of a Known Remediation Order at a Florida Eligible Premises be terminated upon the payment of the amount and expenses which remain payable (**"Closure Costs"**) in order to obtain from the applicable Environmental Authority a closure letter with respect to the Known Remediation Order, as determined pursuant to (ii) below. No consent of Buyer is required and upon payment of the Closure Costs, Seller's obligations shall terminate with respect to the relevant Known Remediation Order. The date of any payment is referred to in this Agreement as the (**"Florida Known Remediation Termination Date"**).

(ii)　　Within fifteen (15) days of Seller's request pursuant to (i) above, Seller and Buyer shall attempt to mutually agree on a consultant to determine Closure Costs. If Seller and Buyer are unable to mutually agree on a consultant within such time period, Seller may retain, at Seller's expense, a Consultant to make the determination of Closure Costs. Any amount to be paid to Buyer pursuant to this subparagraph (d) shall be reduced by the amount that has been paid to Buyer by any applicable state restoration, reimbursement program or UST fund, or recovered from any Third Party and if any such amounts are subsequently paid to Buyer, Seller shall receive a refund from Buyer for such amounts paid.

4.6.4　**Termination of Seller's Environmental Indemnification**.　(a) Seller's obligations to indemnify, defend, save and hold harmless any Buyer Indemnified Party pursuant to Section 4.6.1 (*Seller's Environmental Indemnification*) shall terminate upon the occurrence of any of the following, provided that, with respect to subsections (i), (ii) and (iii), Buyer has failed to cure such occurrence within thirty (30) days of written notice from Seller to Buyer or within such additional period (not to exceed ninety (90) days) if Buyer is diligently and in good faith pursuing a cure after its receipt of Seller's notice:

(i)　　Buyer fails to comply with the provisions of Section 9.1 (*Operations After Closing)*;

(ii)　　Buyer fails to comply with the provisions of Section 10.1 (*Control and Completion of Activities Regarding Known Remediation Orders*);

(iii)    Buyer fails to comply with the provisions of Section 4.6.5 (*Buyer Modifications to Property)*;

(iv)    A Post-Closing Release not caused by Seller's negligence or wrongful act occurs at the Property where Seller is not conducting Remediation or otherwise indemnifying Buyer pursuant to Section 4.6.1 (*Seller's Environmental Indemnification)*, provided, that if any such Post-Closing Release can be differentiated in a manner acceptable to Seller from an occurrence that Seller would otherwise be required to indemnify Buyer for under Section 4.6.1 then Seller's indemnification obligation with respect to such occurrence shall not terminate pursuant to this Section 4.6.4; or

(v)    A Post-Closing Release not caused by Seller's negligence or wrongful act occurs at the Property where Seller is conducting Remediation pursuant to Section 10.1 (*Control and Completion of Activities Regarding Known Remediation Orders)*, or is otherwise indemnifying Buyer pursuant to Section 4.6.1 (*Seller's Environmental Indemnification)* and the Post-Closing Release makes the Remediation (or Seller's obligation to indemnify Buyer) significantly more costly or difficult or significantly increases the time required to complete such Remediation; provided, that Seller shall bear the cost of such Remediation or indemnification as originally required by this Agreement, except to the extent of the increased costs caused by the Post-Closing Release, which the Parties shall in good faith work together to determine and which increased costs shall be borne by Buyer;

(vi)    Buyer fails to satisfy the environmental financial responsibility requirements set forth in Section 4.6.6 (Environmental Financial Responsibility) and Exhibit J to this Agreement;

(vii)    Buyer fails to grant access to a Property as required by this Agreement or the Access Agreement; or

(viii)    Buyer fails to substantially comply with the provisions of Section 4.5.2 (*Buyer's Responsibility Post Closing)*.

4.6.5.    **Buyer's Modifications to Property**.  Buyer acknowledges that any construction or other modification at the Property may affect Seller's Remediation activities at the Property.  Prior to any excavation, construction or other activity at the Property where Seller is conducting or controlling Remediation or where Seller is then indemnifying Buyer pursuant to Section 4.6.1 (*Seller's Environmental Indemnification)*, Buyer shall give Seller prior written notice of any such activities and permit Seller the full, timely and reasonable opportunity at Seller's option to (a) change the location of or remove Seller's equipment and install new equipment at locations on the Property mutually agreeable to the Parties and (b) close any affected monitoring wells in accordance with the requirements of applicable laws.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

The costs of such work and any repair or replacement of wells or equipment due to Buyer's construction shall be at Buyer's expense.  The provisions of this <u>Section 4.6.5</u> shall survive Closing of the transaction contemplated by this Agreement.

4.6.6.  **Environmental Financial Responsibility.**  On or prior to the Closing Date, Buyer shall provide such policy or policies of **environmental** insurance covering the Property as is described on **Exhibit J** attached to this Agreement (**"Buyer's Environmental Insurance"**).

4.6.7.  **Compliance with Laws; Environmental Responsibility**.  Except as otherwise provided in <u>Section 4.6.1</u> (*Seller's Environmental Indemnification*) after the Closing Date, Buyer shall assume responsibility for compliance with all laws and regulations, including Environmental Laws, pertaining to the Property acquired and the operation of the Property and for the assessment and remediation of any Hazardous Substances or other contamination resulting from its use of such Property, including without limitation, maintaining inventory reconciliation records, tank testing records and release detection and monitoring records and reporting any releases of Hazardous Materials, in accordance with applicable Environmental Laws. Buyer shall make such records available for inspection by Seller upon 24 hours written notice. From and after the Closing Date until the twentieth anniversary date of the Closing Date (the **"Compliance Period"**), Buyer shall take all action necessary or advisable to ensure that the UST Systems and the Property are in compliance and eligible for coverage under any available petroleum storage tank fund of the State in which such UST System is located. From and after the Closing Date and for Compliance Period, Buyer shall maintain Buyer's Environmental Insurance contemplated by this Agreement.  On or before January 31 of each year during the Compliance Period, Buyer shall furnish Seller with a copy of the certificate evidencing the insurance contemplated by <u>Section 4.6.6</u> (*Environmental Financial Responsibility)* and **Exhibit J** of this Agreement. The provisions of this Section 4.6.7 shall survive the Closing of the transaction contemplated by this Agreement.

4.6.8.  **Environmental Due Diligence**.  Buyer acknowledges (i) that Seller makes no representation or warranty as to the accuracy of any reports, including, without limitation, the Environmental Reports, or of any other information that Buyer obtains or could have obtained from publicly available information using the Environmental Identification Information that Seller has provided to Buyer, and (ii) that other environmental assessments, reviews and studies may have been performed concerning the Property and may be available from Governmental Entities.  Buyer acknowledges that Buyer has reviewed or could have reviewed the Environmental Reports and any and all publicly available information using the Environmental Identification Information that Seller has provided to Buyer.

4.7  **Knowledge**.  As used in this Agreement, the term "to Seller's knowledge" shall mean only the "current actual knowledge" (as defined below) of the following designee of Seller:

21

Aubrey L. Edge, who is the person with the most knowledge and experience in connection with the ownership and operation of the Property by Seller.  As used in this Agreement, the term "current actual knowledge" shall mean only the actual, current, conscious and not constructive, imputed or implied knowledge of such designee after having made a review of his files but no other inquiry.  Anything in this Agreement to the contrary notwithstanding, such designee shall not have any personal liability or obligation whatsoever with respect to any of the matters set forth in this Agreement or any of Seller's representations in this Agreement being or becoming untrue, inaccurate or incomplete in any respect.

       4.8    **Survival: Liability**.  Except as otherwise specifically provided in this Agreement, any and all of the representations and warranties of Seller as contained in this Agreement shall merge with the Deed at Closing.  If Buyer becomes aware prior to Closing of any breach and/or violation of any of Seller's representations or warranties as set forth in this Agreement, Buyer shall give Seller written notice of any such breach or violation, and during the fifteen (15) day period after such notice, Seller shall have the right, but not the obligation, to cure any such breach or violation to the satisfaction of Buyer, and the Closing Date shall be extended for such fifteen (15) day period.  In the event Buyer becomes aware of any breach and/or violation of any Seller's representations and warranties prior to Closing and (a) Buyer fails to give Seller notice of such breach and/or violation as required by this Agreement or (b) following notice of such breach and/or violation, Seller fails or is unable to cure any such breach or violation to the reasonable satisfaction of Buyer, Buyer's sole remedy for any such breach or violation shall be to terminate this Agreement by delivering written notice of such termination to Seller on or before the Closing Date in which event (subject to the provisions of <u>Section 8.1</u> of this Agreement) the Earnest Money will be paid to Seller, and neither Party shall have any obligation under this Agreement, except the Surviving Obligations.

       4.9    **Branding Agreement and Right of First Refusal**.  Buyer acknowledges and agrees that certain of the Property shall be conveyed subject to the Branding Agreement and the Brand Covenant contained therein, and, as a condition of Seller's obligation to convey any Property, Buyer covenants and agrees to assume the obligations under the Branding Agreement. The Branding Agreement also contains a right of first refusal for purchase of certain of the Property in favor of Motiva.  Notwithstanding anything to the contrary set forth in this Agreement, Seller's obligations under this Agreement are subject to such right of first refusal.  If, after receipt of notice of this Agreement, as required by the Branding Agreement, Motiva exercises its right of first refusal, then either Seller or Buyer shall have the right to terminate this Agreement and the Earnest Money shall be returned to Buyer, whereupon this Agreement shall terminate and all parties shall be released from any further obligation under this Agreement, except the Surviving Obligations.

5.
<u>NO REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY</u>

       5.1.    **Disclaimer**.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE SPECIAL WARRANTY OF TITLE AS SET OUT IN

THE DEED, AS DEFINED BELOW, AND THE PROVISIONS OF THE OTHER CLOSING DOCUMENTS EXECUTED BY SELLER), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES THAT BUYER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL ENTITY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (H) COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION OF THIS AGREEMENT OF BUYER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED IN THIS AGREEMENT; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH IN THIS AGREEMENT. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND ANY OTHER CLOSING DOCUMENT, BUYER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, BUYER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION OF THE PROPERTY, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT,

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

EMPLOYEE, SERVANT OR OTHER PERSON.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND ANY OTHER CLOSING DOCUMENT, BUYER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR IN THIS AGREEMENT IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS.  IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY BUYER SUBJECT TO THE FOREGOING.  THE PROVISIONS OF THIS SECTION 5.1 SHALL SURVIVE THE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.

6.
CLOSING

6.1.    **Closing Date**.  The closing of the sale of the Property from Seller to Buyer (the "**Closing**") shall occur on or before September 30, 2019 (the "**Closing Date**").  The Parties stipulate and agree that time is of the essence of this Agreement and the agreement of Buyer to close the purchase on or before the Closing Date is a material and essential part of the consideration to Seller.  Failure of Buyer to close the transaction and deliver to Escrow Agent all of Buyer's executed closing documents and the Purchase Price in immediately available funds (subject to prorations and credits provided in this Agreement) and otherwise comply with the provisions of Article 6 of this Agreement on or before 5:00 PM Eastern Time on the Closing Date shall be a default under this Agreement, entitling Seller to all remedies for default provided under this Agreement, without the necessity of any notice or opportunity to Buyer to cure such default.

6.2.    **Possession**.  Except Locations 2023, 2032, 2034, 2039, 2531, 2723, 2833, 2836, 2837 and 2842 that are subject to contract operator leases, possession of the Property shall be delivered to Buyer at the Closing.

6.3.    **Proration**.  All ad valorem real estate taxes with respect to the Property for the year in which the Closing Date occurs, shall be prorated between Seller and Buyer as of midnight preceding the Closing Date.  If the Closing shall occur before the tax rate or the assessed valuation of the Property is fixed for the then current year, the apportionment of ad valorem real estate taxes shall be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation. Subsequent to the Closing, when the ad valorem tax rate and the assessed valuation of the Property is fixed for the year in which the Closing occurs, the Parties agree to adjust the proration of taxes and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.  In the event that the Property or any part of the Property shall be or shall have been affected by any ad valorem real estate tax special assessment or assessments, whether or not the same become payable in annual installments, Seller shall, at the Closing, be responsible for any installments of such ad valorem real estate tax special assessments due on or prior to the Closing Date, and Buyer shall be responsible for any installments due after the Closing Date.  Nothing contained in this Agreement shall be deemed to require Seller to pay any Public or Private Assessments as defined in Section 4.1.2(a) of this Agreement, or any pro-rata part of such Public or Private Assessments.

The agreements of Seller and Buyer set forth in this <u>Section 6.3</u> shall survive the Closing and not merge with Seller's Deed or other Closing documents.

6.4.    **Closing Costs**.  Buyer and Seller shall at Closing split equally (each paying one-half of the same) the following costs: (i) any escrow fees of the Escrow Agent; (ii) the cost of the Title Commitment and the premium for an owner's title policy to be issued pursuant to the Title Commitment to insure Buyer in the amount of the Purchase Price; (iii) all recording costs in connection with the Deed, the mortgages, any agreements, and any and all other documents and instruments required or permitted to be recorded under this Agreement; and (iv) the transfer tax imposed on the Deed by the State of Florida.  Buyer shall pay the cost of any new Survey obtained by Buyer and the premiums, issuance fees and any other costs associated with any lender's policy or policies, together with the cost of any endorsements which it requests be included with its owner's policy.  The "transfer tax on the deed" will be calculated on the basis of (a) the amount of the Purchase Price allocated to Land and Improvements at each Location as set forth on **Exhibit A-24** plus (b) the amount of the additional consideration evidenced by the Supplemental Agreement for such Location referenced in 2.2.2(i).  Except as otherwise provided in this Agreement, each Party shall pay its own attorneys' fees.

6.5.    **Seller's Obligations at Closing**.  At the Closing, or at such other time as indicated below, Seller shall deliver to Buyer the following:

(a)    <u>Deed</u>.  Special Warranty Deed (the "**Deed**") for each Location, fully executed and in recordable form, conveying the Land and the Improvements at such Location to Buyer, each in the form attached to this Agreement as **Exhibit E-1** or **E-2**, as applicable, subject to the Permitted Encumbrances for such Location.

(b)    <u>Bill of Sale</u>.  A bill of sale (the "**Bill of Sale**") in the form attached to this Agreement as **Exhibit F**.

(c)    <u>Foreign Person</u>.  An affidavit of Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended, and information to complete and file a 1099.

(d)    <u>Affidavit</u>.  An affidavit, in a form reasonably satisfactory to Seller, which will enable the Title Company to delete the "standard" exceptions (other than the exception for current taxes not yet due and payable and the survey exceptions) including the "gap" and mechanics lien exception.

6.6.    **Buyer's Obligations at Closing**.  At Closing, Buyer shall deliver to Seller the following:

(a)    <u>Purchase Price</u>.  The Purchase Price (adjusted for any credits or prorations provided in this Agreement), by wire transfer of immediately available funds.

(b)    <u>Taxpayer I.D.</u>  Certification, in the form attached to this Agreement as **<u>Exhibit G</u>**.

(c)    The <u>Fuel Supply Covenant</u>, fully executed and in recordable form.

(d)    <u>Supplemental Agreement.</u> The Supplemental Agreement and all guaranties of the Supplemental Agreement, and other attachments to the Supplemental Agreement and other documents, agreements and instruments necessary and appropriate for all Locations to effectuate the financing and supply arrangements outlined in <u>Sections 2.2.1</u> and <u>2.2.3</u>, above.

(e)    <u>Access Agreement</u>.  The Access Agreement in the form attached to this Agreement as **<u>Exhibit H</u>**, fully executed and in recordable form.

(f)    <u>Supply Documentation</u>.  Execution/delivery of the motor fuel supply documentation referenced in <u>Section 2.2.1</u>, above for all Locations, together with any and all other documents and agreements customarily used or relied upon by Seller in connection with its supply relationships with open dealers.

(g)    <u>Other Documents</u>.  Any and all other documents, agreements, certifications, affidavits, and other instruments and materials required by this Agreement or reasonably necessary and appropriate to facilitate and complete the transactions contemplated by this Agreement in accordance with the terms, conditions and provisions of this Agreement.

6.7.    **<u>Documents to be Executed by Seller and Buyer</u>**.  At the Closing, Seller and Buyer shall mutually execute and deliver a closing statement and an update and restatement of representations and warranties in this Agreement as of the Closing Date, satisfactory to Seller and Buyer.

## 7.
## <u>RISK OF LOSS</u>

7.1.    **<u>Condemnation</u>**.  If, prior to the Closing, action is initiated to take any of the Property at any Location by eminent domain proceedings or by deed in lieu of such proceedings, or the written threat of such action occurs, either Buyer or Seller may terminate this Agreement with respect to such Location by written notice to the other, the Purchase Price shall be reduced by the amount allocated to such removed Location on <u>Exhibit A-24</u>, and the Parties shall proceed to consummate the Closing, with neither Party having any further right or obligation under this Agreement with respect to such Location other than the Surviving Obligations.  If neither Party terminates this Agreement with respect to such Location and the transaction closes, then all of Seller's assignable right, title and interest in and to the award of the condemning authority with respect to the Location shall be assigned to Buyer at the Closing and there shall be no reduction in the Purchase Price.

    7.2.  **Casualty**.  Except as provided in Sections 1.4, 4.2 and 5.1 of this Agreement, Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated.  If the Property, or any part of the Property, at a Location suffers any damage in excess of $100,000.00 prior to the Closing, Buyer may either at or prior to Closing (a) terminate this Agreement with respect to such Location, the Purchase Price shall be reduced by the amount allocated to such removed Location on Exhibit A-24, and the Parties shall proceed to consummate the Closing, with neither Party having any further right or obligation under this Agreement with respect to such Location other than the Surviving Obligations, or (b) consummate the Closing, in which latter event all of Seller's right, title and interest in and to the proceeds of any insurance covering such damage, together with the deductible under Seller's policy, shall be assigned and paid to Buyer at the Closing.  If the Property, or any part of the Property, at a Location suffers any damage less than $100,000.00 prior to the Closing, Buyer agrees that it will consummate the Closing with a credit against the Purchase Price for the estimated cost of repairs, with Seller retaining all rights, title and interest in and to the proceeds of any insurance covering such damage.

8.
DEFAULT

    8.1.  **Breach by Seller**.  In the event that Seller shall fail to consummate this Agreement for any reason except Buyer's default or a termination of this Agreement by Buyer or Seller pursuant to a right to do so under the provisions of this Agreement, Buyer, as its sole and exclusive remedy may either (a) terminate this Agreement and neither Party shall have any further right or obligation under this Agreement other than the Surviving  Obligations, or (b) pursue the remedy of specific performance of Seller's obligations under this Agreement; provided, however, that in the event of such termination by Buyer, the Earnest Money shall not be refundable to Buyer unless (i) Seller is not able to convey commercially reasonably acceptable title to the Land or (ii) commits fraud against Buyer; and provided further, however, that Buyer shall only be entitled to specific performance if (A) any such suit for specific performance is filed within sixty (60) days after the date scheduled for Closing, and (B) Buyer is not in default under this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, in the event that because of Seller's willful and wanton conduct the remedy of specific performance is not available to Buyer (for example, the Property is conveyed by Seller to another in violation of the terms of this Agreement), then, in the event of Seller's default under this Agreement, Buyer shall be entitled to the return of the Earnest Money, together with its actual damages.  Buyer agrees that prior to its exercise of any rights or remedies as a result of any defaults by Seller, Buyer will first deliver written notice of said default to Seller, and if Seller so elects, Seller shall have the opportunity, but not the obligation, to cure such default within ten (10) days after Seller's receipt of such notice.  In no event whatsoever shall Buyer file any instrument of record against title to the Property; provided, however, Buyer may file a lis pendens of this Agreement simultaneously with its filing of a suit for specific performance or damages pursuant to this Section 8.1.  Notwithstanding any of the foregoing to the contrary, except as expressly set forth in this Section 8.1 of this Agreement and except for those obligations that survive Closing under this Agreement, in no event whatsoever shall Buyer have the right to seek money damages of any kind as a result of any default by Seller

27

under any of the terms of this Agreement. In no event shall Seller or Buyer be liable to the other for any punitive, speculative or consequential damages.

8.2. **Breach by Buyer**.

(a)     If Buyer fails to comply with Article 6 of this Agreement on or before 5:00 p.m. Eastern time on the Closing Date or otherwise defaults under this Agreement, Seller may terminate this Agreement and thereupon shall be entitled to the Earnest Money as liquidated damages (and not as a penalty) and as Seller's sole remedy and relief under this Agreement (except for the Surviving Obligations); Seller agrees that, prior to exercising any rights or remedies as result of any defaults by Buyer (other than Buyer's failure to consummate this transaction on the Closing Date), Seller will first deliver its notice of said default to Buyer, and if Buyer so elects, Buyer shall have the opportunity, but not the obligation, to cure such default within ten (10) days after Buyer's receipt of such notice. In the event Buyer fails to perform its obligations pursuant to Article 6 of this Agreement on or before 5:00 p.m. Eastern Time on the Closing Date, Seller shall be entitled to the remedies set forth above without notice or opportunity to Buyer to cure, time being of the essence of Article 6. Seller and Buyer have made this provision for liquidated damages because it would be difficult to calculate, on the date of this Agreement, the amount of actual damages for such breach, and Seller and Buyer agree that these sums represent reasonable compensation to Seller for such breach.

(b)     Notwithstanding the provisions of Article 8 above, the foregoing shall not in any way limit, affect or impair any of Buyer's or Seller's indemnities in this Agreement.

8.3. **No Punitive or Consequential Damages**. Except as specifically provided in this Agreement, no Party to this Agreement, nor any of their respective Affiliates, shall be liable to any other Party or any of its Affiliates for Claims for punitive, special, speculative, treble, remote, exemplary, incidental, indirect, or consequential damages, including damages for loss of profits, loss in value of assets, loss of use or revenue or losses by reason of cost of capital connected with this Agreement, regardless of whether a Claim is based in contract, tort (including negligence), strict liability, violation of any applicable deceptive trade practices act, or similar legal requirement or any other legal or equitable principle unless such damages are assessed by a Third Party against a Party to this Agreement.

9.
FUTURE OPERATIONS

9.1. **Operations After Closing**. Buyer covenants and agrees with Seller as follows:

(a)     That Buyer shall not install and it shall, in any conveyance document (in which conveyance documents Buyer shall make Seller a third party

28

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

beneficiary), prevent any subsequent Buyer or permitted assignee of the Property from installing, any well or other tank, pump or related equipment for the storage or use of potable water at the Property.

(b)     That Buyer shall not improve or use, and shall, in any conveyance document (in which conveyance document Buyer shall make Seller a third party beneficiary) prohibit any subsequent buyer or assignee of the Property from using or improving, the Property for residential purposes (including multi-family residential uses, or for any hospital, school, elder care or day care center or for a park or playground).

(c)     Buyer shall not materially change the use of the Property in such a way as to increase the level of clean-up required by any Governmental Entity for any environmental condition which has affected the Property prior to the Effective Date of this Agreement.

(d)     Each of the covenants set forth in clauses (a), (b) and (c) of this <u>Section 9.1</u> shall appear in the Deed delivered pursuant to this Agreement and shall run with the land and bind Buyer and its successors and assigns.

10.

COOPERATION AND PERFORMANCE OF ENVIRONMENTAL
REMEDIATION AND INDEMNIFICATION

10.1.    **Control and Completion of Activities Regarding Known Remediation Orders**. Subject to <u>Section 4.6.3</u> (*Time Limitation on Seller's Environmental Indemnification),* if Seller is conducting Remediation as a result of its indemnification obligations described in <u>Section 4.6.1</u> (*Seller's Environmental Indemnification*) in connection with a Known Remediation Order, Seller shall have the right to continue to conduct and control all activities related to such Remediation until the Remediation Completion Date (as defined below), or the earlier termination of Seller's obligations as set forth below in this <u>Section 10.1</u>, and shall have the right to install, maintain and monitor any monitoring wells required as part of a Remediation; <u>provided</u>, that such right of Seller to control such Remediation includes, but is not limited to, the right to elect conditional closure requiring the entry (as anticipated by <u>Section 10.3</u> below) by Buyer into restrictive covenants or similar land restrictions required by the applicable Governmental Entity overseeing such Remediation as a condition to securing a Closure Letter (as defined below).  Subject to <u>Section 4.6.3</u> and unless sooner terminated pursuant to <u>Section 4.6.3</u>, Seller's obligation with respect to any Known Remediation Order and any Losses related to the Environmental Condition that is the subject of such Known Remediation Order, shall terminate on, upon the earlier to occur of the following dates:

i.       the date of any closure letter, conditional closure letter, "no further action" letter, or similar evidence of approval or concurrence from the Governmental Entity overseeing such Remediation that such Remediation has been

29

completed or that no further action is required ("**Closure Letter**"), such date being referred to in this Agreement as the "**Remediation Completion Date**;" or

ii.    the date that is two (2) years after the date on which the Deed from Seller to Buyer for the Location is recorded.

10.2.    **Control of Remediation Activities Arising From Unknown Environmental Conditions**.  If Remediation covered in whole or in part by Seller's indemnification obligation described in Section 4.6.1 (*Seller's Environmental Indemnification)* is required to be conducted after the Closing Date, Seller shall have the right, at its sole option, to take exclusive control of the Remediation.  If Seller has the right to control Remediation (as provided above for an Known Environmental Condition), but fails to do so, Buyer shall have the right to assume control of the Remediation, subject to Buyer taking the following actions:

(a)    consult with Seller in advance of issuing any material documents, attending any material meetings or hearings or taking any material step or action in relation to the relevant activities;

(b)    provide Seller with reasonable (at least thirty (30) days) notice of, and a reasonable opportunity to attend any meeting or hearing or the carrying out of any activities with respect to any such Remediation;

(c)    provide to Seller any documents, information, assistance or access that Seller may reasonably request;

(d)    provide Seller with a reasonable opportunity to audit the costs of such Remediation;

(e)    implement the lowest cost methodology available consistent with applicable Environmental Laws, unless an alternative is approved by Seller, and

(f)    comply with any other reasonable requests of Seller.

10.3.    **Notice; Access; Cooperation**.  Buyer shall cooperate with Seller's activities in respect of any Remediation that is being conducted or controlled by Seller pursuant to this Article 10, including but not limited to entering into restrictive covenants or similar land restrictions required by the applicable Governmental Entity overseeing such Remediation as a condition to securing a Closure Letter.  Seller agrees that, to the extent practicable, Seller will conduct all Remediation in a manner that minimizes any disruption to ongoing business activity at the Property.  Following the Closing Date, Seller shall use its reasonable efforts to give Buyer prior notice of any activity at the Property involving any excavation or activity that obstructs access to any Property.  Buyer shall refrain from conducting any operations that unreasonably interfere with such Remediation.

10.4.    **Seller's Environmental Equipment**.  The Property transferred to Buyer under this Agreement does not include any groundwater monitoring wells or other environmental equipment

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

now located on the Property or hereafter installed on the Property by Seller (collectively "**Seller's Environmental Equipment**").  Seller shall at all times retain title to Seller's Environmental Equipment and shall be responsible for maintenance of and repairs occasioned by any ordinary wear and tear in respect of such Seller's Environmental Equipment.  Seller shall have the right at any time subsequent to the Closing Date to add new monitoring wells at no expense to Buyer at the Property at mutually agreeable locations, which new monitoring wells shall automatically be deemed to be a part of Seller's Environmental Equipment, and to remove Seller's Environmental Equipment and/or to abandon Seller's Environmental Equipment in such manner as may be permitted by applicable laws and regulations.  Upon any removal or abandonment, such pieces of equipment shall no longer constitute a part of Seller's Environmental Equipment.  Seller shall have no obligation to remove, close or abandon such wells, but at such time as there is no further need for the wells in order to comply with environmental monitoring requirements, Seller shall co-operate with Buyer as may be necessary to permit Buyer to remove, cap or abandon such wells at Buyer's sole expense.  If any of Seller's Environmental Equipment becomes damaged including, but not limited to, any damage as a result of any modification at the Property by Buyer, creating a potentially unsafe or nuisance condition, Buyer shall immediately notify Seller of the existence of such condition.  In the event that Buyer or any Representative, agent or contractor of Buyer damages Seller's Environmental Equipment, Buyer shall immediately compensate the owner of such equipment for the cost of proper abandonment, relocation, replacement and/or repair of Seller's Environmental Equipment.

10.5.    **Buyer Modifications to Premises**.  Buyer acknowledges that any construction or other modification at the Property may affect Seller's Remediation activities at the Property.  Prior to any excavation, construction or other activity at the Property where Seller is conducting or controlling Remediation or where Seller is then indemnifying Buyer pursuant to Section 4.6.1 (*Seller's Environmental Indemnification*), Buyer shall give Seller prior written notice of any such activities and permit Seller the full, timely and reasonable opportunity at Seller's option to (a) change the location of or remove Seller's equipment and install new equipment at locations on the Property mutually agreeable to the Parties and (b) close any affected monitoring wells in accordance with the requirements of applicable Laws.  The costs of such work shall be at Buyer's expense.

10.6.    **Seller's and Buyer's Participation in Restoration/Reimbursement Programs**.

(a)    Buyer agrees that Seller, at its sole discretion after ten (10) days' notice to Buyer, may elect from time to time to participate in either a state administered restoration program or a state reimbursement program or both, if and to the extent such program(s) exist in the State or the work to be performed under this Agreement by Seller qualifies under such program(s), and Buyer shall have no recourse against Seller with regard to any such election.  Buyer agrees that Seller's participation in or compliance with a state-administered restoration program or state reimbursement program constitutes performance of Seller's obligations under this Agreement.  Buyer shall, as requested by Seller and at no expense to Buyer, cooperate with Seller to seek reimbursement under any such state administered restoration program or state reimbursement program.  Seller shall be entitled to

retain all reimbursements from such programs received for work performed by, or attributable to, Seller under this Agreement.  To the extent Buyer receives any such reimbursements Buyer shall promptly pay such reimbursements to Seller.

(b)      In addition, Buyer shall participate in and satisfy any requirements of any applicable Governmental Entity with respect to participation in or compliance with any state administered restoration program or state reimbursement program applicable to the Property. Buyer shall seek any available reimbursement under any such state administered restoration program or state reimbursement program.  By its execution of this Agreement, Buyer assigns to Seller any and all rights it may have against any such state program to the extent Seller has expended funds related to the matters for which reimbursement from such program occurs, and agrees to execute any documents required by such state administered restoration program or state reimbursement program to effectuate such assignment or reimbursement.  To the extent Buyer receives any such reimbursement Buyer shall promptly pay such reimbursement to Seller.

10.7.    **Assignment of Other Rights**.  To the extent that Seller has expended such funds in Seller's Remediation at the Property, Buyer by its execution of this Agreement assigns to Seller any and all Claims (a) that accrued during Seller's ownership of the Property, and (b) with respect to which Seller has previously performed Remediation or otherwise has responsibility pursuant to this Agreement that may exist against any Third Party who may have financial responsibility for any environmental response costs or other expenses or damages at the Property, including, but not limited to, any rights to recover under any insurance policy that may name Buyer as a beneficiary or against which Buyer may have a right of recovery.  Buyer covenants and agrees to cooperate with Seller in determining whether such Claims exist, and in taking any other actions necessary to effectuate the assignment(s) contemplated by this Section 10.7.

10.8.    **Remediation Obligation**.  Seller and Buyer agree that notwithstanding any provision of this Agreement, Seller shall not be obligated, pursuant to the terms of this Agreement or otherwise, to perform Remediation at the Property to achieve any standard or standards other than applicable federal standards or the State's cleanup standards, in each case, for commercial/industrial property use.

10.9.    **Additional Covenant Relating to Institutional Controls**.  In addition to the covenants set forth in Article 9 (*Future Use of Premises*), Seller and Buyer agree to cooperate with the other and any applicable Governmental Entity to execute, file and record any deed notice, restriction or similar restrictive covenant in the real property records of the Property, to the extent such deed notice, restriction or restrictive covenant is necessary or advisable under to achieve a Closure Letter.

10.10.  **Survival.**  The provisions of this Article 10 shall survive the closing of the transaction contemplated by this Agreement.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

11.

## MISCELLANEOUS

11.1.  **Notices**.  All notices, demands and requests that may be given or that are required to be given by either Party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; (b) on the third (3rd) business day after being sent, by certified or registered mail, return receipt requested, addressed to the intended recipient at the address specified below; (c) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal Express Corporation, or UPS, addressed to such Party at the address specified below, or (d) on the date sent by confirmed facsimile to the respective numbers specified below.  For purposes of this Section 11.1, the addresses of the Parties for all notices are as follows (unless changed by similar notice in writing given by the particular person whose address is to be changed):

If to Seller:          First Coast Energy L.L.P.
                       7014 A.C. Skinner Parkway, Suite 290
                       Jacksonville, Florida 32256
                       Attn:  Carrie Breslin
                       Tel:  (904) 594-3218
                       Fax:  (904) 596-8550
                       E-Mail: cbreslin@firstcoastenergy.com

with a copy to:        First Coast Energy L.L.P.
(by facsimile          7014 A.C. Skinner Parkway, Suite 290
or mail only)          Jacksonville, Florida 32256
                       Attn:  Aubrey L. Edge
                       Tel: (904) 594-3200
                       Fax:  (904) 596-8550

If to Buyer:           Boca Gas Company Holdings 2, LLC
                       6971 Federal Highway, Suite 102
                       Boca Raton, FL 33487
                       Attn: Ali Jaferi
                       Tel:  (561) 774-8077
                       Fax:  (561) 790-8462
                       E-Mail: ali@mrmartusa.com

11.2.  **Real Estate Commissions**.  Seller and Buyer each warrants and represents to the other that it has not employed, retained or consulted any broker, agent, or finder in connection with this Agreement or the purchase and sale contemplated in this Agreement.  Each Party agrees to indemnify, defend and hold harmless the other from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by the indemnifying Party with any

33

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

broker or finder in connection with this Agreement or the transaction contemplated by this Agreement. Notwithstanding anything to the contrary contained in this Agreement, this <u>Section 11.2</u> shall survive the Closing or any earlier termination of this Agreement, and not merge with Seller's Deed or other Closing documents.

11.3.   **Entire Agreement**.  This Agreement embodies the entire agreement between the Parties relating to the subject matter of this Agreement, and there are no oral or written agreements between the Parties, nor any representations made by either Party relative to the subject matter of this Agreement, which are not expressly set forth in this Agreement.

11.4.   **Amendment**.  This Agreement may be amended only by a written instrument executed by the Party or Parties to be bound by that instrument.

11.5.   **Headings**.  The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

11.6.   **Time of Essence**.  Time is of the essence of this Agreement; however, if the final date of any period or for any event that is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Florida, then, in such event, the time of such period or date of such event shall be extended to the next day that is not a Saturday, Sunday or legal holiday.

11.7.   **Governing Law**.  This Agreement shall be governed by the laws of the State of Florida and the laws of the United States pertaining to transactions in such State.

11.8.   **Successors and Assigns; Assignment**.  This Agreement shall bind and inure to the benefit of Seller and Buyer and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns.  Except as provided below, Buyer shall not assign Buyer's rights under this Agreement without the prior written consent of Seller, which consent may be withheld absolutely; provided, however, that Seller's consent shall not be required with respect to an assignment of this Agreement to a person or entity that controls, is controlled by, or is under common control with Buyer.  Any subsequent assignment may be made only with the prior written consent of Seller.  No assignment of Buyer's rights under this Agreement shall relieve Buyer of its liabilities under this Agreement.  This Agreement is solely for the benefit of Seller and Buyer; there are no third party beneficiaries of this Agreement.  Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.  Notwithstanding anything to the contrary contained in this Agreement, upon written notice to Buyer, Seller shall be entitled to assign its rights under this Agreement to one or more entities prior to the Closing Date without the necessity of Buyer's consent, but no such assignment shall release Seller from any obligations under this Agreement.

11.9   **Invalid Provision**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement

shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

11.10. **Attorneys' Fees**.  In the event it becomes necessary for either Party to this Agreement to file suit to enforce this Agreement or any provision contained in this Agreement, the Party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided in this Agreement, reasonable attorneys' fees incurred in such suit.

11.11. **Multiple Counterparts**.  This Agreement may be executed in a number of identical counterparts that, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each Party's signature.  Executed counterparts delivered by facsimile and other electronic means shall be deemed originals for all purposes under this Agreement.

11.12. **No Recordation**.  Seller and Buyer by execution of this Agreement acknowledge that neither this Agreement nor any memorandum or affidavit of this Agreement shall be recorded of public record, in the county where the Land is located, or any other public records.  Should Buyer ever record or attempt to record this Agreement, or a memorandum or affidavit of this Agreement, or any other similar document, then, notwithstanding anything in this Agreement to the contrary, said recordation or attempt at recordation shall constitute a default by Buyer under this Agreement, and, in addition to the other remedies provided for in this Agreement, Seller shall have the express right to terminate this Agreement by filing a notice of said termination in the county in which the Land is located.

11.13. **Merger Provision**.  Except as otherwise expressly provided in this Agreement, any and all rights of action of Buyer or Seller for any breach by the other of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

11.15. **Jury Waiver**.  BY THEIR RESPECTIVE EXECUTION OF THIS AGREEMENT, BUYER AND SELLER DO KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY BUYER AT CLOSING OR SELLER AT CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY BUYER AT CLOSING AND SHALL SURVIVE THE CLOSING OF TERMINATION OF THIS AGREEMENT.

11.16.  **Limitation on Liability**.    No present or future partner, director, officer, shareholder, partner, employee, advisor, agent, attorney, or asset manager of or in Seller or Buyer shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Buyer and Seller and their successors and assigns and, without limitation, all other persons and entities, shall look solely to Seller's and Buyer's assets for the payment of any claim or for any performance, and Buyer and Seller by execution of this Agreement waive any and all such personal liability.  The limitations on liability contained in this <u>Section 11.16</u> are in addition to, and not in limitation of, any limitation on liability applicable to Seller and Buyer provided in any other provision of this Agreement or by law or by any other contract, agreement or instrument.

11.17.  **Confidentiality**.  Without limiting the terms and conditions of <u>Section 4.2</u> of this Agreement, prior to Closing, and including during inspections pursuant to this Agreement, Buyer (and its agents) and Seller shall keep confidential and shall not disclose the possibility of the sale or terms of the transfers contemplated in this Agreement, including, without limitation, the Purchase Price and all other financial terms, or disclosures to except: (1) directors, officers, partners, employees, legal counsel, accountants, engineers, architects, qualified intermediaries, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate in connection with the transaction contemplated under this Agreement (and each Party shall inform each of the foregoing Parties of such Party's obligations under this <u>Section 11.17</u>) or (2) as otherwise required by law or regulation.

11.18.  **1031 Exchange**.  As part of the inducement Buyer agrees that Seller shall have the right to effectuate this transaction as a tax-deferred exchange in accordance with Section 1031 of the Internal Revenue Code, and to assign its rights under this Agreement to a qualified intermediary for the purpose of consummating such an exchange.  Buyer agrees to cooperate with Seller as required to effectuate an exchange, including executing and delivering any and all documents required by the exchange trustee or qualified intermediary to acknowledge notice of an assignment of the contract to such qualified intermediary, provided however, that Buyer shall not be required to incur any cost or expense in connection with the exchange.

11.19.  **Radon.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit.**

11.20.  **Exhibits**.  The following Exhibits attached to this Agreement are incorporated as part of this Agreement:

|  |  |
|---|---|
| Exhibits A1- A-23 | Legal Description of Land |
| Exhibit A-24 | List of Locations |
| Exhibit A-24 | List of Other Locations |

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

| | |
|---|---|
| Exhibit B | Definitions |
| Exhibit C | Tangible Personal Property |
| Exhibit D | Environmental Identification Information and Certain Environmental Reports |
| Exhibit E-1 | Deed – Certain Alachua, Clay, Columbia, Duval, Flagler and Volusia County Locations |
| Exhibit E-2 | Deed – Certain Broward and Palm Beach County Locations |
| Exhibit F | Bill of Sale |
| Exhibit G | Taxpayer I.D. Statement |
| Exhibit H | Access Agreement |
| Exhibit I | [Intentionally deleted.] |
| Exhibit J | Environmental Financial Responsibility |
| Exhibit K | Dealer Supply Agreement |
| Exhibit K-1 | Supply Agreement Minimum Gallonage Requirements by Location |
| Exhibit L | Supplemental Agreement |
| Exhibit L-1 | Supplemental Amounts by Location |

[*balance of page intentionally left blank; signatures appear on following page*]

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

IN WITNESS WHEREOF, Buyer and Seller have executed as of the Effective Date.

**BOCA GAS COMPANY HOLDINGS 2, LLC,**
a Florida limited liability company

By: _____
Abbas Jaferi
Its Manager

Date: 8/9/2019 _____

**FIRST COAST ENERGY, L.L.P.,**
a Colorado limited liability partnership

By:    **PETRO DISTRIBUTING PARTNERS
OF FLORIDA, L.L.C.,** a Delaware limited
liability company, its Partner

By: _____
Aubrey L. Edge
Its Manager

Date: _____

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

IN WITNESS WHEREOF, Buyer and Seller have executed as of the Effective Date.

**BOCA GAS COMPANY HOLDINGS 2, LLC,**
a Florida limited liability company

By:_____
          Abbas Jaferi
          Its Manager

Date:_____

**FIRST COAST ENERGY, L.L.P.,**
a Colorado limited liability partnership

By:    **PETRO DISTRIBUTING PARTNERS OF FLORIDA, L.L.C.,** a Delaware limited liability company, its Partner

By:_____
          Aubrey L. Edge
          Its Manager

Date:_____8/9/2019_____

38

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842

Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## **Exhibit A-1**
### "FCE 1018" Land

A parcel of real property situated in St. Johns County, Florida and more particularly described as follows:

A PART OF GOVERNMENT LOT 1, SECTION 14, TOWNSHIP 6 SOUTH, RANGE 28 EAST, ST. JOHNS COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF REFERENCE, COMMENCE AT THE NORTHEAST CORNER OF SAID SECTION 14; THENCE SOUTH 89°32'10" WEST ALONG THE NORTH LINE OF SAID SECTION 14 AND ALONG THE CENTERLINE OF INTERNATIONAL GOLF PARKWAY (A RIGHT-OF-WAY OF VARYING WIDTH), A DISTANCE OF 2438.75 FEET; THENCE SOUTH 00°27'50" EAST LEAVING SAID NORTH LINE OF SECTION 14, A DISTANCE OF 129.00 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY LINE OF THE RAMP LEADING FROM INTERSTATE 95 TO INTERNATIONAL GOLF PARKWAY (A RIGHT-OF-WAY OF VARYING WIDTH), SAID POINT LYING ON A CURVE, SAID CURVE BEING CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 40.00 FEET; THENCE SOUTHWESTERLY ALONG THE EASTERLY RIGHT-OF-WAY LINE OF ROAD EASEMENT PARCEL B AND ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 62.83 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 44°32'10" WEST AND A CHORD DISTANCE OF 56.57 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE SOUTH 00°27'50" EAST CONTINUING ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 130.01 FEET TO THE POINT OF CURVE OF A CURVE, CONCAVE NORTHEASTERLY HAVING A RADIUS OF 40.00 FEET; THENCE SOUTHEASTERLY CONTINUING ALONG SAID RIGHT-OF-WAY LINE AND ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 62.83 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 45°27'50" EAST AND A CHORD DISTANCE OF 56.57 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE NORTH 89°32'10" EAST ALONG THE NORTHERLY RIGHT-OF-WAY LINE, A DISTANCE OF 180.00 FEET; THENCE SOUTH 00°27'50" EAST, A DISTANCE OF 60.00 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID ROAD EASEMENT PARCEL B AND THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 00°27'50" EAST LEAVING SAID RIGHT-OF-WAY LINE, A DISTANCE OF 200.00 FEET; THENCE SOUTH 89°32'10" WEST ALONG A LINE TO ITS INTERSECTION WITH THE EASTERLY RIGHT-OF-WAY LINE OF SAID ROAD EASEMENT PARCEL B, A DISTANCE OF 250.00 FEET; THENCE NORTH 00°27'50" WEST ALONG SAID EASTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 160.00 FEET TO THE POINT OF CURVE OF A CURVE, SAID CURVE BEING CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 40.00 FEET; THENCE NORTHEASTERLY CONTINUING ALONG SAID RIGHT-OF-WAY LINE AND ALONG THE ARC OF SAID CURVE, AN ARC DISTANCE OF 62.83 FEET, SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 44°32'10" EAST AND A CHORD DISTANCE OF 56.57 FEET TO THE POINT OF TANGENCY OF SAID CURVE; THENCE NORTH 89°32'10" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE, A DISTANCE OF 210.00 FEET TO THE POINT OF BEGINNING.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## **Exhibit A-2**
## "FCE 1059" Land

A parcel of real property situated in Duval County, Florida and more particularly described as follows:

That certain piece, parcel or tract of land, situated, lying and being a part of Tract "K" SANDALWOOD UNIT TWO, as recorded in Plat Book 30, pages 36, 36A and 36B, of the current public records of Duval County, Florida and being more particularly described as follows:

Commencing at an iron marking the intersection of the Easterly right of way line of St. Johns Bluff Road Extension (as shown on said plat), with the Southerly right of way line of Atlantic Boulevard (a 100 foot right of way as shown on said plat); thence north 84 degrees 01 minutes 40 seconds East along said Southerly right of way line of Atlantic Boulevard a distance of 150 feet to a point marked by an iron; thence South 00 degrees 58 minutes 10 seconds East for a distance of 150 feet to a point marked by an iron; thence South 84 degrees 01 minutes 40 seconds West for a distance of 150 feet to a point on the Easterly right of way line of St. Johns Bluff Extension marked by an iron; thence North 00 degrees 58 minutes 10 seconds West along the Easterly right of way of St. Johns Bluff Extension a distance of 150 feet to the iron marking the point of beginning.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842

Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

### Exhibit A-3
"FCE 1063" Land

A parcel of real property situated in Alachua County, Florida and more particularly described as follows:

TRACT OF LAND SITUATED IN SECTION 2, TOWNSHIP 10 SOUTH, RANGE 19 EAST, ALACHUA COUNTY, FLORIDA, SAID TRACT OF LAND BEING, MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT THE NORTHWEST CORNER OF SECTION 2, TOWNSHIP 10 SOUTH, RANGE 19 EAST AND RUN SOUTH 89 DEGREES 31 MINUTES 02 SECONDS EAST ALONG THE NORTH LINE OF SAID SECTION 2, A DISTANCE OF 3311.28 FEET, THENCE RUN SOUTH 00 DEGREES 04 MINUTES 28 SECONDS WEST, A DISTANCE OF 449.32 FEET TO THE NORTHWEST CORNER OF GOLF CLUB MANOR, A SUBDIVISION AS RECORDED IN PLAT BOOK E, PAGE 12 OF THE PUBLIC RECORDS OF ALACHUA COUNTY, FLORIDA; THENCE SOUTH 00 DEGREE 04 MINUTES 28 SECONDS WEST ALONG THE WEST LINE OF SAID GOLF CLUB MANOR, A DISTANCE OF 1173.33 FEET; THENCE RUN NORTH 89 DEGREES 29 MINUTES 38 SECONDS WEST, A DISTANCE OF 1168.94 FEET; THENCE RUN SOUTH 57 DEGREES 08 MINUTES 25 SECONDS WEST, A DISTANCE OF 600 FEET TO THE NORTHEASTERLY RIGHT-OF-WAY LINE OF OLD NEWBERRY ROAD (OLD STATE ROAD NO. 26); THENCE SOUTH 38 DEGREES 02 MINUTES 28 SECONDS EAST ALONG THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID NEWBERRY ROAD, A DISTANCE 276.00 FEET TO THE POINT OF THE BEGINNING; THENCE CONTINUE SOUTH 38 DEGREES 02 MINUTES 28 SECONDS EAST ALONG THE NORTHEASTERLY RIGHT-OF-WAY LINE OF OLD NEWBERRY ROAD A DISTANCE OF 46.71 FEET TO THE POINT OF A CURVE; THENCE RUN SOUTHEASTERLY ALONG SAID NORTHERLY RIGHT-OF-WAY LINE WITH A CURVE CONCAVE NORTHEASTERLY, SAID CURVE HAVING A RADIUS OF 305.72 FEET, A CENTRAL ANGLE OF 29 DEGREES 06 MINUTES 27 SECONDS, A LENGTH OF 155.31 FEET AND A CHORD OF SOUTH 52 DEGREES 35 MINUTES 41 SECONDS EAST, A DISTANCE OF 153.65 FEET, THENCE RUN SOUTH 67 DEGREES 08 MINUTES 55 SECONDS EAST ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF NEWBERRY ROAD A DISTANCE OF 150.06 FEET, THENCE RUN NORTH 04 DEGREES 01 MINUTES 22 SECONDS EAST, A DISTANCE OF 154.00 FEET; THENCE RUN NORTH 67 DEGREES 8 MINUTES 55 SECONDS WEST, A DISTANCE OF 158.00 FEET; THENCE RUN SOUTH 80 DEGREES 13 MINUTES 36 SECONDS WEST, A DISTANCE OF 156.60 FEET TO THE POINT OF BEGINNING.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

### Exhibit A-4
"FCE 1064" Land

A parcel of real property situated in Alachua County, Florida and more particularly described as follows:

A PARCEL OF LAND LYING IN SECTION 29, TOWNSHIP 9 SOUTH, RANGE 20 EAST, ALACHUA COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT THE NORTHWEST CORNER OF SAID SECTION 29 FOR A POINT OF REFERENCE; THENCE RUN NORTH 88' 48' 31" EAST ALONG THE NORTH LINE OF SAID SECTION 29, A DISTANCE OF 232.00 FEET; THENCE RUN SOUTH 00 54' 59" EAST, 48.10 FEET TO THE SOUTH RIGHT-OF-WAY LINE OF STATE ROAD NO. 222 (NORTHWEST 39TH AVENUE) AND THE POINT OF BEGINNING; THENCE 'RUN NORTH 88' 48' 31" EAST ALONG SAID SOUTH RIGHTOF-WAY LINE, 120.91 FEET; THENCE RUN SOUTH 00' 48' 56" EAST, 124.35 FEET; THENCE RUN SOUTH 87' 39' 53" WEST, 37.84 FEET, THENCE RUN SOUTH 62' 24' 54" WEST, 37.08 FEET;, THENCE RUN SOUTH 88' 51' 05" WEST, 224.26 FEET TO THE EASTERLY RIGHT-:OF-WAY LINE OF STATE ROAD NO. 25, (NORTHWEST 13TH STREET); THENCE RUN NORTH 00' 35' 10" WEST ALONG SAID EASTERLY RIGHT-OF-WAY LINE, 110.72 FEET TO THE BEGINNING OF A RIGHT-OF-WAY CURVE CONCAVE TO THE SOUTHEAST; THENCE RUN NORTHERLY AND NORTHEASTERLY ALONG THE ARC OF SAID CURVE, HAVING A RADIUS OF 31.00 FEET, A CENTRAL ANGLE OF 36' 26' 25", AN ARC LENGTH OF 19.72 FEET, A CHORD BEARING OF NORTH 17' 35' 25" EAST, AND A CHORD LENGTH OF 19.39 FEET; THENCE RUN SOUTH 49' 33' 50" EAST, 5.00 FEET; THENCE RUN NORTH 40' 26' 10" EAST, 5.00 FEET; THENCE RUN NORTH 49' 33' 50" WEST, 5.00 FEET TO THE AFOREMENTIONED. RIGHT-OF-WAY CURVE; THENCE RUN NORTHEASTERLY AND EASTERLY ALONG THE ARC OF SAID RIGHT-OF-WAY CURVE, HAVING A RADIUS OF 31.00 FEET, A CENTRAL ANGLE OF 43' 44' 59", AN ARC LENGTH OF 23.67 FEET, A CHORD BEARING OF NORTH 66' 56' 07" EAST, AND A CHORD LENGTH OF 23.10 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF- WAY LINE OF SAID STATE ROAD NO. 222 AND THE END OF SAID RIGHT-OF-WAY CURVE; THENCE RUN NORTH 88' 48' 31" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF STATE ROAD NO, 222, A DISTANCE OF 143.04 FEET TO THE POINT OF BEGINNING.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-5
"FCE 1065" Land

A parcel of real property situated in Duval County, Florida and more particularly described as follows:

A portion of Section 31, Township 2 South, Range 28 East Duval County, Florida, and being more particularly described as follows:

Point of reference being at the intersection of the prolongation of the Southerly right of way line of Beach Boulevard ( a 200 foot right of way, as now established) with the prolongation of the Westerly right of way line of St. Johns Bluff Road (a 200 foot right of way, as now established); thence South 01 degrees 51 minutes 30 seconds East along said Westerly right of way, a distance of 25.00 feet to the point of beginning.

From the point of beginning thus described, continue South 01 degrees 51 minutes 30 seconds East along said Westerly right of way line, a distance of 150.00 feet; thence South 88 degrees 08 minutes 00 seconds West, a distance of 175.00 feet; thence North 01 degrees 51 minutes 30 seconds West, a distance of 175.00 feet to said Southerly right of way line of Beach Boulevard; thence North 88 degrees 08 minutes 00 seconds East along said Southerly right of way line, a distance of 150.00 feet to the point of curvature of a curve concave to the Southwest and having a radius of 25.00 feet; thence along the arc of said curve and being the said Westerly right of way line of St. Johns Bluff Road, an arc distance of 39.27 feet (said curve being subtended by a chord which bears South 46 degrees 51 minutes 45 seconds East, 35.36 feet) to the point of beginning.

## Exhibit A-6
"FCE 1073" Land

A parcel of real property situated in Clay County, Florida and more particularly described as follows:

A portion of Section 6, Township 4 South, Range 26 East, Clay County, Florida, and being more particularly described as follows:

For a point of reference, commence at the intersection of the former Easterly right-of-way line of Blanding Boulevard (State Road Number 21, formerly established as a 100 foot right-of-way) with the center line of Wells Road (a 100 foot right-of-way as now established); run thence North 01° 23' 30" East along said former Easterly right-of-way of Blanding Boulevard, a distance of 598.0 feet; run thence South 88° 36' 30" East, a distance of 23.0 feet to the new Easterly right-of-way line of Blanding Boulevard and a common point of beginning for the following descriptions.

From the point of beginning thus described; run thence South 88° 36' 30" East parallel with aforementioned centerline of Wells Road, a distance 165.0 feet; thence North 01° 23' 30" East, a distance of 150.0 feet; run thence North 83° 36' 30" West, a distance of 165.49 feet to the aforementioned Easterly right-of-way line of Blanding Boulevard; run thence South 00° 02' 30" East along said Easterly right-of-way line, a distance of 19.61 feet to an angle point in said Easterly right-of-way line of Blanding Boulevard; run thence South 01° 23' 30" West, a distance of 130.39 feet to the point of beginning.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-7
"FCE 1078" Land

A parcel of real property situated in Columbia County, Florida and more particularly described as follows:

PARCEL 1:

A portion of the West 1/2 of Section 35, Township 3 South,
Range 16 East, Columbia County, Florida, more particularly
described as commencing at the intersection of the Northerly
right-of-way line of U.S. Highway No. 90, a 100 foot
right-of-way at this point, with the Easterly boundary of the
lands now or formerly owned by Lewis B. Turner, said boundary
of Turner being 330 feet more or less West of the Easterly line
of the West 1/2 of said Section 35 as measured along the
Northerly right-of-way line of said U.S. Highway No. 90; thence
along a curve to the left in said Northerly right-of-way line
of U.S. Highway No. 90, said curve having a radius of 2919.79
feet, a distance of 50.96 feet as measured along a chord
bearing South 81° 32' 08" West to a point of tangency; thence
continue along the Northerly right-of-way line of U.S. Highway
No. 90, South 81° 02' 08" West, 9.18 feet; thence continue
along the Northerly right-of-way line of said U.S. Highway No.
90, South 81° 02' 08" West 38.12 feet to a transition point;
thence North 8° 57' 52" East, 10 feet; thence continue along the
Northerly right-of-way line of said U.S. Highway No. 90, South
81° 02' 08" West, 100.19 feet to a point for the point of
beginning; thence continue along said right-of-way line South
81° 02' 08" West, 149.81 feet to its intersection with the ramp
right-of-way approach of Interstate No. 75; thence North 74°
34' 59" West along said ramp right-of-way line, 110 feet;
thence North 8° 57' 52" West, 129.59 feet; thence North 81° 02'
08" East, 250 feet; thence South 8° 57' 52" East, 175 feet to
the point of beginning.  Being a portion of that land conveyed
to Texaco Inc. by deed recorded in Book 152 page 150, Official
Records of Columbia County, Florida.

PARCEL 2:

A portion of the West 1/2 of Section 35, Township 3 South,
Range 16 East, Columbia County, Florida, more particularly
described as commencing at the intersection of the Northerly
right-of-way line of U.S. Highway No. 90, a 100 foot
right-of-way at this point, with the Easterly boundary of the
lands of said Lewis B. Turner, said boundary of Turner being
330 feet, more or less West of the Easterly line of the West
1/2 of said Section 35 as measured along the Northerly
right-of-way line of said U.S. Highway No. 90; thence along a
curve to the left in said Northerly right-of-way line of U.S.
Highway No. 90, said curve having a radius of 2919.79 feet, a
distance of 50.96 feet as measured along a chord bearing South
81° 32' 08" West to a point of tangency; thence continue along
Continued on next page

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-7 (continued)

the Northerly right-of-way line of U.S. Highway No. 90, South
81° 02' 08" West, 9.18 feet; thence continue along the Northerly
right-of-way line of said U.S. Highway No. 90, South 81° 02'
08" West 38.12 feet to a transition point; thence North 8° 57'
52" East 10 feet; thence continue along the Northerly
right-of-way line of said U.S. Highway No. 90, South 81° 02'
08" West, 250 feet to its intersection with the ramp
right-of-way approach of Interstate No. 75; thence along said
right-of-way line of the following two courses: North 74° 34'
59" West 182.43 feet; North 41° 09' 52" West 513.11 feet to a
point of beginning; thence along said right-of-way line North
41° 09' 52" West 30.0 feet; thence North 81° 02' 08" East 50.0
feet; thence South 41° 09' 52" East 30.0 feet; thence South 81°
02' 08" West 50.0 feet to the point of beginning.  Being the
same land conveyed to Texaco Inc. by deed recorded in Book 195
page 213, Official Records of Columbia County, Florida.

Less and Except any portions of the above described Parcels 1
and 2 within current road right-of-way.

## **Exhibit A-8**
"FCE 1079" Land

A parcel of real property situated in Alachua County, Florida and more particularly described as follows:

Commence at the SE corner of the SW 1/4 of the SW 1/4 of Section 26, Township 10 South Range 22 East; then run North a distance of 563.14 feet; thence run South 88°58' East, 26.25 feet to the Point of Beginning; thence run North along the right-of-way line of U.S. 301, 293.60 feet, thence run South 88°58' East 406 feet; then run South parallel with the right-of-way of U.S. 301, 170 feet, then run South 89°10' W, 156 feet, then run South 22°00' East, 132 feet, then run North 88°58' W, 304.60 feet to the Point of Beginning.

Commence at the SE corner of the SE 1/4 of the SE 1/4 of Section 26, Township 10 South, Range 22 East; thence run North for a distance of 563.14 feet; thence run South 88°58' East for a distance of 330.58 feet to the Point of Beginning; thence continue South 88°58' East for a distance of 14.00 feet; thence North 02°23'02" East for a distance of 123.75 feet; thence South 89°10' West for a distance of 68.6 feet; thence South 22°00' East for a distance of 132.00 feet to the Point of Beginning. All lying and being in Section 26, Township 10 South, Range 22 East, Alachua County, Florida.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842

Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-9
"FCE 1090" Land

A parcel of real property situated in Volusia County, Florida and more particularly described as follows:

Lot 34, Block 1, LA VEGA ORMOND, a subdivision according to map in Map Book 1, Page 58, of the Public Records of Volusia County, Florida.

Together with

Lots 35 and 36, Block 1, LA VEGA ORMOND, as per map in Map Book 1, Page 58, of the Public Records of Volusia County, Florida, except the Easterly 8 feet of Lot 36 conveyed to the State of Florida for highway purposes, - the parcel herein conveyed being more particularly bounded and described as follows:

Beginning at the intersection of the Northerly line of Granada Avenue (100 feet wide) and the Westerly line of Yonge Street (66 feet wide) thence North 25° West along Westerly line of Yonge Street 140 feet; thence Westwardly parallel to Granada Avenue 149.8 feet; thence Southwardly along Westerly line of Lot 35, 140 feet to point in the Northerly line of Granada Avenue; thence North 64°42' East with said line of Granada Avenue 148.6 feet to the Place of Beginning.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842 Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-10
"FCE 1094" Land

A parcel of real property situated in Alachua County, Florida and more particularly described as follows:

A PART OF SECTION 13, TOWNSHIP 10 SOUTH, RANGE 19 EAST, ALACHUA COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS; FOR A POINT OF REFERENCE COMMENCE AT THE NORTHWEST CORNER OF SAID SECTION 13; THENCE SOUTH 04 DEGREES 31 MINUTES 30 SECONDS EAST, A DISTANCE OF 892.75 FEET TO THE POINT OF BEGINNING, SAID POINT LYING ON THE EASTERLY RIGHT-OF-WAY LINE OF S.W. 34TH STREET OR STATE ROAD NO. 121 SAID POINT ALSO LYING ON A CURVE CONCAVE EASTERLY, HAVING A RADIUS OF 11,409.16 FEET; THENCE DEPARTING FROM SAID RIGHT-OF-WAY LINE, RUN DUE EAST, A DISTANCE OF 209.61 FEET TO THE NORTHEAST CORNER OF THE LANDS AS DESCRIBED IN OFFICIAL RECORDS VOLUME 380, PAGE 407 OF THE PUBLIC RECORDS OF THE AFOREMENTIONED ALACHUA COUNTY, FLORIDA; THENCE DUE SOUTH, A DISTANCE OF 58.42 FEET TO AN INTERSECTION WITH THE NORTHWESTERLY RIGHT-OF-WAY LINE OF ARCHER ROAD OR STATE ROAD NO. 24, SAID POINT LYING ON A CURVE, CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 5,807.65 FEET; THENCE SOUTHWESTERLY ALONG THE ARC OF SAID CURVE, A CHORD BEARING OF SOUTH 51 DEGREES 53 MINUTES 06 SECONDS WEST, A CHORD DISTANCE OF 192.69 FEET, AND AN ARC DISTANCE OF 192.70 FEET TO A POINT ON A CURVE (NON-TANGENT) OF A FORMER RIGHT-OF-WAY LINE (BEFORE WIDENING), SAID CURVE BEING CONCAVE NORTHEASTERLY, HAVING A RADIUS OF 41.25 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE, A CHORD BEARING OF NORTH 53 DEGREES 30 MINUTES 34 SECONDS WEST, A CHORD DISTANCE OF 62.93 FEET AND AN ARC DISTANCE OF 71.58 FEET TO AN INTERSECTION WITH THE AFOREMENTIONED EASTERLY RIGHT-OF-WAY LINE OF S.W. 34TH STREET OR STATE ROAD NO. 121; THENCE NORTHERLY ALONG THE ARC OF SAID CURVE, A CHORD BEARING OF NORTH 03 DEGREES 01 MINUTES 53 SECONDS WEST, A CHORD DISTANCE OF 140.14 FEET AND AN ARC DISTANCE OF 140.14 FEET TO THE POINT OF BEGINNING.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-11
### "FCE 1713" Land

A parcel of real property situated in Palm Beach County, Florida and more particularly described as follows:

A parcel of land approximately 150 feet by 150 feet, lying and being in the Westerly parcel marked "not Included" as shown on Plat No. 2 of Plantation Mobil Homes Estates, as recorded in Plat Book 28 Page 43 in and for the Public Records of Palm Beach County, Florida, and more particularly described as follows:

Commencing at the NW corner of Section 26, Township 43 S, Range 42 E, Palm Beach County, Florida;

Thence S, along the W line of said Section 26 (the W line of said Section 26 is assumed to bear S, and all bearings are related thereto), a distance of 39.00 feet to a point on a line lying 39.00 feet S of, when measured at right angles, and parallel with the north line of said Section 26, (said parallel line being also the S right-of-way line of Okeechobee Road - SR 704);

Thence N 89° 49' 45" E, along said parallel line a distance of 64.93 feet to the point of beginning of the parcel to be herein described;

Thence continue N 89° 49' 45" E, along the aforedescribed parallel line, a distance of 125.07 feet to a point;

Thence S parallel with the W line of said Section 26, a distance of 150.00 feet to a point;

Thence S 89° 49' 45" W, parallel with the N line of said Section 26, a distance of 150.00 feet to a point on a line lying 40.00 feet E of, when measured at right angles and parallel with the W line of said Section 26(said parallel line being also the East right-of-way line of Drexel Road);

Thence N, along said parallel line, a distance of 125.07 feet to the beginning of a curve concave to the SE, having a radius of 25.00 feet and a central angle of 89° 49' 45";

Thence Northerly, Northeasterly and Easterly, along the arc of said curve, a distance of 39.20 feet to the end of said curve and the point of beginning of the herein described parcel.

Less and except therefrom the land conveyed by that certain right-of-way deed to Palm Beach County, Florida, filed in Official Records Book 4452 Page 1992 of the Public records of Palm Beach County, Florida, more particularly described as follows:

A portion of the NW 1/4 of Section 26, Township 43 S, Range 42 E of Palm Beach County, Florida, more particularly described as follows:

Commence at the NW corner of section 26, Township 43 S, Range 42 E Palm Beach County, Florida;

Thence S along the W line of said Section 26 for 39 feet to a point;

*[legal description continues on next page]*

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842

Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-11 (continued)

Thence run N 89° 49' 45" E along a line parallel to the N line of said Section 26, being the S right-of-way line of Okeechobee Road for 64.93 feet to the point of beginning of Tract of land hereinafter described;

Thence continue N 89° 49' 45" E for 125.07 feet; thence S parallel to W line of said Section 26 for 11.00 feet;

Thence S 89° 49' 45" W, for 125.07 feet to a point;

Thence S 44° 54' 52" W along the Chord of a 25 ft. Radius for 35.303 ft. to a point that is 40 E of the W line of said Section 26;

Thence run N along said line that is 40 feet E of a parallel to the W line of said Section 26 for 11.00 feet to a point of curvature;

Thence Northeasterly along said circular curve concave to the SE having a Radius of 25 ft. and a Central angle of 89° 49' 45" an arc distance of 39.20 ft. to the point of beginning.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## **Exhibit A-12**
"FCE 1818" Land

A parcel of real property situated in Broward County, Florida and more particularly described as follows:

Parcel "A", Shell at I-95 and Commercial Boulevard, according to the plat thereof as recorded in Plat Book 87 Page 25 of the Public Records of Broward County, Florida.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-13
"FCE 1825" Land

A parcel of real property situated in Broward County, Florida and more particularly described as follows:

Tracts A and B, of Shell Subdivision Number Two, according to plat thereof as recorded in Plat Book 71 Page 40 of the Public Records of Broward County, Florida,

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-14
"FCE 2023" Land

A parcel of real property situated in Duval County, Florida and more particularly described as follows:

Part of the Castro Y. Ferrer Grant, Section 38, Township 2 South, Range 29 East, Neptune Beach, Duval County, Florida, more particularly described as follows:

Commencing at the intersection of the center line of Atlantic Boulevard with the center line of Penman Road; thence South 6 degrees 21 minutes East, along the center line of said Penman Road, 50.32 feet; thence South 89 degrees 56 minutes East parallel to the said center line of Atlantic Boulevard and in line with the South right of way of Atlantic Boulevard, a distance of 50.32 feet to the intersection of the South right of way line of Atlantic Boulevard with the East right of way line of Penman Road, for a point of beginning; thence continue South 89 degrees 56 minutes East along the said South right of way line of Atlantic Boulevard 175 feet, thence South 6 degrees 21 minutes East along a line parallel to the East right of way line of Penman Road 240 feet; thence North 89 degrees 56 minutes West along a line parallel to the said South right of way line of Atlantic Boulevard 175 feet to the said East right of way line of Penman Road, thence North 6 degrees 21 minutes West along the said East right of way line of Penman Road, 240 feet to the point of beginning.

### Exhibit A-15
"FCE 2032" Land

A parcel of real property situated in Duval County, Florida and more particularly described as follows:

Part of Lot 25 and 26, Pickett's Subdivision, according to plat thereof recorded in Plat Book 8, page(s) 44 and 45, current public records of Duval County, Florida, more particularly described as follows:

Begin at the intersection of the Westerly right-of-way line of Moncrief Road and the Northerly right-of-way line of Edgewood Avenue, thence run North 42 Degrees, 53 Minutes, 40 Seconds West, a distance of 150 feet along the Westerly line of Moncrief Road; thence run South 46 Degrees, 49 Minutes West, a distance of 150 feet; thence run South 42 Degrees, 53 Minutes, 40 Seconds East, a distance of 150 feet to the Northerly line of Edgewood Avenue, thence run North 46 Degrees, 49 Minutes East, a distance of 150 feet along the Northerly line of Edgewood Avenue to the Point of Beginning.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## **Exhibit A-16**
"FCE 2034" Land

A parcel of real property situated in Duval County, Florida and more particularly described as follows:

Lots 1, 2 and the North 45 feet of Lot 3, Block 2 (except part in State Road) OAKHURST PARK, according to plat thereof recorded in Plat Book 4, page 68 of the current public records of Duval County, Florida.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-17
"FCE 2039" Land

A parcel of real property situated in Duval County, Florida and more particularly described as follows:

That certain piece, parcel or tract of land, situate, lying and being in City of Jacksonville, County of Duval and State of Florida, described as: Lots 1, 2, 15 and 16, and a part of a 10 foot alley lying between said Lots 2 and 16, closed by Ordinance #U-123 and a part of the church lot in Block 63, New Springfield as recorded in Plat Book 3, page 12 of the current public records of Duval County, Florida, all more particularly described as follows: Begin at the Southwest corner of said Lot 15, thence North 1 degree 45 minutes 20 seconds West, 100.00 feet along the Westerly line of said Lot 15, to its Northwest corner, a point in the South line of West 21st Street, thence North 89 degrees 37 minutes 50 seconds East 216.00 feet along the South line of West 21st Street which is also along the Northerly line of said Lots 15 and 16, across the church lot to an along the Northerly line of said Lot 1 and continuing to the Northeast corner of said Lot 1, thence South 1 degree 45 minutes 20 seconds East, 100.00 feet along the West line of Main Street, which is the East line of said Lots 1 and 2 to the Southeast corner of said Lot 2, thence South 89 degrees 37 minutes 50 seconds West 216.00 feet along the North line of Jacksonville Expressway which is along the Southerly line of said Lot 2, across the said 10 foot alley to and along the Southerly line of said Lot 16 and the Southerly line of said Lot 15, to the point of beginning.

## Exhibit A-18
"FCE 2531" Land

A parcel of real property situated in Flagler County, Florida and more particularly described as follows:

A PARCEL OF LAND LYING IN GOVERNMENT SECTION 41, TOWNSHIP 11
SOUTH, RANGE 31 EAST, BEING A PORTION OF RESERVED PARCEL "B" OF
THE SUBDIVISION MAP COUNTRY CLUB COVE - SECTION 8, PALM COAST,
AS RECORDED IN MAP BOOK 6, PAGE 32 OF THE PUBLIC RECORDS OF
FLAGLER COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS
FOLLOWS:

Beginning at the Southwest corner of said Reserved Parcel "B"
said corner being the intersection of the Northerly right-of-way
of Palm Coast Parkway (104' R/W) and the Easterly right-of-way
of Club House Drive (60' R/W) as shown on the Subdivision Map
Country Club Cove - Section 3, Palm Coast, recorded in Map Book
6, Page 5 of the Public Records of Flagler County, Florida;
Thence North 26 degrees 39 minutes 01 seconds West along said
Easterly right-of-way of Club House Drive 200.00 feet; thence
leaving said right-of-way North 63 degrees 20 minutes 59 seconds
East 326.00 feet; thence South 26 degrees 39 minutes 01 seconds
East 200.00 feet to a POINT on the Northerly right-of-way of
said Palm Coast Parkway; thence South 63 degrees 20 minutes 59
seconds West along said right-of-way 326.00 feet to the POINT OF
BEGINNING of this description.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-19
"FCE 2723" Land

A parcel of real property situated in Palm Beach County, Florida and more particularly described as follows:

A Portion of Tract A of Business Section of Lantana Heights Subdivision, a plat of which is recorded in Plat Book 26 Page 161 of Palm Beach County Records, less the N 200 feet thereof, being more particularly described as follows:

Commencing at the S 1/4 corner of Section 4, Township 45 S, Range 43 E, at the Intersection of the centerlines of Seacrest Boulevard and Hypoluxo Road, which point is also the SW corner of the aforesaid subdivision;

Thence N 00° 46' 58" W, along the W line of the SE 1/4 of the aforesaid Section 4, 40.02 feet to a point on the N right-of-way line of Hypoluxo Road, being the SW corner of Tract A and the point of beginning;

Thence N 00° 46' 58" W, 140.08 feet to a point;

Thence S 88° 53' 45" E, 175.09 feet to a point on the W right-of-way line of S 13th Court, and the E line of said Tract A;

Thence S 00° 46' 58" E, along the aforesaid E line, 114.24 feet to a point of curve;

Thence with a curve to the right having a radius of 25 feet, an arc length of 40.09 feet to a point on the N right-of-way line of Hypoluxo Road;

Thence N 88° 53' 45" W, 149.25 feet to the point of beginning.

Less and except that portion of Tract "A" acquired by the State of Florida Department of Transportation, being more fully described as follows:

Begin on the W boundary line of said Tract "A" at a point 40 feet N of the SW corner of the SE 1/4 of Section 4, Township 45 S, Range 43 E;

Thence N 00° 46' 58" W 66.88 feet;

Thence S 14° 17' 13" E 69.33 feet to the N line of existing Hypoluxo Road;

Thence N 88° 53' 45" W 16.22 feet to the point of beginning.

**Exhibit A-20**
"FCE 2833" Land

A parcel of real property situated in Broward County, Florida and more particularly described as follows:

A portion of Tract 8 of "Fort Lauderdale Truck Farms Subdivision" of Section 13, Township 49 S, Range 41 E as recorded in Plat Book 4 Page 31 of the Public Records of Broward County, Florida, be more particularly described as follows:

Commence at the SE corner of said Tract 8;

Thence run N 00° 11' 06" W along the E line of said Tract 8 for a distance of 56.00 feet to a point;

Thence run N 89° 15' 42" W along a line parallel with and 56.00 feet N of the S line of said Tract 8 for a distance of 130.49 feet to the point of beginning, said point of beginning also lying on the N right-of way line of Commercial Boulevard (State Road #870);

Thence continue N 89° 15' 42" W along said parallel line for a distance of 169.51 feet to a point;

Thence run N 00° 11' 06" W along a line parallel with and 300 feet W of the E line of said Tract 8 for a distance of 197.00 feet to a point,

Thence run S 89° 15' 42" E along a line parallel with and 253 feet N of said S line of Tract 8 for a distance of 200.00 feet to a point on the W right-of-way line of U.S. highway #441 (State Road #7);

Thence run S 00° 11' 06" E along a line parallel with and 100 feet W of said E line of tracts for a distance of 166.51 feet to a point;

Thence run S 45° 16' 36" W for a distance of 42.77 feet to the point of beginning.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842

Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## **Exhibit A-21**
"FCE 2836" Land

A parcel of real property situated in Broward County, Florida and more particularly described as follows:

From the Northwest corner of Section 28, Township 49 South, Range 42 East, Broward County, Florida; run on an assumed bearing of due East along the North line of said Section 28, a distance of 40.01 feet; thence South 01 degree 13 minutes 12 seconds West and parallel to the West line of said Section 28, a distance of 74.48 feet to a point of beginning; thence continue South 01 degree 13 minutes 52 seconds West 175.58 feet; thence due East 200.05 feet; thence North 01 degree 13 minutes 52 seconds East 200.05 feet; thence due West 175.58 feet to a point of curvature; thence Southwesterly along a curve to the left having a radius of 25 feet and a central angle of 88 degrees 46 minutes 08 seconds an arc distance of 38.73 feet to a point of tangency and the point of beginning.

Less and except any portion of the above described property taken by the State of Florida Department of Transportation pursuant to Order of Taking recorded in Official Records Book 26620, page 0425, of the Public Records of Broward County, Florida, and known as Parcel No. 104.

## Exhibit A-22
"FCE 2837" Land

A parcel of real property situated in Broward County, Florida and more particularly described as follows:

All that certain tract or parcel of land situated in the City of Fort Lauderdale, County of Broward, State of Florida, with a physical address of 1901 Northwest 40th Avenue, and more particularly described as follows:

A portion of Section 25, Township 49 South, Range 41 E, more particularly described as follows:

Commence at the SE corner of Section 25, Township 49 S, Range 41 E;

Thence run N 0° 54' 30" W a distance of 145.13 feet;

Thence run S 89° 05' 30" W a distance of 50 feet to the point of beginning of the tract of land hereinafter described;

Thence run S 89° 05' 30" W a distance of 200 feet;

Thence run N 0° 54' 30" W a distance of 200 feet;

Thence run N 89° 05' 30" E a distance of 200 feet;

Thence run S 0° 54' 30" E along a line being the W right-of-way line of US 441, a distance of 200 feet to the point of beginning;

### Exhibit A-23
"FCE 2842" Land

A parcel of real property situated in Broward County, Florida and more particularly described as follows:

All that certain tract or parcel of land situated in the City of Pompano Beach, County of Broward, State of Florida more particularly described as follows:

The SW 1/4 of the SW 1/4 of the SW 1/4 of Section 13, Township 48 S, Range 42 E, Broward County, Florida, less the S 35 feet thereof and less the W 35 feet thereof; said lands situate, lying and being in Broward County, Florida.

Less and except that portion conveyed to the State of Florida by Deed recorded in Official Records Book 4073 Page 368, described as follows:

The N 10 feet of the S 45 feet of the SW 1/4 of the SW 1/4 of the SW 1/4 of Section 13, Township 48 S, Range 42 E, Broward County,

And

That part of said SW 1/4 of the SW 1/4 of the SW 1/4 of said Section 13, which is included in the external area formed by a 25 foot radius arc, which is tangent to a line 45 feet N of and parallel to the S line of said Section 13, and tangent to a line 35 feet E of and parallel to the W line of said Section 13.

And further less and except that portion conveyed to Walter K. McGrath by Deed dated December 21, 1971 and recorded in Official Records Book 4725 Page 975.

And further less and except that portion conveyed to Gunnar Madsen, a Trustee, by Deed dated October 11, 1972 and recorded in Official Records Book 5088 Page 641.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-24
## List of Locations

| FCE SITE # | Address | City (all in Florida) | Allocation of Purchase Price |
|---|---|---|---|
| 1018 | 120 Center Place Way | Saint Augustine | $3,249,435 |
| 1059 | 10716 Atlantic Blvd. | Jacksonville | 2,750,000 |
| 1063 | 3850 Newberry Road | Gainesville | 3,002,009 |
| 1064 | 3831 NW 13th Street | Gainesville | 1,528,620 |
| 1065 | 11330 Beach Blvd. | Jacksonville | 1,805,000 |
| 1073 | 11 Blanding Blvd. | Orange Park | 2,400,000 |
| 1078 | 3317 W US Hwy 90 | Lake City | 1,520,000 |
| 1079 | 7015 SE US 301 | Hawthorne | 1,843,000 |
| 1090 | 201 W Granada Blvd. | Ormond Beach | 1,662,500 |
| 1094 | 3330 SW Archer Road | Gainesville | 1,474,901 |
| 1713 | 5980 Okeechobee Road | West Palm Beach | 3,000,000 |
| 1818 | 890 NW 50th Street | Fort Lauderdale | 2,750,000 |
| 1825 | 4701 W. Sunrise Blvd. | Plantation | 2,750,000 |
| 2023 | 1120 Atlantic Blvd.. | Neptune Beach | 530,613 |
| 2032 | 6010 Moncrief Road | Jacksonville | 1,000,000 |
| 2034 | 7752 Lem Turner Road | Jacksonville | 2,800,000 |
| 2039 | 3020 N. Main Street | Jacksonville | 757,276 |
| 2531 | 320 Palm Coast Pkwy. | Palm Coast | 1,800,000 |
| 2723 | 1301 Hypoluxo Road | Lantana | 1,425,000 |
| 2833 | 5001 North State Road 7 | Tamarac | 3,000,000 |
| 2836 | 2090 W. Oakland Park Blvd. | Fort Lauderdale | 3,400,000 |
| 2837 | 1901 NW 40th Avenue | Lauderhill | 2,000,000 |
| 2842 | 301 NE Sample Road | Pompano Beach | 2,700,000 |

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## Exhibit A-24
### List of Other Locations

| FCE SITE # | Address | City (all in Florida) |
|---|---|---|
| 3033 | 430 W 8th St. | Jacksonville |
| 3046 | 852396 US Hwy 17 | Yulee |
| 3716 | 7290 Central Industrial Blvd. | Riviera Beach |
| 3720 | 4524 Forest Hill Blvd. | West Palm Beach |
| 3827 | 815 N Federal Hwy. | Hollywood |
| 3828 | 2801 Pembroke Road | Hollywood |

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

EXHIBIT B
**Conventions of Usage and Definitions**

1.01    **Usage**.  Unless otherwise specified:

(a)    a reference to "Articles," "Section," and "Exhibits" shall be deemed to be references to Articles, Sections and Exhibits to the Agreement to which this Exhibit B relates, unless the context shall otherwise require;

(b)    a reference to a "company" shall include any company, corporation or other body corporate, wherever and however incorporated or established and irrespective of the jurisdiction in or under the law of which it was incorporated or exists;

(c)    a reference to the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "or" is not exclusive.  The words "hereof," "herein" and "hereunder" and words of similar import when used in the Agreement to which this Exhibit B is attached shall refer to the Agreement as a whole and not to any particular provision of the agreement;

(d)    a reference to a "day" (including within the expression "Business Day") shall mean a period of 24 hours running from midnight to midnight;

(e)    a reference to time is a reference to the local time in Jacksonville, Florida;

(f)    all headings and titles used in the Agreement to which this Exhibit B is attached are for convenience only and are not to be used in the interpretation or construction;

(g)    where the context so requires, words importing the singular shall include the plural and vice versa and words importing gender include any other gender;

(h)    all statements or language placed in parentheses within an agreement are done so solely for convenience and ease of reading.  In no event should such statements or language be given less import or be interpreted differently than if it were not so parenthesized; and

(i)    any agreement, instrument, statute, code, proclamation or decree defined or referred to in this Agreement means such agreement, instrument, statute, code, proclamation or decree as from time to time amended, modified, supplanted or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes, proclamations or decrees) by succession of comparable successor statutes, codes, proclamations or decrees.  References to all agreements or instruments include attachments to such agreements and instruments and instruments incorporated in those agreements and references to any statute, code, proclamation or decree shall include all rules and regulations promulgated under that statute, code, proclamation or decree.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079, 1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034 2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

1.02     **Definitions**.  Unless otherwise defined in a specific agreement, the terms set out below shall have the following definitions when capitalized.

**"Affiliate(s)"** means with respect to any specified Person, any other Person(s) directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and, it being understood and agreed that with respect to a corporation, limited liability company or partnership, control shall mean direct or indirect ownership of 50% or more of the voting stock or limited liability company interest or general partnership interest or voting interest in any such corporation, limited liability company or partnership.

"**Agreement**" has the meaning set forth in the introductory paragraph of the Contribution Agreement.

**"Branding Agreement"** means, with respect to certain Locations in Palm Beach and Broward Counties, Florida, the Branding Agreement and Product Purchase Commitment Agreement dated July 2, 2009, between Motiva and SE Petro One LLC or SE Petro Two LLC.

**"Buyer Indemnified Parties"** means Buyer and its Affiliates, and each of their respective officers, directors, members, owners, shareholders, partners, managers, employees, administrators, successors, assigns, agents and representatives.

**"Claim"** means any claim, suit, counterclaim, demand, cause of action, dispute, controversy, loss, investigation, judgment (whether sounding in contract or otherwise provided by statute or common law), for damages or any other relief.

**"Closing Date"** has the meaning set forth in Section 6.1 of the Purchase and Sale Agreement.

**"Closure Letter"** has the meaning set forth in Section 10.1 of the Purchase and Sale Agreement.

**"Environmental Condition"** means a condition or circumstance, other than any condition or circumstance that is the subject of any Known Remediation Order, resulting from one or more related actions, omissions, or events with respect to the Property that exists or is alleged by a Person other than a Party and arises from (i) a violation of Environmental Laws, in effect and as enforced on the Closing Date (whether occurring on-site, or off-site, or having off-site effects, including off-site waste disposal, spills, surface water discharge, migration or groundwater contamination, and releases to the air), or (ii) a release, use, generation, storage, transportation, treatment, sale or disposal of Hazardous Substances (whether occurring on-site or off-site or having off-site effects, including off-site waste disposal, spills, surface water discharge, migration or groundwater contamination, and releases to the air), and including in the case of either

subparagraph (i) or (ii) claims involving property damage, personal injury or wrongful death, including but not limited to, those based on exposure, product defect, failure to warn, conspiracy or other Claims commonly associated with toxic tort or products liability matters.

**"Environmental Identification Information"** means the Florida Department of Environmental Protection facility identification number, as provided on **Exhibit D** to this Agreement.

**"Environmental Laws"** means any and all applicable federal, state, provincial or local laws, statutes, ordinances, orders, codes, rules, regulations, judgments, decrees, injunctions or agreements with any Governmental Entity, relating to the protection of the environment, the release, discharge or disposal of any material or substance, the safety, health or environmental condition of property transferred, natural resource damages, pipeline closure or human health and safety.  Environmental Laws also include civil or common law doctrines (including negligence, nuisance, trespass, personal injury, property damage, and product liability) to the extent that claims under such doctrines arise out of the presence of, release of, or exposure to a Hazardous Substance.

**"Environmental Reports"** means any and all reports, studies, orders, correspondence and other documentation that Buyer reasonably should be able to access from publicly available sources using the Environmental Identification Information, including, but not limited, to the Environmental Reports indicated on **Exhibit D** to this Agreement.

**"Florida Eligible Premises"** means a property where Seller is conducting Remediation and which is eligible for reimbursement from the State of Florida or any agency or fund of the State of Florida.

**"Florida Known Remediation Termination Date"** has the meaning set forth in Section 4.6.3(d) of the Purchase Agreement.

**"Governmental Entity"** means any government organization, subdivision, agency or authority, whether foreign or domestic.

**"Hazardous Materials"** means any hazardous or toxic substances, materials or wastes that are regulated under any applicable Environmental Laws including without limitation, any material, waste or substance that is (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, or (iv) included in the definition of "hazardous" or "dangerous" "material" "substance" or "waste" or words of similar import under applicable Environmental Laws or classified or considered to be hazardous or toxic under Environmental Laws.

**"Inspection Period"** shall have the meaning provided in Section 4.1.1 of this Agreement.

**"Known Remediation Order"** means a written agreement or agreements with a Governmental Entity or other orders from a Governmental Entity directing Seller or Motiva to perform Remediation at the Property.

**"Laws"** means all applicable statutes, laws, rules, regulations, orders, ordinances, judgments and decrees of any Governmental Entity, including the common or civil law of any

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

Governmental Entity; references to any Law is to the same as amended, modified, or replaced from time to time.

**"Losses"** means all losses, damages, liabilities, deficiencies, costs, expenses, penalties, fines, obligations and liabilities of any kind and expenditures, including, without limitation, reasonable attorneys' fees and court and investigation costs.

**"Parties"** means Seller and Buyer, collectively.

**"Party"** means each of Seller and Buyer.

**"Person"** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, trust, estate, unincorporated organization or Governmental Entity; references to any Person includes reference to any successors in title and permitted assigns.

**"Post-Closing Release"** means the presence, discharge, release, leak, spill, deposit, or storage on any Property of any Hazardous Materials in violation of any Environmental Law after the Closing Date and includes future breakdown products, degradation products and migration of such presence, discharge, release, leak, spill, deposit, or storage.

**"Purchase Agreement"** shall mean the Purchase and Sale Agreement between Seller and Buyer to which this **Exhibit B** is attached.

**"Release"** shall mean any spilling, leaking, seeping, pumping, pouring, emitting, emptying, injecting, discharging, escaping, leaching, dumping, disposing or releasing of a Hazardous Materials into the environment (including the air, soil, surface water, groundwater, sewer, septic, system, or waste treatment, storage, or disposal systems) of any kind whatsoever, including the abandonment or discarding of barrels, containers, tanks or other receptacles containing or previously containing a Hazardous Materials.

**"Remediation"** means any investigation, monitoring, correction or remediation of an Environmental Condition (including, but not limited to, tests, inspections, borings, engineering studies, surveys, appraisals, environmental studies, operations, excavations, well installations, soil and groundwater sampling, activities associated with the construction, operation or maintenance of remediation, together with treatment equipment and systems for the treatment of contaminated soil, groundwater and free product and measures to contain, monitor or limit contamination) that is required to bring an Environmental Condition into compliance with Environmental Laws or is required to fulfill the terms of a written agreement with, or written order or directive from, a Governmental Entity or a litigation settlement or judgment involving a Third Party.

**"Remediation Completion Date"** has the meaning set forth in Section 10.1 of this Agreement.

**"Representatives"** means a Party's officers, directors, partners, members, managers, shareholders and Affiliates, as the case may be, and its employees, attorneys, agents, advisors, consultants, accountants and financing sources.

**"Seller Indemnified Parties"** means Seller and its Affiliates and each of their respective officers, directors, members, owners, shareholders, partners, managers, employees, administrators, successors, assigns, agents, and representatives.

**"Third Party"** means a Person other than Seller, Buyer and their respective Affiliates.

**"UST"** means an underground petroleum storage tank.

**"UST System"** means the underground petroleum storage tanks, piping, leak detection devices and any related equipment, including "inground" hoists, direct and remote vapor and fill lines/buckets used for the storage and dispensing of petroleum products, used oil and/or heating oil, and other equipment related to the operation of a motor fuel service station that are or formerly were present in or on the Locations, but including, without limitation, (i) any such tanks, piping, devices, or equipment that may be located in or on the Locations after Closing, including, without limitation, any such tanks, piping, devices or equipment installed in, on or under the Property by Buyer or its successors in title to the Property, or (ii) any concrete or other slab or platform upon or in which any such tanks, piping, devices, or equipment may be stationed.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## EXHIBIT C
**Tangible Personal Property**

Explanatory Note:  The following is provided for the limited purpose of identifying the general categories of equipment and personal property that may be located at the Land, owned by Seller and used in the operation of the business now conducted thereon.

Seller and Buyer expressly acknowledge that (i) the personal property and equipment actually located on the Land may differ significantly from the general categories listed below and some of the items set forth below may not be present; (ii) the Land may have other equipment and personal property located thereon that is owned by Seller; and (iii) a Third Party may own personal property and equipment at the Land, including the items set forth below.

Underground Storage Tanks
Dispensers & Veeder Root Tank Gauge System
Pipework, Fittings, Valves and Product Lines
Pipework Vapor Recovery systems
POS Systems
Shelving, Counters, Cabinets and Gondolas (whether Interior, Cooler or C-Store)
Interior Graphics
Misc. Store Equipment
Misc. Bay Equipment
- Lifts
- Compressors
- Lube equipment
Air/Water Equipment
Vacuums
Intercom
Car Wash Equipment

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## EXHIBIT D
### Environmental Identification Information and Environmental Reports

The Environmental Identification Information for each Location is as set forth below in the column labeled "FDEP FACID."

| FCE # | Address | City | County | FDEP FACID # | "Environmental Reports" * | Dates of Reports |
|-------|---------|------|--------|--------------|---------------------------|------------------|
| 1018 | 120 Center Place Way | St. Augustine | St. Johns | 9701332 | SRCO | 2014 |
| 1059 | 10716 Atlantic Blvd. | Jacksonville | Duval | 8507001 | SRCO | 9/20/2013 |
| 1063 | 3850 Newberry Rd. | Gainesville | Alachua | 8500248 | LSRAP | 4/23/2018 |
| 1064 | 3831 NW 13th St. | Gainesville | Alachua | 8500249 | SRCO | 2015 |
| 1065 | 11330 Beach Blvd. | Jacksonville | Duval | 8629563 | RAIR | 7/13/2018 |
| 1073 | 11 Blanding Blvd. | Orange Park | Clay | 8503235 | SRCO | 2013 |
| 1078 | 3317 US Hwy. 90 W | Lake City | Columbia | 8503445 | LSSI NFA | 4/16/2018 |
| 1079 | 7015 US Hwy. 301 | Hawthorne | Alachua | 8731866 | WAR | 1/9/2018 |
| 1090 | 201 W Granada Blvd. | Ormond Beach | Volusia | 8517403 | RAP O&M | 9/28/2016 |
| 1094 | 3330 SW Archer Rd. | Gainesville | Alachua | 8500252 | NAM | 5/3/2018 |
| 1713 | 5980 Okeechobee Rd. | West Palm Beach | Palm Beach | 8514753 | SRCO | 2010 |
| 1818 | 890 NW 50th St. | Fort Lauderdale | Broward | 8501625 | Letter Report | 6/4/2018 |
| 1825 | 4701 W Sunrise Blvd. | Plantation | Broward | 8502627 | TSAR | 3/23/2017 |
| 2023 | 1120 Atlantic Blvd. | Neptune Beach | Duval | 8507476 | NFA | 2014 |
| 2032 | 6010 Moncrief Rd. | Jacksonville | Duval | 8507009 | RAIR | 10/31/2017 |
| 2034 | 7752 Lem Turner Rd. | Jacksonville | Duval | 8507161 | RAIR | 10/17/2016 |
| 2039 | 3020 N. Main Street | Jacksonville | Duval | 8521558 | LSRAP | 12/1/2017 |
| 2531 | 320 N Palm Coast Pkwy. | Palm Coast | Flagler | 8736144 | LSSI | Jul-15 |
| 2723 | 1301 Hypoluxo Rd. | Lantana | Palm Beach | 8514743 | SRCO | 2010 |
| 2833 | 5001 N SR 7 | Tamarac | Broward | 8502639 | Conditional SRCO | 11/16/2016 |
| 2836 | 2090 W Oakland Park Blvd. | Fort Lauderdale | Broward | 8502633 | SRCO | 10/18/2016 |
| 2837 | 1901 NW 40th Ave. | Fort Lauderdale | Broward | 8502626 | RAP | 7/12/2018 |
| 2842 | 301 E Sample Rd. | Pompano Beach | Broward | 8502640 | PARM | 5/10/2018 |

* Key on following page.

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

## **EXHIBIT D (continued)**

SRCO – Site Rehabilitation Completion Order
SSAR – Supplemental Site Assessment Report
RA – Remedial Action Report
RAIR – Remedial Action Interim Report
RAP – Remedial Action Plan
NAM – Natural Attenuation Monitoring Report
LSSI – Low Score Site Initiative

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

**EXHIBIT E-1**
**Deed – Locations including Locations in**
**Alachua, Clay, Columbia, Duval, Flagler and Volusia Counties**

Record and return to:
David Ubbens
Gibraltar Title Services
4190 Belfort Road, Suite 475
Jacksonville, FL  32216

RE Parcel ID#:  _____

**SPECIAL WARRANTY DEED**
**(with Covenant)**

      **FIRST COAST ENERGY, L.L.P.**, a Colorado limited liability partnership whose address is 7014 A.C. Skinner Parkway, Suite 290, Jacksonville, Florida 32256, for ("**Grantor**") and _____ **LLC**, a Florida limited liability company with offices located at _____ ("**Grantee**") enter into this Special Warranty Deed (this "**Deed**") as of _____ ____, 2019 (the "**Effective Date**").

**W I T N E S S E T H:**

      For and in consideration of the sum of Ten Dollars ($10.00), the covenants and restrictions contained in this Deed and other good and valuable consideration, the receipt and sufficiency of which are agreed and acknowledged, Grantor does by execution and delivery of this Deed GRANT, BARGAIN, SELL, CONVEY, and RELEASE unto Grantee, its successors and assigns forever, all of Grantor's right, title and interest, if any, in and to the Premises more particularly described in **Exhibit A** attached to and made a part of this Deed (the "**Premises**"), together with any buildings, fixtures and improvements owned by Grantor and located thereon;

      Together with all right, title and interest of Grantor in and to any streets and roads abutting the Premises to the center lines of such streets and roads, plus all the estate and rights of Grantor in and to any easements, rights, privileges, appurtenances, strips and gores and all other hereditaments appurtenant to the Premises;

      This conveyance is made by Grantor and accepted by Grantee SUBJECT TO all covenants, reservations, exceptions, restrictions, easements, encumbrances and rights of way of record; ad valorem and real estate taxes and assessments, both general and special, for the year 2019 and all subsequent years; building and zoning ordinances, laws, regulations, and restrictions by municipal and other governmental authorities; and all other matters of record that are currently valid and subsisting, and that affect the Premises (which reference shall not be deemed to reimpose any of the foregoing); any mortgage of even date herewith executed and given by Grantee in favor of Grantor encumbering the Premises and the items set forth on **Exhibit B**, to the extent that the same are currently valid and enforceable against the Premises;

74

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

TO HAVE AND TO HOLD the Premises unto Grantee, its successors and assigns in fee simple forever; but:

IN ADDITION TO THE FOREGOING, Grantor grants the Premises to Grantee subject to the following covenants and restrictions:

1.    From and after the Effective Date until the 20th anniversary of the Effective Date in 2039, the Premises is subject to a Supply Agreement and a Supplemental Agreement dated of even date herewith pursuant to which Grantee, its successors and assigns, agree to purchase motor fuel from Grantor and to be obligated to pay a supplemental fee to Grantor in the amount set forth in the Supplemental Agreement upon the occurrence of events set forth in the Supplemental Agreement.  Until the termination of the Supply Agreement, Grantor shall have a first right of refusal as set forth in the Supply Agreement to purchase the Premises from Grantee upon the terms and conditions set forth in the Supply Agreement.  The Supply Agreement and Supplemental Agreement and the remedies for breach thereof, as provided therein, shall run with the land, and pass with each and every portion of the Premises, and shall apply to and bind the respective successors, assigns and transferees and subsequent owners in interest thereof.

2.    Grantee has granted a right of access to Grantor pursuant to the terms of an Access Agreement dated as of the Effective Date that is being recorded on the same day as this instrument.

3.    Grantee covenants and agrees that it shall not install and, it shall prevent any subsequent purchaser or permitted assignee of the Premises from installing, any well or other tank, pump or related equipment for the use or storage of potable water at the Premises.  Grantee further covenants and agrees that it shall not improve or use, and shall prohibit any subsequent purchaser or assignee of the Premises from using or improving, the Premises for residential purposes (including multi-family residential uses), or for any hospital, school, elder care or day care center or for a park or playground.  Grantee further covenants and agrees that it shall not materially change the use of the Premises in such a way as to increase the level of clean-up required by any governmental entity for any environmental condition that had affected the Premises as of the Effective Date.  Each of these covenants shall run with the Premises, and pass with each and every portion of the Premises, and shall apply to and bind the respective successors in interest of each and every portion of the Premises.  Motiva Enterprises LLC, a Delaware limited liability company, shall be a third party beneficiary of the covenant set forth above.

4.    NOTWITHSTANDING ANYTHING CONTAINED IN THIS DEED TO THE CONTRARY, GRANTEE ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT GRANTEE HAS BEEN GIVEN THE OPPORTUNITY TO MAKE FULL AND COMPLETE INSPECTIONS OF THE PREMISES TO GRANTEE'S SATISFACTION PRIOR TO THE DATE OF THIS DEED AND THAT, AS OF THE DATE OF THIS DEED, GRANTEE IS RELYING SOLELY ON GRANTEE'S OWN INVESTIGATIONS OF THE PREMISES AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GRANTOR, OR ANY AGENT, REPRESENTATIVE OR OTHER PARTY ACTING, OR PURPORTING TO ACT, ON BEHALF OF GRANTOR. IT IS THE UNDERSTANDING AND INTENTION OF THE PARTIES THAT THE SALE OF THE PREMISES FROM GRANTOR TO GRANTEE IS

75

MADE ON A STRICT "AS IS, WHERE IS" BASIS AND WITH ALL FAULTS. GRANTEE ACKNOWLEDGES THAT GRANTOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, RELATING TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR PRESENT OR FUTURE CONDITION OF THE ASSETS, INCLUDING WITHOUT LIMITATION THE PREMISES, (B) THE COMPLIANCE OF, OR BY, THE PREMISES WITH ANY LAWS OF ANY APPLICABLE GOVERNMENTAL ENTITY, (C) THE LIABILITY, MERCHANTABILITY, MARKETABILITY, OR PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PREMISES, INCLUDING WITHOUT LIMITATION THE ASSETS THEREON, OR (D) ANY OTHER MATTER WITH RESPECT TO THE ASSETS. GRANTEE REPRESENTS TO GRANTOR THAT GRANTEE IS RELYING, HAS RELIED AND SHALL IN THE FUTURE RELY SOLELY UPON ITS OWN INVESTIGATIONS, INSPECTIONS AND STUDIES OF THE PREMISES, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GRANTOR, GRANTOR'S AGENTS OR CONTRACTORS OR OTHERWISE GENERATED FROM THIRD PARTY SOURCES. GRANTOR SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PREMISES OR THE OPERATION OF THE PREMISES FURNISHED BY ANY PARTY PURPORTING TO ACT ON BEHALF OF GRANTOR, INCLUDING, WITHOUT LIMITATION, ANY AGENT, BROKER OR SALESPERSON. GRANTEE ACKNOWLEDGES THAT THE CONTRIBUTION VALUE HAS BEEN SPECIFICALLY NEGOTIATED AND ADJUSTED TO TAKE INTO ACCOUNT THE AS-IS NATURE OF THIS SALE AND THE DISCLAIMERS AND WAIVER OF REPRESENTATIONS AND WARRANTIES AS STATED IN THIS AGREEMENT.

**GRANTOR AND GRANTEE ACKNOWLEDGE AND AGREE THAT GRANTEE'S ACCEPTANCE OF THE PROPERTY WITH AND SUBJECT TO EACH AND ALL OF THE FOREGOING COVENANTS AS SET FORTH IN THIS DEED AND THE CONTINUING ENCUMBRANCE OF THE PROPERTY WITH THOSE RESTRICTIONS AND COVENANTS ARE EACH A SIGNIFICANT AND MATERIAL PORTION OF THE CONSIDERATION PROVIDED BY GRANTEE TO GRANTOR IN CONNECTION WITH GRANTOR'S AGREEMENT TO CONVEY THE PREMISES AND THAT GRANTOR WOULD NOT CONVEY THE PREMISES TO GRANTEE FOR THE OTHER CONSIDERATION GIVEN BY GRANTEE FOR THE PREMISES ALONE WITHOUT SUCH RESTRICTIONS AND COVENANTS.**

SUBJECT to the foregoing, Grantor covenants with Grantee that Grantor will warrant specially the Premises in this Agreement conveyed and defend title to the Premises against the lawful claims of all persons claiming by, through, or under Grantor, but not otherwise, provided, that this conveyance and the special warranty made by Grantor contained in this Agreement are subject to the matters contained in this Agreement and any and all matters of record, and the interest of Grantor in any offsite easements is conveyed without warranty. The preceding sentence is for the benefit of Grantee and the parties now or hereafter constituting Grantee and may not be

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

relied on or enforced by any other entity, including, without limitation, any direct or remote successor in title to Grantee or any title insurer of Grantee or its direct or remote successors in title, by way of subrogation or otherwise.

IN WITNESS WHEREOF, Grantor has caused this Special Warranty Deed to be duly executed on the day and year first above written.

**FIRST COAST ENERGY, L.L.P.,** a
Colorado limited liability partnership

By:    **PETRO DISTRIBUTING PARTNERS OF FLORIDA, L.L.C.,** a Delaware
limited liability company
Its Partner

By: _____

Aubrey L. Edge
Its Manager

Signed, Sealed and Delivered In Our Presence:

WITNESS:

_____
Printed Name:_____

WITNESS:

_____
Printed Name:_____

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this _____ of _____ 2019 by Aubrey L. Edge, Manager of Petro Distributing Partners of Florida, L.L.C., a Delaware limited liability company, as Partner in and of First Coast Energy, L.L.P., a Colorado limited liability partnership, on behalf of the company and the partnership.  Mr. Edge is personally known to me.

_____
Notary Signature
Print Name: _____
Notary Public, State and County Aforesaid
My commission expires:_____
Commission Number: _____
(Notarial Seal)

77

FCE Store Numbers: 1018, 1059, 1063, 1064, 1065, 1073, 1078, 1079,
1090, 1094, 1713, 1818, 1825, 2023, 2032, 2034
2039, 2531, 2723, 2833, 2836, 2837, 2842
Alachua, Broward, Clay, Columbia, Duval, Flagler, Palm Beach, Volusia and St. Johns Counties, Florida

**"GRANTEE":**

_____ **LLC**,
a Florida limited liability company

By: _____

_____
Its Manager

Witness: _____
Print Name: _____

Witness: _____
Print Name: _____

STATE OF FLORIDA
COUNTY OF _____

The foregoing instrument was acknowledged before me this \_\_\_\_\_ of _____,
20\_\_\_, by _____, as Manager of _____ LLC, a Florida
limited liability company, on behalf of the company, who

( )    is personally known to me;
( )    has produced a _____ Driver's License as identification; or
( )    has produced a _____ as identification.

_____
NOTARY PUBLIC
Print Name:_____

Notary Public in and for the State of _____
My commission expires: _____
Commission Number: _____

[Notarial Seal]

## <u>EXHIBIT A TO DEED</u>
**Legal Description of Premises**

## **EXHIBIT B TO DEED**
Permitted Encumbrances

To come upon receipt of Title Commitment

**EXHIBIT E-2**
**Deed – Certain Locations in Broward and Palm Beach Counties**

Record and return to:
David Ubbens
Gibraltar Title Services
4190 Belfort Road, Suite 475
Jacksonville, FL 32216

RE Parcel ID#:    _____

## SPECIAL WARRANTY DEED
### (with Covenant)

This **SPECIAL WARRANTY DEED** (this "**Deed**"), dated to be effective as of the ____
day of _____ 2019 ("**Effective Date**"), is by and between **FIRST COAST ENERGY,
L.L.P**, a Colorado limited liability partnership, as successor by merger to SE Petro ____ LLC, a
Delaware limited liability company, with offices located at 7014 A.C. Skinner Parkway, Suite 290,
Jacksonville, Florida 32256 ("**Grantor**") and _____**,** a Florida
_____ with offices located at _____, _____,
Florida _____ ("**Grantee**").

## W I T N E S S E T H:

For and in consideration of the sum of Ten Dollars ($10.00) and the mutual covenants and
restrictions contained in this Deed and other good and valuable consideration, the receipt and
sufficiency of which are agreed and acknowledged, Grantor does by execution and delivery of this
Deed GRANT, BARGAIN, SELL, CONVEY, and RELEASE unto Grantee, its successors and
assigns forever, all of Grantor's right, title and interest, if any, in and to the Premises more
particularly described in **Exhibit A** attached to and made a part of this Deed (the "**Premises**"),
together with any buildings, fixtures and improvements owned by Grantor and located thereon;

Together with all right, title and interest of Grantor in and to any streets and roads abutting
the Premises to the center lines of such streets and roads, plus all the estate and rights of Grantor
in and to any easements, rights, privileges, appurtenances, strips and gores and all other
hereditaments appurtenant to the Premises;

This conveyance is made by Grantor and accepted by Grantee SUBJECT TO all covenants,
reservations, exceptions, restrictions, easements, encumbrances and rights of way of record; ad
valorem taxes and assessments, both general and special, for the year 2019 and subsequent years
that are not yet due and payable; zoning regulations; and all other matters of record that are
currently valid and subsisting, and that affect the Premises (which reference shall not be deemed
to reimpose any of the foregoing); and the items set forth on **Exhibit B**, to the extent that the same
are currently valid and enforceable against the Premises;

TO HAVE AND TO HOLD the Premises unto Grantee, its successors and assigns in fee
simple forever; but:

81

IN ADDITION TO THE FOREGOING, Grantor grants the Premises to Grantee subject to the following covenants and restrictions:

1.      From and after the Effective Date until December 31, 2024 ("**Termination Date**"), if motor fuel is stored, advertised or sold at or from the Premises, the motor fuel stored, advertised or sold shall be sold under the "Shell" trademark ("**Brand Covenant**"), all as more fully set forth in that certain Branding and Product Purchase Commitment Agreement dated as of June 2, 2009, by and between Motiva Enterprises LLC, a Delaware limited liability company ("Motiva") and Grantor's predecessor by merger ("**Branding Agreement**").  The Brand Covenant shall expire automatically on the Termination Date without need for filing a release, or other action of any of Motiva, Grantor or Grantee.  The Premises and every portion of the Premises shall be improved, held, used, occupied, leased, sold, hypothecated, encumbered and conveyed subject to the Brand Covenant.  The Brand Covenant and the remedies for breach of the Brand Covenant, as provided in the Branding Agreement, shall run with the land, and pass with each and every portion of the Premises, and shall apply to and bind the respective successors, assigns and transferees and subsequent owners in interest of the Premises.  The Brand Covenant is imposed upon the entire Premises.

Grantee agrees to include the Brand Covenant in any conveyance or assignment of the Premises to a successor grantee and, as a condition of any conveyance of the Premises, to require successor grantees to enter into an agreement assuming all obligations of Grantee under the Branding Agreement.

2.      Until the Termination Date, Motiva and Grantor retain a right of first refusal to purchase the Premises, pursuant to the terms of the Branding Agreement ("**Right of First Refusal**").  The Right of First Refusal shall expire automatically on the Termination Date, without need for filing a release, or other action of either Grantor or Grantee. The terms of the Right of First Refusal are set forth on Exhibit C attached to the Special Warranty Deed from Motiva Enterprises, LLC, a Delaware limited liability company, to Grantor's predecessor in interest recorded at Official Records Book _____, Page __ of the public records of _____ County, Florida.

3.      Subject to prior rights of Motiva as set forth herein, from and after the Effective Date until the 20th anniversary of the Effective Date in 2039, the Premises is subject to a Dealer Supply Agreement (the **"Supply Agreement"**) and a Supplemental Agreement (the "**Supplemental Agreement**") dated of even date herewith, pursuant to which Grantee, its successors and assigns, agree to purchase motor fuel from Grantor and to be obligated to pay a supplemental fee to Grantor in the amount set forth in the Supplemental Agreement upon the occurrence of events set forth in the Supplemental Agreement.  The Supply Agreement and Supplemental Agreement and the remedies for breach thereof, as provided therein, shall run with the land, and pass with each and every portion of the Premises, and shall apply to and bind the respective successors, assigns and transferees and subsequent owners in interest thereof.  Until the termination of the Supply Agreement, Grantor shall have a first right of refusal as set forth in the Supply Agreement to purchase the Premises from Grantee upon the terms and conditions set forth in the Supply Agreement if either (a) the Premises for any reason ceases to operate as a service station supplied exclusively by Grantor, its successor s or assigns, in strict accordance with the Supply Agreement, or (b) the Supply Agreement (or any modification or renewal thereof) is

terminated or expires for any reason without the simultaneous execution of a renewal or substitute Supply Agreement, and if Grantee fails to pay when due any amount due under the Supplemental Agreement as a result of the occurrence of the conditions stated in (a) or (b) above.

4.     Grantee covenants and agrees that it shall not install and, it shall prevent any subsequent purchaser or permitted assignee of the Premises from installing, any well or other tank, pump or related equipment for the use or storage of potable water at the Premises.  Grantee further covenants and agrees that it shall not improve or use, and shall prohibit any subsequent purchaser or assignee of the Premises from using or improving, the Premises for residential purposes (including multi-family residential uses), or for any hospital, school, elder care or day care center or for a park or playground.  Grantee further covenants and agrees that it shall not materially change the use of the Premises in such a way as to increase the level of clean-up required by any governmental entity for any environmental condition that had affected the Premises as of the Effective Date.  Each of these covenants shall run with the Premises, and pass with each and every portion of the Premises, and shall apply to and bind the respective successors in interest of each and every portion of the Premises.  Motiva shall be a third party beneficiary of the covenant set forth above.

5.     NOTWITHSTANDING ANYTHING CONTAINED IN THIS DEED TO THE CONTRARY, GRANTEE ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT GRANTEE HAS BEEN GIVEN THE OPPORTUNITY TO MAKE FULL AND COMPLETE INSPECTIONS OF THE PREMISES TO GRANTEE'S SATISFACTION PRIOR TO THE DATE OF THIS DEED AND THAT, AS OF THE DATE OF THIS DEED, GRANTEE IS RELYING SOLELY ON GRANTEE'S OWN INVESTIGATIONS OF THE PREMISES AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GRANTOR, OR ANY AGENT, REPRESENTATIVE OR OTHER PARTY ACTING, OR PURPORTING TO ACT, ON BEHALF OF GRANTOR. IT IS THE UNDERSTANDING AND INTENTION OF THE PARTIES THAT THE SALE OF THE PREMISES FROM GRANTOR TO GRANTEE IS MADE ON A STRICT "AS IS, WHERE IS" BASIS AND WITH ALL FAULTS.  GRANTEE ACKNOWLEDGES THAT GRANTOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, RELATING TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR PRESENT OR FUTURE CONDITION OF THE ASSETS, INCLUDING WITHOUT LIMITATION THE PREMISES, (B) THE COMPLIANCE OF, OR BY, THE PREMISES WITH ANY LAWS OF ANY APPLICABLE GOVERNMENTAL ENTITY, (C) THE LIABILITY, MERCHANTABILITY, MARKETABILITY, OR PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PREMISES, INCLUDING WITHOUT LIMITATION THE ASSETS THEREON, OR (D) ANY OTHER MATTER WITH RESPECT TO THE ASSETS. GRANTEE REPRESENTS TO GRANTOR THAT GRANTEE IS RELYING, HAS RELIED AND SHALL IN THE FUTURE RELY SOLELY UPON ITS OWN INVESTIGATIONS, INSPECTIONS AND STUDIES OF THE PREMISES, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GRANTOR, GRANTOR'S AGENTS OR CONTRACTORS OR OTHERWISE GENERATED FROM THIRD PARTY SOURCES. GRANTOR SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION

PERTAINING TO THE PREMISES OR THE OPERATION OF THE PREMISES FURNISHED BY ANY PARTY PURPORTING TO ACT ON BEHALF OF GRANTOR, INCLUDING, WITHOUT LIMITATION, ANY AGENT, BROKER OR SALESPERSON. GRANTEE ACKNOWLEDGES THAT THE CONTRIBUTION VALUE HAS BEEN SPECIFICALLY NEGOTIATED AND ADJUSTED TO TAKE INTO ACCOUNT THE AS-IS NATURE OF THIS SALE AND THE DISCLAIMERS AND WAIVER OF REPRESENTATIONS AND WARRANTIES AS STATED IN THIS DEED.

6.      From the Effective Date until the Termination Date (the "**Compliance Period**"), Grantee, its successors and assigns, shall take all action necessary or advisable to insure that the UST System, as defined below, and the Premises are in compliance with and eligible for coverage under any available petroleum storage tank fund in the State of Florida, and on or prior to the Effective Date, Grantee shall purchase environmental insurance in the form set forth on **Schedule 1** attached hereto and Grantee and its successors and assigns shall maintain such insurance coverage in effect as long as there is a UST System on the Premises, and on or before each anniversary of the Effective Date each year until the Termination Date shall furnish Grantee and Motiva a copy of an insurance certificate evidencing such insurance.  As used herein and on **Schedule 1**, "**UST System**" means any underground storage tanks, piping, leak detection devices and related equipment, including "inground" hoists, direct and remote vapor and fill lines/buckets used for the storage and dispensing of petroleum products, used oil and/or heating oil, and other equipment related to the operation of a motor fuel service station that are, were or may be present on the Premises, but does not include any concrete or other slab or platform upon which such equipment may be stationed.

GRANTOR AND GRANTEE ACKNOWLEDGE AND AGREE THAT GRANTEE'S ACCEPTANCE OF THE PREMISES WITH AND SUBJECT TO EACH AND ALL OF THE FOREGOING COVENANTS AS SET FORTH IN THIS DEED AND THE CONTINUING ENCUMBRANCE OF THE PREMISES WITH THOSE RESTRICTIONS AND COVENANTS ARE EACH A SIGNIFICANT AND MATERIAL PORTION OF THE CONSIDERATION PROVIDED BY GRANTEE TO GRANTOR IN CONNECTION WITH GRANTOR'S AGREEMENT TO CONVEY THE PREMISES AND THAT GRANTOR WOULD NOT CONVEY THE PREMISES TO GRANTEE FOR THE OTHER CONSIDERATION GIVEN BY GRANTEE FOR THE PREMISES ALONE WITHOUT SUCH RESTRICTIONS AND COVENANTS.

SUBJECT to the foregoing, Grantor covenants with Grantee that Grantor will warrant specially and defend title to the Premises conveyed in this Deed against the lawful claims of all persons claiming by, through, or under Grantor, but not otherwise, provided, that this conveyance and the special warranty made by Grantor in this Deed are subject to the matters contained in this Deed and any and all matters of record.  The preceding sentence is for the benefit of Grantee and the parties now or hereafter constituting Grantee and may not be relied on or enforced by any other entity, including, without limitation, any direct or remote successor in title to Grantee or any title insurer of Grantee or its direct or remote successors in title, by way of subrogation or otherwise.

IN WITNESS WHEREOF, Grantor has caused this Special Warranty Deed to be duly executed on the day and year first above written.

**FIRST COAST ENERGY, L.L.P.,** a Colorado limited liability partnership

By:  **PETRO DISTRIBUTING PARTNERS OF FLORIDA, L.L.C.,** a Delaware limited liability company, its Partner

By: _____
                       Aubrey L. Edge
                       Its Manager

Signed, Sealed and Delivered In Our Presence:

WITNESS:

_____
Printed Name:_____

WITNESS:

_____
Printed Name:_____

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this _____ of _____ 2019 by Aubrey L. Edge, as Manager and on behalf of Petro Distributing Partners of Florida, L.L.C., a Delaware limited liability company, as partner of and on behalf of First Coast Energy, a Colorado limited liability partnership.  He is personally known to me.

_____
Notary Signature
Print Name: _____
Notary Public, State and County Aforesaid
My commission expires:_____
Commission Number: _____

(Notarial Seal)

85

**"GRANTEE":**

By: _____

Signed, Sealed and Delivered In Our Presence:

WITNESS:

_____

Printed Name:_____

WITNESS:

_____

Printed Name:_____

STATE OF FLORIDA
COUNTY OF _____

     The foregoing instrument was acknowledged before me this _____ of _____ 2019 by _____, as manager of and on behalf of _____ a Florida _____. He is personally known to me or produced has produced a _____ Driver's License or _____ as identification.

_____
Notary Signature
Print Name: _____
Notary Public, State and County Aforesaid
My commission expires:_____
Commission Number: _____

(Notarial Seal)

86

**<u>EXHIBIT A TO DEED</u>**
**Legal Description of Premises**

A parcel of land situated in Broward County, Florida, and more particularly described as follows:

**EXHIBIT B TO DEED**

Permitted Encumbrances

[To come from Title Commitment]

## SCHEDULE 1 TO DEED

1.  Grantee, at Grantee's sole cost, shall obtain a one (1) year policy of not less than $1,000,000 each occurrence and $3,000,000 general aggregate with insurers satisfactory to Grantor and Motiva Enterprises LLC, a Delaware limited liability company ("**Motiva**") with annual renewals thereof during the Compliance Period;

2.  Grantee's insurance policy shall cover all of the Premises, and may cover Grantee's other facilities, from and after the Effective Date;

3.  Grantee's policy shall compensate third parties for bodily injury and property damage caused by accidental releases arising from its operation of each of the Premises and operation of the UST System, as contemplated by 40 CFR 280.93, Part 211 of the Natural Resources and Environmental Protection Act and the rules and regulations thereunder;

4.  Grantee's policy (and each certificate evidencing such insurance) shall name Grantor and Motiva (and its members, subsidiaries, affiliates and joint venture partnerships to the extent of their interest) as an additional "named insured," without regard to the allocation of liability provisions contained in any agreement;

5.  Grantee's policy shall provide that in the event of bankruptcy or insolvency of Grantee, Grantor or Motiva may, at Grantor or Motiva's sole option, request Grantee to have the applicable insurance contract endorsed to name Grantor and Motiva as the principal named insured without requiring Grantor and Motiva to assume either the ownership or operational control of the Premises:

6.  Grantee's policy shall provide a waiver of the insurer's right of subrogation in favor of Grantor and Motiva where permissible by law;

7.  Grantee's policy shall be the primary insurance underlying any other insurance available to Grantor or Motiva;

8.  Grantee's policy shall provide Grantor and Motiva with a minimum of thirty (30) days written notice of cancellation or material change;

9.  Grantee shall be responsible for any deductible applicable to such policy or the retention of insurable risks;

10.  Grantee shall provide a certificate of insurance and named insured endorsement to Grantor and Motiva evidencing the required insurance on the Effective Date and shall provide such certificate of insurance and named insured endorsement within ten (10) days of each subsequent annual anniversary of the Effective Date; and

11.  Grantee may terminate such insurance policy as to any particular Premises upon the removal of the UST System from such Premises.

**EXHIBIT F**
**BILL OF SALE**
(ABSOLUTE)

THIS BILL OF SALE is made by First Coast Energy L.L.P. (the "Seller"), to
_____ LLC, a Florida limited liability company (the "Buyer"),
pursuant to the Purchase and Sale Agreement between Buyer and Seller dated as of
_____, 20___ (the "Purchase Agreement") pursuant to which Seller has this day sold the
real property described on **Exhibit A** attached to this Bill of Sale to Buyer (the "Real Property").
Seller sells and conveys to Buyer the Tangible Personal Property (as defined in the Purchase
Agreement) owned by Seller and located on the Real Property as of the date of this Agreement,
subject to the terms and conditions of the Purchase Agreement. This Bill of Sale shall not be
deemed to convey any Excluded Assets as defined in the Purchase Agreement. Other than as
expressly set forth in the Purchase Agreement, Buyer acknowledges that Seller has made no
representations or warranties with respect to the condition of the Tangible Personal Property, it
being the intent of Seller and Buyer that, except as aforesaid, the Tangible Personal Property shall
be conveyed and transferred to Buyer in their present state of repair, "As-Is" and "Where Is, with
all Faults." Buyer acknowledges that the Purchase Price has been specifically negotiated and
adjusted to take into account the "As-Is" nature of this transfer and the disclaimers and waiver of
representations and warranties as stated in this Bill of Sale and in the Purchase Agreement.

Signed, sealed and delivered          **FIRST COAST ENERGY, L.L.P.**
in the presence of:                   a Colorado limited liability partnership

_____     By:  **PETRO DISTRIBUTING PARTNERS OF**
                                           **FLORIDA, L.L.C.**
Print: _____           a Delaware limited liability company
                                           Its Partner

_____
Print: _____      By: _____
                                           Aubrey L. Edge
                                           Its Manager

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this ___ day of _____
20___ by Aubrey L. Edge, in his capacity as Manager of Petro Distributing Partners of Florida,
L.L.C., a Delaware limited liability company, on behalf of the company as partner of First Coast
Energy, L.L.P., a Colorado limited liability partnership, on behalf of the partnership. Mr. Edge is
personally known to me.

_____
Notary Signature
Print Name: _____
Notary Public – State of _____
My Commission Expires: _____
(NOTARY SEAL)

90

**<u>EXHIBIT G</u>**
**Taxpayer I.D. Statement**


       In connection with certain Internal Revenue Service reporting requirements imposed upon Seller, Buyer certifies that listed below is Buyer's address and taxpayer I.D. number, true and correct as of the Closing Date.

Address:

Taxpayer I.D. No.:       _____


       Buyer consents to Seller's release of the above information in connection with any reporting requirements imposed upon Seller by any governmental authority.

                            _____ LLC,
                            a Florida limited liability company


                        By:    _____
                              _____
                              Its Manager

**EXHIBIT H**
**Form of Access Agreement**

Record and return to
Andrew Keith Daw
7014 A. C. Skinner Parkway, Suite 290
Jacksonville, Florida 32256

Parcel Identification No.

## ACCESS AGREEMENT

THIS **ACCESS AGREEMENT** (this "**Agreement**") is entered into as of the ___ day of
_____ 2019 by and between **FIRST COAST ENERGY, L.L.P.**, a Colorado limited liability
partnership with offices located at 7014 A.C. Skinner Parkway, Suite 290, Jacksonville, Florida
32256 ("**FCE**"), and _____ **LLC**, a Florida limited liability company
with offices located at _____ ("**Company**").

## R E C I T A L S

**WHEREAS,** FCE has on this date conveyed to Company all of FCE's right, title and
interest in and to the Property described on **Exhibit A** to this Agreement (the "**Premises**"),
pursuant to a Purchase and Sale Agreement between FCE and Company having an Effective Date
of _____ (the "**Purchase Agreement**"); and

**WHEREAS**, in accordance with the Purchase Agreement, FCE may require access to the
Premises in connection with certain post-closing activities contemplated or required by the terms
of the Purchase Agreement;

**NOW, THEREFORE**, in exchange for the mutual promises and considerations stated in
this Agreement and in the Purchase Agreement and for other good and valuable consideration, the
receipt and sufficiency of which are acknowledged, FCE and Company agree as follows:

## ARTICLE 1.
## DEFINITIONS AND PROCEDURES

1.1    Definitions and Procedures.  Unless defined in this Agreement or the context shall
otherwise require, terms used and not defined in this Agreement shall have the meanings set forth
in the Purchase Agreement.

## ARTICLE 2.
## GRANT OF LICENSE

2.1 Grant of License.  Company, as owner of the Premises, grants a nonexclusive
irrevocable license from the date of this Agreement to FCE, its employees, authorized agents and
contractors, to enter the Premises to perform any and all post Closing activities contemplated by
the Purchase Agreement, which activities may include, but are not limited to, remediation

activities, and engineering or environmental studies, tests, survey, appraisals or inspections. This Agreement is intended and shall be construed only to grant a temporary license and is not intended to be a grant of an easement or any other interest in the Premises.

## ARTICLE 3.
## COVENANTS

3.1 <u>Notice to Assigns.</u> In the event Company's interest in the Premises is conveyed, transferred or in any way assigned in whole or in part to any other person or entity, whether by contract, operation of law or otherwise, Company shall provide prior written notice to FCE of such conveyance or transfer.

## ARTICLE 4.
## TERMINATION

4.1 <u>Termination</u>. This Agreement shall automatically terminate, without any further action of either FCE or Company, upon the completion of the post-Closing activities contemplated by the Purchase Agreement. The parties may execute a recordable joint notice of termination.

## ARTICLE 5.
## INDEMNIFICATION; LIMITATIONS

5.1 <u>Indemnification</u>. This Agreement is delivered pursuant to the Purchase Agreement and is subject to the provisions, including, without limitation, provisions relating to indemnification by FCE and by Company, and the limitations in respect of such indemnification set forth in the Purchase Agreement.

## ARTICLE 6.
## MISCELLANEOUS

6.1 <u>Notice.</u> All notices and other communications pursuant to this Agreement shall be in writing and shall be deemed to have been received only if and when (a) personally delivered or (b) on the third day after mailing, by United States mail, first class, postage prepaid, by certified mail return receipt requested, (c) given by facsimile transmission to the number set forth below, or (d) one day after deposit with a reputable overnight courier, address in each case as follows (or to such other addresses for a party as may be specified by notice given in accordance with this <u>Section 6.1</u>):

If to FCE, addressed to it at:              If to Company, addressed to it at:

A. C. Skinner Parkway, Suite 290      _____ LLC
Jacksonville, Florida 32256
Attn: Aubrey L.  Edge
                                                         Attn:  _____

6.2 <u>Environmental Investigation and Remediation.</u> **Company agrees that this Agreement imposes no obligation on FCE to remedy or respond to any environmental condition at the Premises. FCE and Company agree that no provision of this Agreement shall expand FCE's obligations to respond to such environmental conditions and shall not be construed to be an admission of liability, wrongdoing or violation of any law by FCE or Company or their predecessors, successors or permitted assigns.**

6.3 <u>Governing Law.</u>  This Agreement shall be construed in accordance with the internal laws of the State of Florida, excluding any conflict of law principles that would direct application of the laws of another jurisdiction.

6.4 <u>Waiver</u>.  No waiver by any party of any breach of the covenants and/or agreements set forth in this Agreement, or any rights or remedies provided under this Agreement and no course of dealing shall be deemed a continuing waiver of the same or any other breach, right or remedy, unless such waiver is in writing and is signed by the party sought to be bound.  The failure of a party to exercise any right or remedy shall not be deemed a waiver of such right or remedy in the future.

6.5 <u>Collective Transaction; Successors and Assigns</u>.  FCE and Company acknowledge that this Agreement has been entered into pursuant to the Purchase Agreement.  The covenants of this Agreement shall run with title to the Premises and shall be binding upon the Premises and each part thereof, and upon Buyer, its successors and assigns.

**[signatures appear on the following page]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement to be effective as of the date set forth above.

Signed, sealed and delivered        **FIRST COAST ENERGY, L.L.P.,**
in the presence of:                 a Colorado limited liability partnership

_____             By:  **PETRO DISTRIBUTING PARTNERS**
Print: _____                  **OF FLORIDA, L.L.C.,** a Delaware
                                          limited liability company, its Partner


_____
Print:_____             By: _____
                                        Aubrey L. Edge
                                        Manager



STATE OF FLORIDA
COUNTY OF DUVAL

        The foregoing instrument was acknowledged before me this _____ of _____ 2019 by Aubrey L. Edge, as Manger of Petro Distributing Partners of Florida, L.L.C., a Delaware limited liability company, on behalf of the company as partner of First Coast Energy, L.L.P., a Colorado limited liability partnership, on behalf of the partnership.  He is personally known to me.


                                    _____
                                    Notary Signature
                                    Print Name: _____
                                    Notary Public, State and County Aforesaid
                                    My commission expires:_____
                                    Commission Number: _____
                                         (Notarial Seal)

_____ **LLC,**
a Florida limited liability company

_____
Print: _____


_____                    By: _____
Print : _____
                                                   _____
                                                   Its Manager



STATE OF FLORIDA
COUNTY OF _____

     The foregoing instrument was acknowledged before me this _____ of _____,
20___, by _____, as Manager of _____
LLC, a Florida limited liability company, on behalf of the company, who

     ( )    is personally known to me;
     ( )    has produced a _____ Driver's License as identification; or
     ( )    has produced a _____ as identification.

     _____
     NOTARY PUBLIC
     Print Name:_____

Notary Public in and for the State of _____
My commission expires: _____
Commission Number: _____

     [Notarial Seal]

96

**<u>EXHIBIT A</u>**
**Legal Description of Premises**

A parcel of real property situated in _____ County, Florida, and more particularly described as follows

## **EXHIBIT I**
**Intentionally deleted**

## EXHIBIT J
### Environmental Insurance

1. The Buyer, at Buyer's sole cost, shall obtain a one (1) year policy of not less than $1,000,000 each occurrence and $3,000,000 general aggregate with insurers satisfactory to Seller with annual renewals of such policy during the Compliance Period;

2. The Buyer's insurance policy shall cover all of the Premises, and may cover Buyer's other facilities, from and after the Closing Date;

3. The Buyer's policy shall compensate third parties for bodily injury and property damage caused by accidental releases arising from its operation of each of the Premises and operation of the UST Systems, as contemplated by 40 CFR 280.93, Part 211 of the Natural Resources and Environmental Protection Act and the rules and regulations thereunder;

4. The Buyer's policy (and each certificate evidencing such insurance) shall name Seller (and its members, subsidiaries, affiliates and joint venture partnerships to the extent of their interest) as an additional "named insured," without regard to the allocation of liability provisions contained in the Agreement;

5. The Buyer's policy shall provide that in the event of bankruptcy or insolvency of Buyer, Seller may, at Seller's sole option, request the buyer to have the applicable insurance contract endorsed to name Seller as the principal named insured without requiring Seller to assume either the ownership or operational control of the Premises:

6. The Buyer's policy shall provide a waiver of the insurer's right of subrogation in favor of Seller where permissible by law;

7. The Buyer's policy shall be the primary insurance underlying any other insurance available to Seller;

8. The Buyer's policy shall provide Seller with a minimum of thirty (30) days written notice of cancellation or material change;

9. The Buyer shall be responsible for any deductible applicable to such policy or the retention of insurable risks;

10. The Buyer shall provide a certificate of insurance and named insured endorsement to Seller evidencing the required insurance on the Closing Date and shall provide such certificate of insurance and named insured endorsement within ten (10) days of each subsequent annual anniversary of the Closing Date; and

11. The Buyer may terminate such insurance policy as to any particular Premises upon the removal of the UST System from such Premises.

**EXHIBIT K**
TO PURCHASE & SALE AGREEMENT

**FIRST COAST ENERGY, L.L.P**
**DEALER SUPPLY AGREEMENT**

Dealer's Name: _____ LLC    Effective Date: _____

Dealer's FEI No.    _____    Site No.: FCE #_____

Facility Address:    _____

Notice Address:    _____

THIS DEALER SUPPLY AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2019, by and between FIRST COAST ENERGY, L.L.P., a Colorado limited liability partnership ("First Coast"), whose address for notice purposes is 7014 A.C. Skinner Parkway, Suite 290, Jacksonville, FL 32256, and _____ LLC, a Florida limited liability company ("Dealer"), whose address for notice purposes is _____, operating a petroleum products business at _____ ("Facility").    As used in this Agreement, "Parties" means First Coast and Dealer, collectively, and the successors and assigns of each.

WHEREAS, First Coast has a reputation as a marketer of high quality petroleum products; and

WHEREAS, Dealer desires to operate the Facility offering First Coast's petroleum products and the highest quality service to the motoring public;

NOW, THEREFORE, in consideration of the mutual undertakings contained in this Agreement, First Coast and Dealer agree as follows:

1.    Term.

The initial term of this Agreement shall commence on _____ and shall end on _____; thereafter this Agreement shall automatically renew for successive terms of one (1) year each until such time as either party provides written notice of termination not less than one (1) year prior to the end of the renewal term then in effect.  Termination of this Agreement for any reason shall not operate to cancel or otherwise affect any financial security agreements, mortgages, notes or guaranties.  This Agreement is intended by the parties to supersede any existing contracts and supply agreements or arrangements with respect to the Facility, and any such existing agreement(s) or arrangement(s) shall terminate and be of no further force or effect immediately upon the execution hereof by both parties.

2.    Equipment.

If First Coast provides to Dealer any Equipment (as shown on the "Equipment Schedule" attached to this Agreement and made a part hereof as Exhibit A to Dealer Supply Agreement--the "Equipment"), Dealer agrees that the Equipment shall remain the property of First Coast and shall not be encumbered, changed, modified, relocated or removed without the consent of First Coast.  First Coast reserves the right at any time to remove from the Facility without replacement any item of Equipment not deemed by First Coast essential to the operation thereof, and upon expiration or any termination of this Agreement First Coast shall have the right to remove all of the Equipment.

Dealer will at Dealer's own expense make all minor repairs and provide all maintenance required to keep the Equipment in good operating condition.  First Coast may, but is not obligated to, make major repairs required to keep the Equipment in good operating condition or replace Equipment, provided that if such repairs are necessitated by the negligence or misuse of Dealer, of any employee of Dealer, or of any third party, Dealer shall be obligated to reimburse First Coast for the cost of such repairs or replacement.  Dealer will maintain First Coast's equipment in good working order and repair.  Dealer agrees that in no event shall First Coast incur any liability to Dealer for damages, consequential or otherwise, by reason of the condition of the Equipment or First Coast's negligence, failure, or delay, regardless of cause, in repairing any of the Equipment, and Dealer waives all claims for damages resulting therefrom or connected therewith.  Upon termination of the Agreement Dealer agrees to surrender and return the Equipment to First Coast in as good order and condition as when supplied to Dealer under this Agreement, ordinary wear and tear excepted.  Dealer shall permit First Coast to enter upon the Facility from time to time, to inspect any Equipment used for storing, advertising, dispensing and selling First Coast's motor fuels, to inspect Dealer's fuel reconciliation, to read meters and gauge tanks, to test and take samples of First Coast's motor fuels, and to adjust, exchange, remove or add to First Coast's signs and Equipment.  However, First Coast is not obligated to make any such inspections.  Any maintenance required on any gallon or dollar totalizers on any of the fuel dispensing equipment owned by First Coast shall be performed by First Coast, or its representative.  Dealer will inform First Coast promptly if maintenance is required.  Dealer will not reset, modify, adjust or in any way alter the operation of or the totals shown on the totalizers.

3.      Operation of Facility.

(a)      Dealer recognizes that First Coast has established a high standard for product quality, facility appearance (inside and out) and customer service, and Dealer agrees to conduct business at, on and from the Facility in a manner consistent with those high standards.  Accordingly, Dealer agrees to furnish such service and accommodations to retail motor fuel customers as are customarily provided, including but not limited to:  (1) keeping the Facility open for operation not less than the hours set forth in Section 3(b), (2) keeping the premises, buildings, equipment, fixtures, rest rooms, sidewalks, approaches, and driveways in good condition, properly lighted, clean, safe, sanitary, and free of trash and other debris, (3) keeping the approaches, driveways, and service areas uncluttered and free of parked vehicles, trailers, and other obstructions, including ice and snow at all times, (4) providing sufficient qualified attendants dressed in First Coast approved uniforms to render first class service to customers, (5) rendering efficient, courteous, and diligent services to customers and not engaging in or permitting any improper act or conduct on the premises detrimental to Dealer, First Coast or any member of the

public, (6) keeping abreast of the changing competitive environment and reacting to such changes in a way to maximize the level of fuel and non-fuel business at the Facility, (7) providing free air and restroom facilities, and (8) complying with all laws, ordinances, rules or regulations of constituted public authority applicable to the use and occupancy of the premises and the conduct of the business. By execution of this Agreement, Dealer grants to First Coast (and its agents, employees, contractors, and representatives) a right of access to the Facility for purposes of ensuring and enforcing any and all of the terms, conditions, and requirements of this Agreement.

In the event that the motor fuels supplied to the Facility by First Coast are marketed under the brand of a major oil company, then Dealer agrees to strictly comply with any and all image or inspection programs or other brand initiatives implemented by such major oil company; and, Dealer specifically acknowledges and confirms that any failure by Dealer to comply with the requirements of such program shall be deemed a material breach of this Agreement and shall be grounds for termination hereof.

(b)     Minimum Operating Hours. The Facility will be kept open for operation, properly lighted and staffed for at least the hours shown below:

Minimum Open Hours

| Day | From: | To: | 24 Hrs.* | No. of Hours |
|-----|-------|-----|----------|--------------|
| Monday | x AM | x PM | _ | 24 |
| Tuesday | x AM | x PM | _ | 24 |
| Wednesday | x AM | x PM | _ | 24 |
| Thursday | x AM | x PM | _ | 24 |
| Friday | x AM | x PM | _ | 24 |
| Saturday | x AM | x PM | _ | 24 |
| Sunday | x AM _ | x PM | _ | 24 |

*Place an X if applicable                    Total Weekly Hours:     168

4.     Electronic Point of Sale Equipment.

Dealer acknowledges and agrees that First Coast shall have the right at any time during the term of this Agreement to install at the Facility Electronic Point of Sale Equipment for the processing of credit card, and/or debit card transactions. If such equipment is installed, Dealer agrees that he shall pay to First Coast all fixed and variable transaction charges and maintenance charges required by First Coast, which shall be set forth in an EPOS Equipment Rental Agreement to be executed by Dealer and First Coast. The terms of the EPOS Equipment Rental Agreement

may be changed or modified by First Coast at any time upon sixty (60) days' notice to Dealer, provided that similar changes or modifications are being incorporated in the EPOS Equipment Rental Agreements between First Coast and all other similarly situated dealers within the relevant geographical area.

     5.     Product Integrity and Handling.

     Dealer agrees to become informed about and observe all valid laws, ordinances and regulations pertaining to the handling, storage and dispensing of petroleum products, including without limitation ethanol-blended fuels, at the Facility. In particular Dealer will comply strictly with all regulations relating to product purity, environmental protection and self-service. Dealer will not permit First Coast products to be adulterated, mixed or blended with any substance whatever prior to delivery to consumers.

     Dealer will make physical measurements of all products stored in underground tanks at least daily. These daily measurements of liquid level must be entered in a log and reconciled with metered sales and product deliveries. Measurements and reconciliations must be maintained in the log for twelve months, or longer if required by law or governmental regulation. Dealer shall immediately notify First Coast upon discovery of any inventory loss or other condition which may be the result of a leaking tank or other equipment failure. Dealer shall promptly investigate and undertake the appropriate remedy. In addition Dealer will, if requested by First Coast, cooperate in all current and future petroleum product storage/dispensing system integrity verification programs established by First Coast.

     6.     Unleaded Gasoline Handling.

     Dealer shall at all times strictly comply with the provisions and requirements of 40 CFR Part 80 and all other statutes, regulations, ordinances, rulings and other laws applicable to the delivery, storage, handling, and dispensing of unleaded gasoline. Dealer shall establish and enforce a positive program of compliance to ensure that unleaded gasoline will not become contaminated between delivery to the Facility and delivery to the consumer. The program shall include as necessary securing manhole covers, fill line caps and dispensers to avoid unauthorized entry or use, and supervision and instruction of Dealer's employees and others having access to the unleaded gasoline system to prevent accidental or willful contamination of unleaded gasoline. Dealer shall give prompt notice to First Coast of any circumstance or occurrence which reasonably could cause the unleaded gasoline or the unleaded gasoline dispensing equipment to be out of compliance with federal regulation; and, upon discovery of any possible non-compliance, cease selling, dispensing or offering for sale such product until First Coast can confirm that the product is in compliance. Dealer will cooperate with First Coast's unleaded gasoline monitoring program and will immediately inform First Coast upon the occasion of any inspection or sampling by representatives of a state or federal governmental agency. Dealer agrees to indemnify First Coast and hold it harmless against any liability, penalty or loss which may result from a violation of any regulation relating to the sale and distribution of unleaded gasoline and which is not attributable solely to the acts or omissions of First Coast, its agents or employees. This indemnity in no way limits and is intended to be included within the scope of the general indemnity set forth in Section 15 hereof.

7.      Supply of Products; Meter Marketing Option.

Subject to the remaining terms and conditions of this Agreement, First Coast agrees to sell to Dealer and Dealer agrees to buy and promote the sale of such quantities of motor fuels and other petroleum products sold, marketed, or supplied by First Coast as may be necessary to meet the customer demand for said fuels and products at the Facility.  First Coast may, at First Coast's sole option, upon thirty (30) days' notice to Dealer, change the supply/payment arrangement with respect to motor fuels delivered to the Facility to a meter marketing arrangement pursuant to which Dealer will not take title to motor fuels delivered to the Facility until such motor fuels have been registered on the dispenser or pump meters in connection with the withdrawal or removal of same from the underground storage tanks.  In the event First Coast exercises the foregoing meter marketing option, Dealer agrees to promptly execute such additional agreements, riders and/or amendments as First Coast deems necessary and appropriate to reflect the terms and conditions of the meter marketing arrangement.

First Coast may supply any branded or non-branded motor fuels and/or petroleum products to the Facility that First Coast is authorized to supply and shall have the right at any time to change, withdraw, substitute or add brands and grades of petroleum products, TBA, trademarks, identification signs or color schemes.  First Coast's obligation under this Agreement is understood by Dealer to be limited to supplying Dealer with such of its products as may generally be available to other similarly situated dealers in the same geographic area in which the Facility is located.  All fuel deliveries shall be made in full transport truckload quantities or in such other minimum quantities per delivery as specified by First Coast from time to time.  If Dealer requests delivery of less than First Coast's established minimum volumes, compensatory delivery charges will be imposed.  If, at the time this Agreement is entered into, the Facility is equipped for the handling of only two grades of gasoline, Dealer acknowledges and agrees that First Coast has no obligation to supply three grades of gasoline at the Facility.  In no circumstances is First Coast obligated to make deliveries into a tank that is suspected of leaking or that has any measurable amount of water or other impurity that could affect the fuel's performance.  Under this Agreement, First Coast is obligated to supply product to only the Facility specified above.

8.      Healthy and Safety Precautions.

In recognition of the fact that petroleum products may pose a health or safety risk, Dealer will follow generally accepted safety procedures for the handling of hazardous materials.  Dealer will also train Dealer's employees concerning product safety and supervise them to ensure compliance.

9.      Minimum Volumes.

Dealer agrees to purchase from First Coast and resell through the Facility a quantity of motor fuel equal to at least _____ gallons per Contract Year.  "Contract Year" shall mean each successive 365-day period during which this Agreement is in effect.  In any Contract Year in which Dealer fails to purchase the minimum required quantity of motor fuel as set forth above, Dealer shall, upon written demand, pay to First Coast an amount equivalent to four cents ($0.04) times the difference between the number of gallons actually purchased during that Contract Year

104

and the minimum number of gallons required to be purchased during that Contract Year (the "Shortfall Obligation"). The parties specifically agree that four cents ($0.04) per gallon represents a reasonable estimate of the amount necessary to cover the actual financial losses that First Coast will incur as the result of Dealer's failure to purchase the minimum required volume of motor fuel during each Contract Year throughout the full term of this Agreement. Such losses will include, without limitation, losses incurred by First Coast as a result of its reliance on Dealer's satisfaction of its minimum purchase obligation in (a) agreeing to long-term motor fuel purchase commitments with First Coast's suppliers, and (b) making branding and ownership decisions within the competitive geographical market in which the Facility is located. Dealer acknowledges and confirms that Dealer shall owe First Coast the Shortfall Obligation in the event that this Agreement is terminated or ceases to be binding upon Dealer for any reason, including without limitation (a) the sale or transfer of a controlling interest in the corporation in violation of the Corporate Rider attached to this Agreement, or (b) Dealer's breach of or failure to comply with any condition, provision or requirement of this Agreement.

In addition, Dealer's failure to purchase the required minimum volumes shall be grounds for termination of this Agreement and repayment of any unamortized balance(s) owed by Dealer to First Coast.

First Coast recognizes that there may be some extenuating and uncontrollable circumstances such as, but not limited to, road construction, natural disasters, supply shortages, abnormal marketing conditions, etc. that may prevent Dealer from achieving the minimum volumes. In such cases, Dealer may make a written request for a reasonable adjustment to the minimum volume stating specifically the reason that the adjustment is being requested. First Coast agrees to respond to all minimum volume adjustment requests within thirty (30) days of receipt.

10.    Quality and Claims.

First Coast guarantees that all products delivered under this Agreement will be uniform in quality and up to its standards. Any claim for deficiency in quality or quantity of any product is waived unless Dealer gives First Coast notice of such deficiency at time of delivery (or during the next period of regular business hours if a night delivery) for quantity claims and within 48 hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Dealer's claim is based, and First Coast shall be given full opportunity to inspect, measure and test the products involved.

11.    Price of Products.

Unless a different arrangement is expressly agreed to in writing by the parties, prices for all motor fuels purchased by Dealer from First Coast shall be the rack price established by First Coast in effect at the time and place of delivery, PLUS (a) ____cents ($0.0_) per gallon, together with all freight and freight-related charges and costs incurred in connection with the transportation and delivery of the products to the Facility (including without limitation fuel surcharges, if applicable). Prices for all products shall be subject to change without notice to Dealer. In addition to such prices and freight charges, Dealer shall pay to First Coast any tax, duty, fee or charge levied on any of the products, or on First Coast, or required to be paid or collected by First Coast upon

the sale, delivery, transportation, storage, ownership or use of any of the products.  First Coast reserves the right to make additional charges to Dealer for split loads of motor fuel, pump-overs, retains, and other service-related performance.  Dealer acknowledges that Dealer shall not be eligible for any "prompt pay discount" or other similar discounts, rebates or credit programs, or any motor fuel incentives or rebates unless First Coast expressly stipulates to same in writing; First Coast may, in its sole discretion, decline to make any such incentive(s) or rebate(s) available to Dealer.

12.     Terms of Payment.

(a)     Terms of payment for all products shall be the same as those currently in effect for dealers of the same class purchasing like products from First Coast and shall be subject to change by First Coast from time to time without notice.  Motor fuel sales shall be net cash at time of delivery unless otherwise expressly agreed in writing by First Coast and Dealer (or unless FCE exercises its option to convert Dealer's retail motor fuel operation to a meter marketing arrangement pursuant to paragraph 7, above).  If First Coast should agree to extend credit to Dealer for any products purchased under this Agreement, security may be demanded by First Coast, and, in default thereof, First Coast may elect to discontinue credit deliveries.

(b)     Dealer agrees to establish an account with a financial institution that provides electronic fund transfer ("EFT") services and to authorize certain transfers of funds between that account and designated accounts of First Coast.  Dealer shall provide First Coast with the information and authorization necessary to debit and credit Dealer's account through EFT transactions.  The types of dealer debiting transaction for which EFTs may be used include without limitation, motor fuel deliveries, TBA purchases, and credit card chargebacks.  The types of dealer credit transactions which may be made through EFTs include, without limitation, First Coast purchases of credit card invoices and any rebates or other price adjustment for which Dealer may qualify.

(c)     On or before the Effective Date of this Agreement, Dealer will make, and thereafter shall maintain, a cash fuel deposit in the amount of _____and NO/100 Dollars ($___,000) as security for the full and timely payment of all amounts payable by Dealer for motor fuels sold and delivered under this Agreement and for any and all other funds required to be paid by Dealer to First Coast under this Agreement; such amount may be adjusted from time-to-time by First Coast and any additional deposit remittances required of Dealer due to any increase in the amount of such deposit will be remitted within twenty (20) business days of First Coast's issuance of notice to Dealer that such additional remittance is required.  The said fuel deposit shall also stand as security for Dealer's full, strict, and prompt performance of all other duties, responsibilities, and liabilities (including, without limitation, the duty to pay any monies under this Agreement) arising under, out of, or in connection with this Agreement.  Payment, holding, handling, and disbursement of the deposit funds shall be governed by and in accordance with a separate written deposit agreement between the parties.

(d)     First Coast reserves the right to require Dealer to make or receive payments for other additional types of transactions.  Dealer agrees to provide the necessary authorization and assistance to implement such additional EFTs promptly upon the request of First Coast.

13.     Transaction Card Sales.

(a)     As long as First Coast elects to accept specified credit cards, credit identification, fleet cards, debit cards, pre-paid cards or other similar transaction authorization cards (collectively, "Transaction Cards"), Dealer shall accept and honor all Transaction Cards identified the Transaction Card Guide most recently provided by First Coast (as amended, supplemented and/or updated from time to time, the "Card Guide"), one or more copies or counterparts of which is/are being furnished by First Coast to Dealer, and which may are also available to Dealer through a vendor website.  Dealer shall account for and process all such transactions in strict compliance with the terms set forth in the Card Guide.  Dealer shall be responsible for paying any Transaction Card processing fees that may be assessed for or in connection with such services.

(b)     Credits for all transactions conducted by Dealer's customers using approved Transaction Cards shall be credited to First Coast on behalf of Dealer, but only for such merchandise and services, and upon the express terms and conditions, approved and provided in the Card Guide.  First Coast shall accept from Dealer all transactions generated as a result of purchases made with authorized Transaction Cards and shall process such purchases in accordance with the terms and conditions set forth in the Card Guide.  At First Coast's option, First Coast may pay or credit the amount of the transaction to Dealer, after deducting any processing fee in effect under the current Card Guide, by (i) business check payable to Dealer, (ii) electronic credit to Dealer's designated bank account, or (iii) an appropriate set-off against or credit to Dealer's account with First Coast.  It is expressly agreed by the parties that, with respect to any credit card transaction credits received by First Coast on behalf of Dealer, First Coast has the authority, in its sole discretion, to apply all or any portion of such credits to satisfy or reduce the amount(s) of outstanding fuel invoices and/or any other debts, shortfalls, or other obligations owed by Dealer to First Coast.  In the event that Dealer's failure to strictly comply with applicable Transaction Card procedures or guidelines results in a chargeback, First Coast shall have the right to debit or charge Dealer for the full amount of such chargeback.

(c)     For each transaction that is disputed, unauthorized or otherwise subject to charge-back under the terms and conditions of the Card Guide, First Coast may either charge the appropriate amount to Dealer's account, or electronically draft the appropriate amount from Dealer's designated bank account, without deduction for any processing fee.

(d)     Dealer acknowledges receipt of one or more copies or counterparts of the Card Guide; Dealer acknowledges that Card Guide amendments, supplements and updates may be available to Dealer through a vendor website; and, Dealer agrees to fully comply with all of the terms, conditions and requirements set forth in the Card Guide and such amendments, supplements and updates.  Without limiting any rights or remedies available to First Coast, if Dealer fails to comply with this paragraph or any provision or requirement of the Card Guide, First Coast may limit or terminate Dealer's right to participate in any or all Transaction Card programs.  Further, First Coast (or its wholesale fuel supplier) may alter, modify, amend or terminate the Transaction Card program at any time upon notice to Dealer.

(e)     First Coast (and its wholesale fuel supplier) shall have the right to charge-back sales transaction amounts as provided in this Agreement and in paragraph (c), above.  Dealer shall maintain records of each sales transaction (including the actual draft generated by the sale) for a period of not less than six (6) months from the date of the transaction.  Any Transaction Card transactions that are charged back because of a failure to strictly comply with the then-current instructions, policies, and requirements as set forth in the Card Guide, or because of customer dispute, shall be the responsibility of Dealer.

(f)     Dealer and First Coast agree that all Transaction Card sales transactions conducted at or from the Facility shall be made pursuant to and in accordance with the applicable point of sale ("POS") system for processing Transaction Card transaction.

(g)     Dealer acknowledges and confirms that the Payment Card Industry Data Security Standard (as amended or supplemented from time to time—the "PCI DSS") sets forth clearly defined standards establishing the duties of merchants, such as Dealer, to secure sensitive cardholder data.  Dealer shall become fully informed and familiar with the terms, provisions, standards, and requirements of the PCI DSS, as the PCI DSS applies to Dealer's business operations at and from the Facility.  Dealer shall at all times (i) comply with the PCI DSS, (ii) take appropriate steps to ensure that all POS and other related network hardware and software utilized at or in connection with the Facility are and remain PCI DSS certified and compliant, and (iii) take appropriate steps to monitor, test, and assess the POS and related hardware and software utilized at or in connection with the Facility pursuant to the PCI DSS.

(h)     Dealer shall indemnify, defend and hold First Coast and its wholesale fuel supplier harmless from and against any and all losses, fines, penalties, damages, and other liabilities, together with costs and expenses, including reasonable attorney's fees, incurred in defending or resolving same, arising out of or in connection with Dealer's breach or violation of, or failure to comply with, the PCI DSS or the Card Guide.  The indemnity provision set forth in this subparagraph (f) shall survive the termination or expiration of the Dealer Lease and Supply Agreement.

14.     Trademarks and Names.

Dealer expressly agrees that all tanks, pumps and other storage or dispensing equipment for gasoline or diesel fuel furnished by First Coast shall be used exclusively for the storing handling, dispensing, and advertising of products purchased by Dealer from First Coast, that all First Coast's (or its supplier's) trademarks, names and colors appearing on any of the equipment shall be kept clear and legible, and that Dealer will use only signs approved by First Coast to advertise products purchased by Dealer from First Coast.  During the term of this Agreement Dealer shall be entitled to use appropriate trademarks, names and colors as authorized and approved by First Coast from time to time on equipment and vehicles owned by Dealer to identify Dealer as a dealer of First Coast's branded or non-branded petroleum products.  First Coast shall be entitled to withdraw or substitute the use of any particular trademark, name or colors at any time.  Upon the expiration or any termination of this Agreement, all of Dealer's rights to use or display proprietary trademarks, names or colors shall terminate immediately, and Dealer agrees, at Dealer's sole expense, to forthwith remove or paint out any such marks, names or colors from

108

the Facility, equipment and vehicles belonging to Dealer. In the event that Dealer fails or refuses to promptly and fully de-brand the Facility within thirty (30) days following the expiration or termination of this Agreement, Dealer grants to First Coast a right and license of access to the Facility and related premises for purposes of performing or completing the de-branding process, removing and/or effectively obliterating all proprietary trademarks, names and colors, in which event Dealer agrees to promptly reimburse First Coast for all costs and expenses incurred in de-branding the Facility. Dealer agrees that under no circumstances will First Coast's trademarks, names or colors be employed to identify products originating from any source other than First Coast or other than the particular grade or quality corresponding to the designation employed. Dealer agrees that the size, format and location of signs advertising services offered by Dealer or products purchased by Dealer from sources other than First Coast will conform generally to the size, format and location of signs which would be approved by First Coast for advertising like products purchased by Dealer from First Coast.

15.    Dealer's Business - Indemnity.

It is mutually agreed that business conducted by Dealer at the Facility is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon First Coast any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer shall have no authority to employ any person as an agent or employees of First Coast for any purpose, and neither Dealer nor any other person performing any act in connection with the operation of Dealer's business at the Facility shall be deemed to be an employee or agent of First Coast. Dealer will not erect or permit any sign or other advertising device on or near the Facility which in any way indicates or represents that First Coast is the owner or operator of the business conducted by Dealer at the Facility. Dealer agrees to permit First Coast to post and maintain a sign identifying Dealer as an independent business. Dealer agrees to indemnify, defend and hold First Coast harmless from and against all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, costs and expenses (including attorney's fees) of whatsoever nature for damage to property (including that of First Coast or Dealer) or for injury to or death of persons (including agents and employees of First Coast or Dealer) which may be imposed upon, incurred by, or asserted against First Coast directly or indirectly resulting from or connected with any occurrence arising out of the use, non-use, possession, condition, operation or maintenance of the Facility and the business conducted by Dealer thereon.

16.    Insurance.

Dealer agrees to purchase and maintain comprehensive general and automobile liability insurance covering Dealer's Facility and operation thereof. Such insurance shall be in an amount of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence. All insurance policies shall be written by companies satisfactory to First Coast and shall contain a clause that the insurance carried by Dealer is primary to any liability insurance carried by First Coast and shall include First Coast as an additional insured. Dealer or Dealer's insurance carrier shall furnish First Coast with a certificate of insurance certifying the existence of the above coverage and clauses and stating that First Coast will receive at least 10 days written notice prior to cancellation or material change. Dealer agrees to increase the amount of any of the insurance

described in this Agreement upon receiving the written request of First Coast to do so.  In addition First Coast reserves the right to require additional types of coverages such as, for example, environmental impairment liability insurance to satisfy governmental requirements for financial responsibility, and promptly upon notice of such an additional requirement Dealer agrees to obtain the necessary coverage.

17.    Security Interest.

In order to secure payment of all Dealer's present and future indebtedness owed by Dealer to First Coast at any time during the term of this Agreement or upon its termination or expiration, by execution of this Agreement Dealer grants to First Coast a first priority security interest in all of Dealer's inventory of First Coast petroleum and other products and TBA purchased from First Coast, regardless of when purchased, and all proceeds thereof.  Dealer also grants to First Coast a first priority security interest in the following collateral: (a) all accounts receivable owing to Dealer regardless of when or how incurred; (b) all of Dealer's equipment purchased from First Coast, (c) the proceeds of Dealer's inventory (other than inventory of petroleum and other products and TBA purchased from First Coast), accounts receivable and equipment.  Dealer agrees to sign all financing statements and renewals as necessary to provide public record of this security interest. In addition, Dealer authorizes First Coast to file financing and continuation statements under the Uniform Commercial Code in the jurisdiction where dealer is located/organized, where the Facility is located, or any other applicable jurisdiction as may be required by law to create, establish, perfect, preserve, or protect the liens and security interests granted to First Coast in this Agreement. In the event of insolvency of Dealer, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against Dealer, or failure of Dealer to perform any of the obligations of payment in accordance with the terms of payment established by First Coast from time to time, or default by Dealer under any agreement for supply of petroleum products to any other location at which Dealer (or any entity controlled by or under common control with Dealer) also conducts a petroleum products business, First Coast shall have the option without notice or demand upon Dealer to declare an event of default under the Uniform Commercial Code, and upon any such default, First Coast may declare all of Dealer's indebtedness to First Coast immediately due and payable. Thereafter First Coast may proceed to enforce payment and may exercise any and all rights available to it.  In addition, First Coast reserves the right, at any time and in First Coast's sole discretion, to require a security deposit, letter of credit, and/or personal guaranty.  By execution of this Agreement Dealer grants to First Coast (and its agents, employees, contractors, and representatives) a right and license of access to the Facility for purposes of enforcing First Coast's security interest in Dealer's assets and property.

18.    Deliveries Delayed or Prevented.

First Coast will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure in whole or in part to fill orders resulting from acts of public enemies, regulations or orders of civil or military authorities (including, without limitation, declarations of states of emergency), fires, acts of God (including, without limitation, earthquakes, floods, hurricanes, tropical storms and tornadoes), strikes, labor disputes, accidents, shortage of labor, of crude oil, of refined products or refinery capacity, or materials, or of transportation, or any other cause beyond First Coast's reasonable control, either at the plants of its sources of supply

110

or in connection with the delivery of its products. If First Coast is prevented by any of the foregoing causes from supplying the full quantities of any one or more of its products hereunder, First Coast shall have the right without liability to Dealer to allocate the quantity deliverable hereunder to Dealer or to temporarily cease deliveries until the source of the delay is concluded. In no event shall First Coast be liable for loss of profits or special or consequential damages because of delay or failure to make deliveries.

19.    Assignment - Subleasing.

(a)    This Agreement is personal to Dealer and Dealer will not without the prior written consent of First Coast (a) assign, mortgage, encumber, or transfer this Agreement or the interest created by this Agreement, (b) permit any lien or encumbrance to be placed on the First Coast owned Equipment, (c) become associated with any other person as a partner or otherwise with respect to this Agreement, or (d) permit any other person, firm or corporation to occupy the Facility or any part thereof, except as may otherwise be required by law.

(b)    In the event that Dealer is permitted to assign, or otherwise transfer this Agreement or Dealer's interest under this Agreement in accordance with Paragraph 19(a), First Coast reserves the right, if not prohibited by applicable law, to collect from Dealer a transfer fee therefor and to insist that such transferee enter into a new Dealer Supply Agreement and "Trial Franchise" with First Coast as defined in the "Petroleum Marketing Practices Act."

20.    Termination.

(a)    This Agreement is subject to and governed by Title 1 of the Petroleum Marketing Practices Act, 15 U.S.C. 2801, et. seq. ("PMPA"), which is made a part of this Agreement. To the extent any provision of this Agreement conflicts with the PMPA, that provision shall be deemed modified so as to comply with PMPA. Notice of termination or non-renewal of this Agreement by First Coast shall be provided in the manner prescribed by PMPA and the franchise created by this Agreement shall continue until the effective date, including any postponement thereof, of such termination or non-renewal.

(b)    Grounds for termination or non-renewal of this Agreement and the franchise relationship created by this Agreement are as set forth in Section 2802 of PMPA. A copy of a summary of Title 1 of PMPA is attached to this Agreement as Exhibit B.

(c)    No waiver of the provisions of this section and no failure on the part of either party to terminate this agreement because of any breach on the part of the other shall be construed as a waiver of either party's right to terminate this Agreement in the event of any further breach or failure to perform all undertakings under this Agreement. Termination of this Agreement under this section or any other section shall not discharge Dealer from any accrued liability to First Coast.

21.    First Right of Refusal.

During the initial term of this Agreement (and, thereafter, during any renewal or extension thereof), FCE shall have a right of first refusal to purchase Dealer's business and/or Dealer's interest in the real property and improvements (including personal property and equipment) comprising the Facility from the Dealer on the same terms and conditions as those contained in any bona fide, good faith offer received by Dealer from a separate and independent third party. Upon Dealer's receipt of any such offer which Dealer intends to accept, FCE shall be given written notification of the complete terms of the offer (including a true and complete copy of the offer) and of Dealer's intent to accept it (subject to FCE's rights under this Agreement), and FCE shall have thirty (30) days from the date of receipt of said copy of the offer to elect to purchase Dealer's business and/or Dealer's interest in the real property and improvements (including personal property and equipment) comprising the Facility, as the case may be, on the same terms and conditions as those contained in the bona fide third-party offer, provided that FCE shall not be required to pay any agent's or broker's commissions or similar fees included in or added to the contract purchase price. If FCE elects not to exercise this right of first refusal, Dealer may consummate the sale to the third party (on the terms disclosed in the written notification), subject to the remaining terms of this Agreement. If Dealer fails to consummate the sale to the third party offeror within ninety (90) days from the date of FCE's receipt of a copy of the third-party offer, or if FCE does not exercise its right of first refusal with respect to said offer, FCE shall retain its rights of first refusal with respect to any other or subsequent bona fide offers received by Dealer.

22.     Waiver.

The waiver of any default or breach by Dealer under this Agreement, forbearance, or failure to insist upon strict performance of any of the terms or provisions hereof or prior course of dealing on the part of First Coast shall not be taken to be a waiver of any continuing or subsequent default or beach of the same or any other covenant, condition or provision hereof or affect the rights or remedies of First Coast with respect thereto.

23.     Severability.

Should any of the provisions contained in this Agreement now or hereafter become illegal or unenforceable by statue or otherwise, such provisions shall be void and the remaining provisions shall continue to be of full force and effect. If subsequent to the date of this Agreement valid state or federal laws or regulations governing the relationship between Dealer and First Coast take effect, this Agreement shall be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provision of this Agreement in conflict therewith shall during such period be void.

24.     Entirety - Release.

This Agreement constitutes the entire agreement and understanding between First Coast and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express or implied between First Coast and Dealer. All prior agreements between First Coast and Dealer concerning the subject matter of this Agreement are terminated by the Parties' execution of this Agreement, and ALL CLAIMS WHICH FIRST COAST AND DEALER RESPECTIVELY MAY HAVE OR ASSERT, EACH AGAINST THE

OTHER, DIRECTLY OR INDIRECTLY RESULTING FROM OR CONNECTED WITH ANY SUCH PRIOR AGREEMENTS BEFORE THE EFFECTIVE DATE OF THIS AGREEMENT, EXCEPTING ONLY LIQUIDATED INDEBTEDNESS DUE FROM EITHER PARTY TO THE OTHER, CLAIMS RELATING TO EQUIPMENT OR CLAIMS SPECIFICALLY RESERVED IN WRITING, ARE FOREVER RELEASED AND DISCHARGED.  Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon First Coast or Dealer unless in writing, duly executed by Dealer and First Coast.

25.    Notices.

Any notice provided for in this Agreement shall be given in writing and shall be considered properly given when personally delivered or sent by U.S. Mail, Certified, Return Receipt Requested, addressed by either party to the other at such party's address shown above or at any changed address of which notice has been received by the party giving notice.

26.    Authority to Sign Agreement.

Dealer is aware that this Agreement may be signed on behalf of First Coast only by an officer of a Partner of First Coast and acknowledges that this Agreement is not effective until so signed.  Dealer expressly acknowledges that no agent or employee of any Partner of First Coast below the level of officer may alter or modify the written terms of this Agreement or in any way bind First Coast to obligations not set forth in writing in this Agreement.

EXECUTION OF THIS AGREEMENT BY DEALER IS AN ACKNOWLEDGMENT THAT NO REPRESENTATIONS NOT SET FORTH IN WRITING IN THIS AGREEMENT HAVE BEEN MADE TO OR RELIED UPON BY DEALER.

27.    Attorneys' Fees and Costs; Venue.

In the event of litigation between the parties regarding the provisions of this Agreement or the obligations of the parties under this Agreement, the prevailing party shall be entitled to recover from the other party its attorneys' fees and costs in maintaining the litigation.  In the event of litigation arising out of or in connection with this Agreement, the parties agree that venue shall be in the court of appropriate jurisdiction in Duval County, Florida, and Dealer hereby waives any right that he may have to bring suit or to be sued in any other county or venue.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

In the presence of:

**FIRST COAST ENERGY, L.L.P.**, a Colorado limited liability partnership ("First Coast"), by its Partner, Petro Distributing Partners of Florida, L.L.C., a Delaware limited liability company

_____
(As to First Coast)

By _____
    Aubrey L. Edge, Manager

_____ **LLC**,  a Florida limited liability company ("Dealer")

_____
(As to Dealer)
Manager

By _____

_____,

Dealer acknowledges receipt of the following Exhibits to this Agreement by initialing below:

| | |
|---|---|
| Exhibit A - Equipment Schedule | _____ |
| Rider to Exhibit A | _____ |
| Exhibit. B – PMPA Summary | _____ |
| Rental Agreement | _____ |
| Limited Liability Company Rider | _____ |
| Personal Guaranty | _____ |
| Credit Agreement | _____ |
| Cross Deposit Agreement | _____ |
| Card Guide | _____ |

**EXHIBIT A TO DEALER SUPPLY AGREEMENT**
**EQUIPMENT SCHEDULE (FCE #_____)**

A.    Signage/trade materials

No. ____    Size ____    Type ____ monument ID    Monthly Fee    $ ____
No. ____    Size ____    Type ____ price sign    Monthly Fee    $ ____
No. ____    Size ____    Type ____ trade materials    Monthly Fee    $ ____

B.    Imprinters

No.  1    Size _____    Type  Addressograph    Monthly  Fee:  $ _____

C.    EPOS Equipment

No. _____    Size _____ Type _____    Monthly Fee    $ _____

D.    Miscellaneous

| No. | Credit Network Connection | Monthly Fee | $ _____ |
|---|---|---|---|
| | | TOTAL FEES | $ _____ |

DEALER ACKNOWLEDGES RECEIPT OF THE ITEMS AND EQUIPMENT IDENTIFIED ABOVE AND THAT THE FOREGOING IS TRUE, ACCURATE, AND CORRECT.  DEALER AGREES TO PAY THE APPLICABLE RENTAL CHARGES AND FEES SET FORTH ABOVE.

Signed in the presence of:                    _____ LLC, a
                                              Florida limited liability company


_____    BY: _____
Print:                                 _____,
Manager


                                       FIRST COAST ENERGY, L.L.P., a
                                       Colorado limited liability partnership, by its
                                       Partner, Petro Distributing Partners of
                                       Florida, L.L.C., a Delaware limited liability
                                       company


_____    BY:_____
Print:                                 Aubrey L. Edge, Manager

Facility No.:
Account No.:
Facility Location:

## RIDER TO EXHIBIT A of DEALER SUPPLY AGREEMENT

### <u>DEALER ELECTRONIC POINT OF SALE EQUIPMENT RENTAL AGREEMENT (FCE #_____ )</u>

      The following equipment is leased to the Dealer under the terms and conditions of the Dealer Electronic Point of Sale Equipment Rental Agreement entered into between Dealer and First Coast Energy, L.L.P. ("FCE"):

| Equipment | No of Units | Make | Model No. | Monthly Rent |
|---|---|---|---|---|
| Elec. P.O.S. Terminals | _____ | _____ | _____ | _____ |
| P.O.S. Dial Terminals | _____ | _____ | _____ | _____ |
| Printers | _____ | _____ | _____ | _____ |
| Imprinters | 1 | Addressograph | _____ | _____ |
| Key Pads | _____ | _____ | _____ | _____ |
| Modems | _____ | _____ | _____ | _____ |
| CRINDS | _____ | _____ | _____ | _____ |
| <u>Credit Network Connnection</u> | 1 | | | |

**TOTAL**

Dealer Name:

Facility Location:

Base Customer No.:    FCE #

_____        _____
Signed, Dealer                                              Signed, FCE

<u>MONTHLY BILLING INSTRUCTIONS</u>

Dealer's Billing Address:
Dealer's Telephone:                              Dealer's Fax:
Name of Contact Person if Billing Questions:
Site No. (From Imprinter) _____        Month to Begin Billing:

## RENTAL AGREEMENT

THIS RENTAL AGREEMENT (this "Agreement") is made and entered into between First Coast Energy, L.L.P. ("FCE") and _____ LLC ("Dealer").

WHEREAS, Dealer operates a service station located at _____, _____, Florida, from which products distributed by FCE are sold; and

WHEREAS, Dealer desires to lease from FCE, upon the terms and conditions set forth in this Agreement, Electronic Point of Sale (EPOS) terminals, printers, modems, other point of sale related equipment ("Equipment") for use at the service station identified above; and

WHEREAS, Dealer desires to utilize credit card processing services through the Equipment, such services to be provided by FCE and/or FCE's supplier or agent(s).

NOW, THEREFORE, the parties agree as follows:

1.      Term.

The term of this lease will commence on _____, 20___, and shall terminate simultaneously with the expiration or termination of the term of the Dealer Supply Agreement of even date herewith between the parties covering the subject service station.

2.      Equipment.

FCE leases to Dealer the items and units of Equipment identified above.

3.      Rental.

Dealer agrees to pay FCE the monthly rental amount set forth above for each item and unit of the Equipment for the duration of this Agreement, on or before the first day of each calendar month.  FCE shall have the right to change the monthly rental amount at any time during the term of this Agreement upon thirty (30) days written notice, provided that, within a reasonable period of time, FCE makes a similar change in the rental amount charged by FCE to the other dealers in Dealer's class of trade in the same geographic area.  Dealer agrees to sign an EFT agreement allowing FCE to draft Dealer's designated bank account for payment of the monthly rental amount(s) and all other amounts due or payable.

4.      Variable Transaction Cost.

Dealer agrees to pay or reimburse to FCE the full amount of all transaction charges (including all fixed transaction charges on oil company proprietary cards) incurred or paid by FCE in connection with credit or debit card transactions which Dealer causes to be processed through the network.  FCE reserves the right to change the method or timing of payment, collection, reimbursement or credit with respect to such transaction charges at any time during the term of this Agreement upon thirty (30) days written notice.

5.      Payment.

Any payment not received by FCE in strict accordance with the terms and requirements of this Agreement shall be subject to a late payment charge equivalent to five percent (5%) of the amount of the delinquent payment. Any payment not received by FCE within thirty (30) days following the due date for such payment shall (in addition to the late charge provided in the previous sentence) accrue interest at the maximum rate permitted by law until paid in full.

6.      Warranties and Claims.

DEALER ACKNOWLEDGES THAT FCE HAS MADE NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE CONDITION OR PERFORMANCE OF THE EQUIPMENT, ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR WITH RESPECT TO PATENT INFRINGEMENTS OR THE LIKE. FCE shall have no liability to Dealer for any claim, loss or damage of any kind or nature whatsoever relating to or arising from Dealer's rental and use of the Equipment.

7.      Maintenance.

During the term of this Agreement, Dealer will receive maintenance services on the Equipment ONLY as follows:

(a)      If Dealer believes there is an equipment malfunction, Dealer shall immediately notify FCE and the responsible major oil company. Dealer shall thereafter comply with all applicable instructions, guidelines, and procedures established or communicated by FCE or the responsible major oil company to Dealer.

(b)      Dealer shall be solely responsible for (i) maintenance, service or replacement parts required because of accident, neglect, misuse or abuse, failure of electric power, damage caused by transport or any other cause other than malfunction or defects resulting from ordinary and proper use of the Equipment by Dealer; and (ii) basic maintenance services including, without limitation, painting the Equipment, furnishing material for painting, replacing damaged covers, repairs required to restore Equipment to good operating condition as a result of service performed by anyone other than FCE or its authorized service agent, repair of data communication line problems, and replacement of media (i.e., equipment ribbons, paper, etc.). In addition, Dealer shall be responsible for any maintenance and repairs, or loss, destruction or damage, resulting in whole or in part from the negligent or intentional act or omission of Dealer or Dealer's employees, agents, customers, invitees, or contractors; from Dealer's failure to give prompt notice of the need for maintenance or repair; or, from any other cause whatsoever except for normal wear and tear. Dealer shall be responsible for paper and ribbon replacement and daily cleaning of magnetic stripe readers on each unit of Equipment. Dealer agrees to maintain adequate insurance covering Dealer's responsibility for loss, destruction or damage as provided above, and shall, upon request by FCE, provide proof satisfactory to FCE that such insurance is in full force and effect.

(c)     FCE shall not be responsible for failure to render service due to causes beyond its control including, but not limited to, acts of God, labor disputes, shortage of materials, fire, flood or warfare.

8.     Telecommunications.

In order to access credit card processing services through the Equipment, it may be necessary for Dealer to arrange for certain telecommunication services.  All costs and expenses incurred in connection with services shall be borne entirely by Dealer.

9.     Risk of Loss.

Dealer assumes and shall bear the entire risk of loss and damage, whether or not insured, of the Equipment from any and every cause whatsoever from and after the date the Equipment is delivered to Dealer.  No loss or damage to the Equipment or any part of the Equipment shall impair any obligation of Dealer under this Agreement, which shall continue in full force and effect.  If any item of Equipment is irreparably damaged or lost, FCE shall replace such item and Dealer shall reimburse FCE for the full replacement cost of such damaged or lost item.

10.     Title to Equipment.

Nothing contained in this Agreement shall confer title to or ownership of the Equipment upon or in Dealer.  Upon termination of this Agreement for any reason, FCE shall have the right to enter upon the premises and remove the Equipment which shall be returned to FCE in the condition when installed, normal wear and tear only excepted.  Dealer will not encumber or remove the Equipment, or do anything or allow anything to be done, pursuant to which the Equipment may or shall be seized, taken into execution, attached, destroyed or damaged or by which the title or ownership of the Equipment may in any manner be altered, destroyed, prejudiced or otherwise adversely affected.

11.     Termination.

In the event Dealer fails to pay FCE any amounts payable under the terms of this Agreement when due, FCE may at its option and without further notification, immediately terminate this Agreement without prejudice to any other rights or remedies FCE may have against Dealer.  This Agreement shall terminate automatically upon termination for whatever reason of the Dealer Supply Agreement between Dealer and FCE.  In the event of any termination of this Agreement Dealer will immediately return the equipment to FCE.

12.     Binding Effect.

This Agreement is binding upon the parties and their respective successors and assigns.  Dealer may not assign this Agreement without the prior written consent of FCE.  FCE shall give Dealer written notice of its assignment, if any, of this Agreement.

13.    Severability; Headings.

If any provision of this Agreement is found to be legally invalid, void or unenforceable, the remaining provisions shall continue in full force.  Paragraph headings are for convenience only and shall not be construed as part of this Agreement.

14.    Laws.

Dealer shall comply with all laws, regulations and orders of any governmental agency which relate to the installation, use, possession or operation of the Equipment.

15.    Notices.

All notices required or permitted under this Agreement must be in writing and delivered in accordance with the provisions of the Dealer Supply Agreement.

16.    Construction.

The construction, validity and interpretation of this Agreement shall be governed by the laws of the State of Florida.

17.    Attorneys' Fees and Costs; Venue.

In the event of litigation between the parties regarding the provisions of this Agreement or the obligations of the parties under this Agreement, the prevailing party shall be entitled to recover from the other party its attorneys' fees and costs in maintaining the litigation.  In the event of litigation arising out of or in connection with this Agreement, the parties agree that venue shall be in the court of appropriate jurisdiction in Duval County, Florida, and Dealer hereby waives any right that he may have to bring suit or to be sued in any other county or venue.

IN WITNESS WHEREOF the parties to this Agreement have executed this Agreement on the _____ day of _____ 2019.

_____ LLC            First Coast Energy, L.L.P. ("FCE"), by its
("Dealer")                                                               Partner, Petro Distributing Partners of
                                                                              Florida, L.L.C.


BY:_____            BY:_____
_____, Manager                                       Aubrey L. Edge, Manager

EXHIBIT B

**PMPA Summary**

DEPARTMENT OF ENERGY

Revised Summary of Title I of the Petroleum Marketing Practices Act

SUMMARY OF DEALER RIGHTS AT TERMINATION OR NONRENEWAL

AGENCY:  Department of Energy.

ACTION:  Notice.

**SUMMARY:**  This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act).  The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994.  On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act.  The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises.  This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees.  The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

**SUPPLEMENTARY INFORMATION:**

Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§ 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title.  The Department published this summary in the Federal Register on August 30, 1978.  43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute.  Among the key issues addressed in the 1994 amendments are:  (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company'' operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations.  See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.  Congress intended to:  (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the

premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

**Summary of Legal Rights of Motor Fuel Franchisees**

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. §§ 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise'' is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal

is permitted.  Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods.  These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act.  These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law.  These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act.  For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§ 2801-2806).  This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I.  Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below.  If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated.  If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal'' exists.

### A.  Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship.  However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law.  In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently.  The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### B.  Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the

requirement.  This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

### C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act.  You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

### D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate.  You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted.  See 15 U.S.C. § 2802(b)(E).

### E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1)  Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2)  You declare bankruptcy or a court determines that you are insolvent.

(3)  You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4)  Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5)  Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain.  If the termination is based on a condemnation or other taking, your

supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6)  Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7)  Destruction (other than by your supplier) of all or a substantial part of your marketing premises.  If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8)  Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9)  Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10)  Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11)  Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12)  Your conviction of any felony involving moral turpitude.

(13)  Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II.  Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A.  Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B.  Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C.  Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D.  Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical.  Your supplier may also

125

decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III.  Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship.  These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A.  How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so.  In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later.  If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180

days before the termination or nonrenewal takes effect.

### B.  Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you.  It must contain:

(1)  A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2)  The date the termination or non-renewal takes effect; and

(3)  A copy of this summary.

## IV.  Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A.  Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less.  A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice

requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### V.  Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act.  The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment,

mandatory or prohibitive injunctive relief, and interim equitable relief.  Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized.  For a more detailed description of these legal remedies you should read the text of the Act.  15 U.S.C. §§ 2801-2806.

### VI.  Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law.  In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

### Further Discussion of Title I – Definitions and Legal Remedies

### I.  Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act.  The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement.  (You should consult section 101 of the Act for additional definitions not included here.)

### A.  Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or

127

distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

## B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

## C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

## D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

## E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

## F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

## G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

128

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A.  Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act.  The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B.  Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements.  Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### C.  Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed.  The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

### D.  Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate.  The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E.  Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1)  To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2)  To materially alter, add to, or replace such premises;

(3)  To sell such premises;

(4)  To withdraw from marketing activities
in the geographic area in which such
premises are located; or

(5)  That the renewal of the franchise
relationship is likely to be uneconomical to
the franchisor despite any reasonable
changes or additions to the franchise
provisions which may be acceptable to the
franchisee.

In making this defense, the franchisor also
must show that he has complied with the
notice provisions of the Act.

This defense to permanent injunctive relief,
however, does not affect the franchisee's
right to recover actual damages and
reasonable attorney and expert witness fees
if the nonrenewal is otherwise prohibited
under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.

## LIMITED LIABILITY COMPANY RIDER
(FCE #[####], _____, Jacksonville, Florida 322__)

**THIS LIMITED LIABILITY COMPANY RIDER** is attached to and is an integral part of the Dealer Supply Agreement (the "Agreement") between **FIRST COAST ENERGY, L.L.P.,** a Colorado limited liability partnership ("First Coast"), and _____ **LLC**, a Florida limited liability company ("Company"), dated the _____ day of [Month] 2019 covering Company's retail motor fuel facility located at _____, [Jacksonville], Florida 322__.    First Coast is relying on the representation that _____ ("Owner") is the manager of Company and that Owner will monitor all day-to-day business operations under the Agreement.  To the extent possible, all obligations of a personal nature set forth in the Agreement shall apply as if Company were a natural person and shall, to the extent practicable, be performed by Owner.  Any transfer of membership interests of Company or other form of ownership interest in Company by sale, gift, devise, operation of law, or otherwise, which results in a transfer of control over Company from Owner to any other person(s) or entity, constitutes an event which renders termination or non-renewal of the Agreement reasonable and justifiable and shall give First Coast the absolute right to terminate or to decline to renew the Agreement.  Failure to terminate the Agreement upon such a transfer of control shall not obligate First Coast to renew the Agreement upon its expiration.  Company shall (whenever practicable) notify First Coast at least thirty (30) days in advance of any intended transfer of controlling ownership of Company; such notice shall be given as soon as possible in all other cases.

**DATED** contemporaneously with the Agreement as indicated above.

Signed in the presence of:             **COMPANY:**

                                       _____ **LLC**, a
                                       Florida limited liability company

_____           By:  _____
Name: _____          _____
                                            Its Manager

## <u>PERSONAL GUARANTY</u>

FOR VALUE RECEIVED, and to induce **FIRST COAST ENERGY, L.L.P.** ("Company"), 7014 A.C. Skinner Parkway, Suite 290, Jacksonville, FL 32256, to lend money, extend credit, and/or otherwise extend financial accommodation to or for the account of _____ **LLC**, a Florida limited liability company ("Debtor"), the undersigned Guarantors, _____ and _____ (the "Guarantors"), both individuals, by execution and delivery of this Guaranty to Company, absolutely and unconditionally guaranty full and timely payment and performance when due, whether by declaration, demand, or otherwise, of all indebtedness and other liabilities and obligations of any type or nature whatsoever, including interest and penalties thereon, of or owed by Debtor to Company, however such indebtedness or other liability or obligation may arise, whether as principal, guarantor, endorser, or otherwise, now existing or hereafter arising, whether known or unknown, including without limitation payments or credits received by Company from Debtor which Company may subsequently be required to relinquish because of Debtor's insolvency (all such indebtedness and other liabilities and obligations are collectively referred to in this Guaranty as the "Debt"), and the Guarantors further agree to pay all costs, expenses, and other charges and fees (including attorney's fees and legal expenses) incurred by Company in collecting the Debt and enforcing this Guaranty.

By execution and delivery of this Guaranty, the Guarantors waive presentment, demand, and protest; notice of acceptance of this Guaranty; notice of the creation of the Debt, of any default, and of protest, dishonor, or other action taken in reliance on this Guaranty; all demands and notices of any kind in connection with this Guaranty or the Debt; and all requirements of diligence in collection or protection of or realization upon the Debt. Company may, from time to time, either before or after receipt of notice of revocation of this Guaranty, without notice to or consent from the Guarantors, and without in any way affecting the Guarantors' liability or Company's rights under this Guaranty, alter, accelerate, extend, renew, or change the time, place, manner, or terms of payment of, or grant concessions or accommodations with respect to, the Debt; increase or decrease the amount of the Debt or the rate of interest on the Debt; obtain the primary or secondary liability of any party or parties, in addition to the Guarantors, with respect to the Debt; release or compromise the liability of the Guarantors under this Guaranty or any other party or parties primarily or secondarily liable on the Debt; release, foreclose on, or otherwise exercise or enforce any of Company's secured or equitable interests in any real property or tangible or intangible personal property serving as collateral for any obligation or liability of Debtor to Company, whether or not covered by this Guaranty; apply to the Debt in such manner as Company, in its sole discretion, may determine, any sums received by Company from or on behalf or account of Debtor or from any other source to be applied to Debtor's debts, obligations, or liabilities; or, resort to the Guarantors for payment of any or all of the Debt, whether or not Company shall have resorted to any property securing payment or satisfaction of the Debt or shall have first proceeded against the Debtor, or any other party or parties primarily or secondarily liable on the Debt. It is specifically agreed and understood by Guarantors that Company is not required to attempt to collect the Debt from, or proceed in any manner against, the Debtor before proceeding against the Guarantors or otherwise enforcing this Guaranty.

This Guaranty shall be a continuing and unconditional Guaranty of payment and performance and not of collection, provided that it may be revoked as to any of the Guarantors only by giving written notice (by certified mail, return receipt requested) to the Company at the address set forth above (or at such other address as Company shall designate) of the revocation of this Guaranty as to the Guarantor or Guarantors giving such notice; however, no such notice of revocation shall be effective in any respect unless and until it is actually received by Company, and shall not affect in any degree or manner Guarantors' duties, responsibilities, and liabilities under this Guaranty or Company's rights and remedies under this Guaranty with respect to any debt, obligation, or liability, including contingent or un-liquidated debt or liability, existing at the time of Company's receipt of such notice of revocation, any interest or penalties subsequently accruing thereon, or any expenses incurred by Company in collecting the Debt and/or in enforcing this Guaranty. This Guaranty shall survive the death of any of the Guarantors, provided that, upon Company's actual receipt (by certified mail, return receipt requested) of written notice of the death of any Guarantor, Company shall be deemed to have received notice of revocation of this Guaranty with respect to said deceased Guarantor only. Any such notice of revocation with respect to any one or more Guarantors shall not affect the duties, obligations, or liabilities under this Guaranty of any other Guarantor or Guarantors. This Guaranty shall inure to the benefit of Company, its successors, transferees, and assigns. If more than one person executes this Guaranty, the term Guarantors as used in this Guaranty shall refer to each said person, and all said persons shall jointly and severally obligated and liable to Company under this Guaranty. Guarantors consent to the jurisdiction of any state or federal court in or of Duval County, Florida to enforce the terms of this Guaranty and waive any and all objections to venue in any such court that Company may elect to bring any action in enforcement of this Guaranty.

IN WITNESS WHEREOF, the undersigned Guarantors have executed this Personal Guaranty this _____ day of _____, 2019, at _____, _____ County, Florida.

SIGNED IN THE PRESENCE OF:


_____          _____
Print:                                                     _____


_____          _____
Print:                                                     _____

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT is made and entered into this _____ day of _____ _____ 2019 by and between First Coast Energy, L.L.P. ("First Coast"), a Colorado limited liability partnership, whose address is 7014 A.C. Skinner Parkway, Suite 290, Jacksonville, Florida 32256, and _____ LLC ("Dealer"), a Florida limited liability company corporation, whose address is_____ _____.

IT IS STIPULATED AND AGREED by the parties that First Coast will grant to Dealer the following credit terms in connection with the sale of motor fuels and other petroleum products by First Coast to Dealer for resale at Dealer's retail motor fuel facility located at _____, _____, Florida ("Dealer's Facility"):

Gasoline, Diesel, and Miscellaneous        Net two (2) days

Unless a different payment arrangement is agreed to in writing by First Coast, all payments for motor fuels and other petroleum products sold and delivered to Dealer's Facility shall be by electronic funds transfer ("EFT") from Dealer's designated bank account. Each such payment shall be electronically drafted by First Coast from Dealer's designated account before 12 o'clock Noon on the second (2nd) day following delivery. If said second (2nd) day falls on a Saturday, Sunday, or bank holiday, the EFT will be initiated by First Coast before 12 o'clock Noon on the next business day. In the event that an EFT is dishonored or rejected due to insufficient funds or for any other reason (excepting only an error or omission for which the bank acknowledges responsibility in writing), Dealer shall forthwith pay to First Coast, in cash or by cashiers check, the full amount of the dishonored/rejected EFT, together with a fee in the amount of One Hundred and No/100 Dollars ($100.00) or five percent (5%) of the amount of the dishonored/rejected draft, whichever is greater. After the second such dishonored or rejected EFT, the terms of this Credit Agreement shall be forthwith suspended and Dealer and Dealer's account shall immediately be placed on a C.O.D. (cash or cashier's check) basis.

Any amount not received by First Coast in strict accordance with the above terms shall accrue interest at the rate of eighteen percent (18%) per annum from and after the due date (i.e., the second day following delivery) until actual receipt by First Coast of full payment.

Dealer shall pay First Coast's costs and expenses, including without limitation First Coast's reasonable attorney's fees, in the event First Coast elects to undertake either formal or informal collection efforts in connection with any default by Dealer under this Agreement.

This Credit Agreement shall be construed and enforced in accordance with the laws of the State of Florida. In the event of litigation arising out of or in connection with this Credit Agreement, the parties agree that venue shall be in the court of appropriate jurisdiction in Duval County, Florida, and Dealer waives any right that he may have to bring suit or to be sued in any other county or venue.

IN WITNESS WHEREOF, the parties to this Credit Agreement have caused it to be executed this _____ day of _____ 2019.

134

SIGNED IN THE PRESENCE OF:      FIRST COAST ENERGY, L.L.P.
by its Partner,
Petro Distributing Partners of Florida, L.L.C.


_____      BY:_____
          Aubrey L. Edge, Manager


          _____ LLC
      ("Dealer")


_____      BY:_____
          _____, Manager

## CROSS DEPOSIT AGREEMENT

(FCE # _____ [XXXX], FCE # _____ [XXXX], & FCE #_____ [XXXX])

**THIS CROSS DEPOSIT AGREEMENT** is made and entered into this _____ day of _____ 2019 (the "Effective Date") by and among **FIRST COAST ENERGY, L.L.P.**, a Colorado limited liability partnership ("First Coast"), and _____ **LLC**, a Florida limited liability company ("Dealer").

## RECITALS

A.      Dealer owns and operates three retail motor fuel facilities - one located at _____, Jacksonville, Florida 32_____ ("Facility 70___"), one located at _____, _____, Florida 32 _____ ("Facility 7___") and one located at _____, _____, Florida 32_____ [ALL LOCATIONS LISTED] ("Facility 70__,"), and with Facility 7_____ Facility 70____, Facility 70__ and Facility 70__, the "Facilities," each being a "Facility"). First Coast is the wholesale supplier of motor fuels to Facility 7__ pursuant to certain Dealer Supply Agreements between Dealer and First Coast all dated _____ __, 2019 ("Agreement 1" (as to Facility 70__), "Agreement 2" (as to Facility 70__) and "Agreement 3" (as to Facility 70__), and with Agreements 1, 2 and 3, and including any renewal or modification of those three agreements, the "Agreements," each being an "Agreement"). In connection with Dealer's agreement to purchase motor fuels from First Coast for resale at Facility 70__, Dealer has posted a cash deposit in the amount of $__,000.00 ("Deposit 1"). In connection with Dealer's agreement to purchase motor fuels from First Coast for resale at Facility 70__, Dealer has posted a cash deposit in the amount of $__,000.00 ("Deposit 2"). In connection with Dealer's agreement to purchase motor fuels from First Coast for resale at Facility 70__, Dealer has posted a cash deposit in the amount of $__,000.00 ("Deposit 3" and, together with Deposit 1 and Deposit 2, the "Deposits," each of such Deposits being a "Deposit").

B.      It is the shared intention of the parties to this Agreement that the Deposits shall be combined so that the full sum of all Deposits (a total of $____,000) will stand as security for Dealer' payment and performance under each and all of the Agreements covering the Facilities.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants hereinafter set forth, together with other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, Customers and First Coast stipulate and agree as follows:

1.      The foregoing Recitals are true and correct and are incorporated in this Agreement.

2.      Dealer confirms, stipulates, and agrees that the full amount of each and all Deposits shall together serve and stand as security for Dealer's full and timely payment and performance of each and all of Agreement 1, Agreement 2 and Agreement 3 as provided in this Agreement. It is the intent of the parties that the Deposits shall provide cross security for First Coast, so that any breach, default, or violation by Dealer under Agreement 1 covering Facility 70__ or any breach, default, or violation by Dealer under Agreement 2 covering Facility 70__ or any breach, default, or violation by Dealer under Agreement 3 covering Facility 70__ shall give First Coast the right to resort to the full combined amount of all Deposits for purposes of satisfying, reducing, or

offsetting any and all debts, debits, shortfalls, and other obligations and liabilities of any or all of the Facilities under the any or all of the Agreements, as provided in this Agreement.

3.      First Coast shall hold the Deposits for purposes of satisfying, reducing, or offsetting any and all debts, debits, shortfalls, and other obligations and liabilities, including interest, penalties, attorneys' fees, and other collection costs, owed by Dealer to First Coast ("Dealer's Debt") arising out of or in connection with either (a) the operation of First Coast's retail motor fuel business and/or the use or occupation of the leased premises under or pursuant to any and/or all of the Agreements covering any and/or all of the Facilities, and/or (b) payment and/or performance under and pursuant to any and/or all of the Agreements covering any and/or all of the Facilities.  The Deposits shall accrue interest at the rate of [**two percent (2%) per annum]** for the period from the date said Deposits (or portion thereof) are actually received by First Coast through the earlier of (a) the date when the last to expire or be terminated of the Agreements has expired or been terminated, or (b) the date when the Deposits (or any portion of such Deposits) are refunded or credited to Dealer pursuant to the terms of this Agreement.  First Coast shall, on an annual basis, pay or credit to Customers the amount of interest that has accrued on the Deposits during the preceding year; provided, however, that First Coast may withhold from any annual interest payment sufficient funds to satisfy (in whole or in part, at First Coast's discretion) Dealer's Debt, if any, as of the date of the interest payment.  If, at any time during the term of any of the Agreements (or any extensions or renewals of those agreements), Dealer's Debt exceeds the cumulative amount of the Deposits, First Coast is authorized to retain the full amount of the Deposits (and any interest that has accrued thereon) and apply said amount against Dealer's Debt, without waiving or relinquishing First Coast's right to recover any remaining balance owed to First Coast by Dealer.  At such time as all of the Agreements have expired or been terminated or ceased for any reason to be fully binding upon and enforceable against Dealer, First Coast shall apply the Deposits (and any interest that has accrued thereon) against the amount of Dealer's Debt.  The undisputed balance (if any) of the Deposits (after appropriate reduction for Dealer's Debt), including any accrued interest, shall be refunded by First Coast to Customers within sixty (60) days from the date of such expiration or termination of Agreement 1 and Agreement 2; provided, however, that First Coast may withhold all or an appropriate portion of the balance of the Deposits for a longer period of time if and as necessary, in First Coast's sole discretion, to cover or resolve any disputed items, charge-backs, or other potential claims against the Deposits.  It is specifically agreed and acknowledged by Dealer that First Coast shall have no duty or obligation whatsoever to refund any portion of the Deposits while any of the Agreements remain in effect; and, in the event that one, but not both, expires or is terminated, First Coast shall have the right to hold the entire amount of the Deposits as security for the full and timely payment and performance of Dealer' duties, responsibilities, and obligations under any remaining Agreement.

4.      Immediately upon the execution of this Cross Deposit Agreement by all parties hereto, all prior deposit agreements governing, affecting, or relating to any of the Deposits shall be superseded by this Cross Deposit Agreement; and, all such prior deposit agreements shall thereupon be terminated and cancelled.

5.      In any action or proceeding arising out of or in connection with this Cross Deposit Agreement, (a) venue for such action or proceeding shall be in the court of appropriate jurisdiction in Duval County, Florida, and (b) the prevailing party shall be entitled to recover its costs and

expenses, including reasonable attorneys' fees, incurred in bringing, maintaining, or defending same.

6.    Except for those agreements specifically referenced herein, this Cross Deposit Agreement represents the entire agreement and understanding of the parties with respect to the general subject matter addressed herein and may only be modified or amended by written instrument signed by both parties.

7.    This Cross Deposit Agreement may be executed in multiple counterparts, each of which shall have the same force and effect as the original for all purposes.

*[balance of page intentionally left blank; signatures appear on following page]*

**DATED** as of the Effective Date above.

**FIRST COAST:**                                      **DEALER:**

**FIRST COAST ENERGY, L.L.P.**,                       _____
a Colorado limited liability partnership             **LLC,** a Florida limited liability company

By:     Its Partner, Petro Distributing Partners
        of Florida, L.L.C., a Delaware limited        By:  _____
        liability company
                                                           _____
                                                           Its Manager

        By:  _____
             Aubrey L. Edge, Manager

**EXHIBIT K-1**
TO PURCHASE AND SALE AGREEMENT
Required Supply Agreement Minimum Gallonages
(By Location)

| FCE SITE # | Minimum Gallonage |
|---|---|
| 1018 | 1,795,379 |
| 1059 | 1,062,861 |
| 1063 | 1,988,859 |
| 1064 | 1,641,978 |
| 1065 | 1,392,366 |
| 1073 | 1,372,932 |
| 1078 | 1,011,057 |
| 1079 | 1,192,718 |
| 1090 | 1,197,939 |
| 1094 | 1,763,859 |
| 1713 | 1,360,920 |
| 1818 | 1,094,226 |
| 1825 | 1,232,130 |
| 2023 | 614,544 |
| 2032 | 395,494 |
| 2034 | 1,072,282 |
| 2039 | 241,013 |
| 2531 | 700,000 |
| 2723 | 676,190 |
| 2833 | 1,300,180 |
| 2836 | 1,536,257 |
| 2837 | 671,232 |
| 2842 | 996,241 |

**EXHIBIT L**
TO PURCHASE & SALE AGREEMENT
(Supplemental Agreement)

**SUPPLEMENTAL AGREEMENT**

THIS SUPPLEMENTAL AGREEMENT (this "Supplemental Agreement") is entered into this ____ day of _____ 2019 (the "Effective Date"), by and between First Coast Energy, L.L.P. ("First Coast"), whose address is 7014 A.C. Skinner Parkway, Suite 290, Jacksonville, Florida 32256, and _____ LLC ("Dealer"), whose address is _____.

RECITALS

WHEREAS, First Coast and Dealer are parties to a Purchase and Sale Agreement dated _____, 2019 (the "Purchase and Sale Agreement"), pursuant to which Dealer has agreed to purchase from First Coast certain service station real property and related improvements located at _____, _____, Florida (the "Property"), as more particularly described in the Purchase and Sale Agreement; and,

WHEREAS, First Coast has agreed to sell and Dealer has agreed to purchase the Property for the Purchase Price stated in the Purchase and Sale Agreement, together with other material consideration including, without limitation, Dealer's agreement to (a) enter into a Dealer Supply Agreement (the "Supply Agreement") with First Coast providing for Dealer's purchase of certain minimum quantities of branded and non-branded motor fuels from First Coast for resale at and from the Property for a term of years that will expire no earlier than _____, 20_____; and, (b) enter into this Supplemental Agreement upon the terms and subject to the conditions set forth in this Supplemental Agreement;

NOW THERFORE, in consideration of the mutual covenants and promises set forth in this Supplemental Agreement, together with other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties stipulate and agree as follows:

1.      Dealer has purchased, or contemporaneously with or immediately following the execution of this Agreement, will purchase the Property for the Purchase Price indicated in the Purchase and Sale Agreement and for other valuable consideration as set forth above. The parties specifically agree and confirm that, upon the occurrence of either of the events set forth in paragraph 3 below, Dealer shall be liable to First Coast for a supplemental amount of money to be determined in accordance with paragraph 2 of this Agreement (the Initial Supplemental Amount, as reduced or amortized in accordance with the formula set forth in paragraph 2, below, are referred to in this Supplemental Agreement as the "Supplemental Amount").

2.      Dealer expressly acknowledges and confirms a present and existing indebtedness and obligation to First Coast in the principal amount of _____ and NO/100 Dollars ($_____) (the "Initial Supplemental Amount"). First Coast and Dealer agree that the Initial Supplemental Amount will be reduced or amortized ratably over the

term of the Supply Agreement (which expires not earlier than _____ , 20__) in accordance with the formula set forth in this paragraph 2. First Coast's agreement to permit the balance of the Supplemental Amount to be amortized over the term of the Supply Agreement is expressly contingent and conditioned upon Dealer's faithful performance of its duties under and in strict accordance with the provisions of the Supply Agreement for the full term of that agreement; and, the parties expressly acknowledge that First Coast would not agree to permit the amortization of Supplemental Amount in the absence of such a long-term commitment by Dealer.

The Initial Supplemental Amount (_____) shall be amortized or reduced at the rate of 1/180 of said balance (or $_____) for each complete calendar month (i) during years six (6) through twenty (20) of the term of the Supply Agreement (ii) that Dealer operates the Facility in strict compliance with the terms of the Supply Agreement, so that the exact unamortized balance of the Supplemental Amount can be determined at any point during the term of the Supply Agreement by multiplying the Initial Supplemental Amount of $_____by a fraction, (a) the denominator of which is 180, and (b) the numerator of which is 180 reduced by the total number of complete calendar months, up to the determination point, but after the end of the fifth (5th) year of the term of the Supply Agreement, during which Dealer has operated the Facility in strict compliance with the Supply Agreement.  (For example, if Dealer has operated the Facility in compliance with the Supply Agreement for a total of 72 complete calendar months, then as of that date, the unamortized balance of the Supplemental Amount can be determined by multiplying the Initial Supplemental Amount by the fraction 108/180, resulting in an unamortized balance, as of that date, of $_____.)   Dealer expressly acknowledges and understands that (a) Dealer shall not be entitled to receive amortization credit for or during the first five (5) full years of the term of the Supply Agreement, (b) Dealer shall not be entitled to receive amortization credit for or during any calendar month in which Dealer fails to operate the Facility in strict accordance with the Supply Agreement, and (c) Dealer shall not be entitled to receive amortization credit for any months during any contract year in which Dealer fails to sell at least the minimum annual volume of motor fuels required under the Supply Agreement.

If First Coast and Dealer so agree, the unpaid balance of the Supplemental Amount may be pre-paid by Dealer in cash; immediately upon Dealer's full payment of the unamortized balance of the Supplemental Amount (as determined in accordance with the foregoing formula), Dealer shall have no further duties or obligations under this Supplemental Agreement.

3.    Upon the occurrence of either of the following events, Dealer shall owe to First Coast, as of the date of the occurrence, the unamortized balance of the Supplemental Amount as determined in accordance with paragraph 2 of this Supplemental Agreement, which amount shall be paid in full within thirty (30) days of the date of the occurrence:

(i)  The Facility, for any reason, ceases to operate as a branded or non-branded service station, supplied exclusively by First Coast or its legal successors or assigns, in strict accordance with the Supply Agreement; or,

(ii)  The Supply Agreement (or any renewal of that agreement) is terminated or expires for any reason without the simultaneous execution of a renewal or substitute Dealer Supply Agreement.

If neither of the foregoing events occurs, at the conclusion of the initial term of the Dealer Supply Agreement (_____, 20__), First Coast will determine, in accordance with the provisions of paragraph 2 of this Supplemental Agreement, the amount, if any, of the remaining balance of the Supplemental Amount. Any such balance shall be paid in full to First Coast within thirty (30) days of the conclusion of the term of the Supply Agreement.

4.    Dealer's obligation to repay amounts (whether the full amount or an amortized/ reduced amount) shall be a personal obligation of the Dealer and shall not be assignable or transferable.

5.    Dealer shall provide First Coast with security for the Supplemental Amount and Dealer's full and timely performance under this Supplemental Agreement and the Supply Agreement. Such security shall be in the form of a Mortgage, in form reasonably acceptable to First Coast, creating an enforceable first lien on the Property creating an enforceable lien on the Property. The Mortgage shall be recorded in the Official Records of the county in which the Property is located. Beginning in year six of the term of the Supply Agreement, the amount secured by the Mortgage shall be reduced annually by the amount of reduction of balance of the Supplemental Amount as determined in accordance with paragraph 2 of this Supplemental Agreement.

6.    The exercise or pursuit by First Coast of any right, relief or remedy under or pursuant to this Supplemental Agreement, and First Coast's right to recover the unamortized balance of the Supplemental Amount under this Supplemental Agreement, shall be cumulative to, and shall in no way affect or diminish, any rights, remedies and/or relief to which First Coast might otherwise be entitled by law or under or pursuant to any other contract, agreement or understanding between the parties. In the event of litigation arising out of or in connection with this Supplemental Agreement, the parties agree that venue shall be in the court of appropriate jurisdiction in Duval County, Florida, and Dealer hereby waives any right that he may have to bring suit or to be sued in any other county or venue.

DATED this _____ day of _____ 2019 at Jacksonville, Florida.

In the presence of:                                    FIRST COAST ENERGY, L.L.P.
                                                       ("First Coast") by its Partner, Petro
                                                       Distributing Partners of Florida, L.L.C


_____      By _____
(As to First Coast)                        Aubrey L. Edge, Manager


                                           _____ LLC
                                           ("Dealer")


_____      _____
(As to Dealer)                         _____,
Manager

143

**EXHIBIT L-1**
TO PURCHASE AND SALE AGREEMENT
Supplemental Amounts (By Location)

| FCE Site # | Supplemental Amount |
|:---:|---:|
| 1018 | $1,520,000 |
| 1059 | 960,000 |
| 1063 | 1,680,000 |
| 1064 | 1,400,000 |
| 1065 | 1,360,000 |
| 1073 | 1,280,000 |
| 1078 | 760,000 |
| 1079 | 1,120,000 |
| 1090 | 1,280,000 |
| 1094 | 1,600,000 |
| 1713 | 1,200,000 |
| 1818 | 960,000 |
| 1825 | 1,200,000 |
| 2023 | 640,000 |
| 2032 | 340,000 |
| 2034 | 920,000 |
| 2039 | 320,000 |
| 2531 | 560,000 |
| 2723 | 720,000 |
| 2833 | 1,280,000 |
| 2836 | 1,440,000 |
| 2837 | 720,000 |
| 2842 | 960,000 |