IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 3:23-cv-366-BJD-PDB

BOCA GAS COMPANY HOLDINGS 2,
LLC, a Florida limited liability
company,

      Plaintiff,

vs.

FIRST COAST ENERGY, L.L.P., a
Colorado limited partnership,

      Defendant.

_____/

**PLAINTIFF/COUNTER-DEFENDANT BOCA
GAS COMPANY HOLDINGS 2, LLC'S RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff/Counter-Defendant, BOCA GAS COMPANY HOLDINGS 2, LLC

("Boca Gas"), by and through its undersigned counsel, and pursuant to Rule 65 of

the Federal Rules of Civil Procedure and Local Rules 6.01 and 6.02, hereby files its

response to Defendant/Counter-Plaintiff FIRST COAST ENERGY, L.L.P.'s ("First

Coast") Motion for Preliminary Injunction (the "Motion") [D.E. 51], filed May 5,

2023, and, as support, argues as follows:

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Boca Gas purchased 28 gas stations from First Coast through two separate

Purchase and Sale Agreements, executed respectively in November 2019 and

February 2020. [D.E. 5-1 ¶¶ 3, 6]. In conjunction with these real estate

transactions, the parties entered into 28 Fuel and Dealer Supply Agreements

("Supply Agreements") in which First Coast became the sole fuel supplier of the gas stations owned by Boca Gas. *Id.* ¶¶ 4, 5. "Six hours after First Coast sold the 28 facilities to Boca Gas, Boca Gas sold its real estate interest in the facilities to 28 different entities, most of which are collectively known as the Embree Entities who are the current landlords for the facilities."[1] Ex. A ¶ 4 (Second Declaration of Abbas Jaferi).

As additional consideration for the sale of each facility, Boca Gas and First Coast entered into four separate agreements: (1) a Supplemental Agreement ("Supplemental Agreement"); (2) a Declaration of Fuel Supply Restriction ("Fuel Supply Declaration") for each facility between First Coast, Boca Gas, and the third-party entity (which mostly consisted of the Embree Entities) requiring that the supply of fuel to the Facility be purchased through First Coast; (3) one Promissory Note ("Real Property Promissory Note") issued by Boca Gas to First Coast which related to the 28 facilities; and (4) a Personal Guaranty ("Personal Guaranty") for each facility by Abbas Jaferi, Ali Jaferi, Ather Jaferi, Hani Baskeron, and Salpie Baskeron. [D.E. 23-1, 26-1, 26-7, 30-30].

Under the Supply Agreements and Supplemental Agreements, Boca Gas had to make certain timely payments at a date certain, which it always did. The payment for the Supply Agreements and Supplemental Agreements is essentially a conditional liability in that payment with respect to those agreements stemmed

---

[1] The Embree Entities in this suit have been defined by First Coast in the Counterclaim. [*See* D.E. 30 at 10–11].

directly from the sale of motor fuel. Regarding the Real Property Promissory Note, Boca Gas was late on its payment, and so in March 2022, the parties entered into a one-year Forbearance Agreement that would expire on March 1, 2023 ("Forbearance Agreement"). [D.E. 26-8]

"In consideration of [Boca Gas]'s agreement of timely and strict compliance with the terms of Supply Documents and Loan Documents," the Forbearance Agreement stated, "First Coast agree[d] to forbear until [March 1, 2023] from exercising its rights and remedies under the Supply Documents and the Loan Documents and otherwise as a result of the Existing Defaults." *Id.* at 4. Critically, under the section of the agreement entitled "Remedies of First Coast Upon Default," the agreement states:

> In the event that any of the representations, warranties, agreements, covenants, or conditions contained in the Agreement or the Supply Documents and the Loan Documents are not satisfied, performed or discharged as, when, and in a manner required by this Agreement or the Supply Documents and the Loan Documents, . . . First Coast shall immediately be entitled to exercise any and all of its rights and remedies under any of the Supply Documents and the Loan Documents, at law, in equity, or otherwise, without further notice to any party obligated thereon, ***except such notice as is required by applicable law.***

[D.E. 26-8 at 5 (emphasis added)]. Section 20 of the Supply Agreement, entitled "Termination," in turn, provided that termination of the agreement can only occur in accordance with the notice provisions of the PMPA. [D.E. 21-3 at 13]. In particular, it stated that:

> This Agreement is subject to and governed by Title 1 of the Petroleum Marketing Practices Act, 15 U.S.C. 2801, et. seq. ("PMPA"), which is made a part of the Agreement. . . . Notice of termination of non-renewal of [the Supply Agreement] by First Coast shall be provided in the manner

prescribed by PMPA and the franchise created by [the Supply Agreement] ***shall continue until the effective date, including any postponement thereof, of such termination or non-renewal.***

*Id.* (emphasis added). Reading these two provisions together, the "notice as is required by applicable law" to terminate the relevant agreements must take into account any "postponement thereof"–i.e., the one year forbearance period–in rendering what the "effective date" would be for lawful notice of termination under the PMPA.

Notwithstanding, two weeks after the forbearance period, on March 16, 2023, First Coast sent Boca Gas a Notice of Termination, stating that Boca Gas has failed to make deposits and pay sums due pursuant to a Promissory Note ("Notice of Termination"). [D.E. 1-3 at 1–2]. The Notice of Termination does not allege the failure to pay for the supply of, or costs associated with, fuel. *See id.* Rather than providing 90-days' notice of termination as required by PMPA, First Coast instead purported to terminate effective that same day, or "at 11:59 p.m. on Thursday March 16, 2023." *Id.* at 2. Thereafter, First Coast ceased to supply fuel to Boca Gas effectively putting it out of business. [D.E. 5-1 ¶ 16].

As of March 2023, Boca Gas owed First Coast the payments under the Real Property Promissory Note for $1.52 million. [D.E. 1-3 at 2]. First Coast, meanwhile, owed, or was holding onto money belonging to, Boca Gas in the form $565,000 in credit card surpluses and an $800,000 fuel security deposit. Ex. A ¶ 5.

Following the commencement of this suit on March 29, 2023, Boca Gas sought preliminary injunctive relief pursuant to Section 2805(b) of the PMPA,

which this Court denied on April 26. [D.E. 5, 29]. The following day, First Coast filed its counterclaims (collectively referred to as the "Counterclaim"), which included five claims for breach of contract and two claims for preliminary and permanent injunctive relief. [D.E. 30]. One of the claims for injunctive relief demands that Boca Gas "immediately de-brand all of the Facilities by removing and discontinuing the use of all trademarks, colors, and names of First Coast and First Coast's suppliers." *Id.* at 36. The other claim seeks to enforce the terms of the Declarations of Fuel Supply Restriction by prohibiting "any person or entity from selling fuel that was not purchased from or through First Coast at the Facilities until the expiration dates set forth in the Declarations." *Id.* at 33. On May 5, First Coast moved for preliminary injunctive relief pursuant to Rule 65 with respect to Counts VI and VII of the Counterclaim. [D.E. 51]. In it, First Coast makes multiple references to, and substantially relies on, the Court's reasoning in its denial of Boca Gas's prior motion. [*See id.* at 13–14, 18].

First Coast, however, knew of the contents that formed its Motion over a month-and-half before the instant Motion was filed. Between March 21 and 28, First Coast initiated ten separate lawsuits in multiple Florida state circuit courts against Boca Gas in the different counties in which a Fuel Supply Declaration was recorded.[2]  In each lawsuit, First Coast raises the same two claims for injunctive

---

[2] Pursuant to Rule 201(c)(2), Boca Gas requests that this Court take judicial notice of the dockets, complaints, and motions in the parallel state court proceedings. *See Geico Indem. Co. v. Vazquez,* 2016 WL 10587207, at *1 n.2 (S.D. Fla. Nov. 4, 2016) (judicially noticing "another court's docket entries and orders for the limited purpose of recognizing the filings and judicial acts they represent" (citing *McDowell Bey v. Vega,* 588 F. App'x 923, 926-27 (11th Cir. 2014) (finding that

relief and, in one case the same five claims for breach of contract, squarely at issue and set forth in the Counterclaim in this case.[3] Immediately following those filings, First Coast, without serving Boca Gas (except for one case in which service was effectuated on May 22, 2023 as a result of an order directing service), the Embree Entities, or any other party, filed an "Emergency Motion for Temporary Injunction." The Motion strongly resembles the prior emergency motions for

---

the district court properly took judicial notice of entries appearing on state court's docket sheet)). The captions of the state court suits are as follows:

(1)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. CACE23011933 (Fla. 17th Cir. Ct.) (Broward County);

(2)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 16-2023-CA-001316 (Fla. 4th Cir. Ct.) (Duval County);

(3)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 2023CA000580 (Fla. 4th Cir. Ct.) (Clay County);

(4)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 452023CA000212 (Fla. 4th Cir. Ct.) (Nassau County);

(5)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 552023CA000899 (Fla. 7th Cir. Ct.) (St. Johns County);

(6)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 2023CA000337  (Fla. 7th Cir. Ct.) (Flagler County);

(7)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 2023-30985-CICI  (Fla. 7th Cir. Ct.) (Volusia County);

(8)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 122023CA000310 (Fla. 3rd Cir. Ct.) (Columbia County);

(9)  *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 01-2023-CA-001183 (Fla. 8th Cir. Ct.) (Alachua County);

(10)       *First Coast Energy, L.L.P. v. Boca Gas Company Holdings 2, LLC, et al.*, No. 50-2023-CA-009137 (Fla. 15th Cir. Ct.) (Palm Beach County).

[3] Due to the parallel nature of these lawsuits, Boca Gas will soon file a motion to dismiss or stay the Counterclaim.

temporary injunctions First Coast has filed in ten parallel cases in Florida circuit courts.[4]

## LEGAL STANDARD

Absent a statute to the contrary, a movant who seeks to institute a preliminary injunction against an adverse party must satisfy the quadripartite test set forth under Rule 65 of the Federal Rules of Civil Procedure and, in this district, Local Rules 6.01 and 6.02.  Local Rule 6.01(a) calls for the motion to include, among other things "a precise and verified description of the conduct and the persons subject to restraint" and "a precise and verified explanation of the amount and form of the required security," a "proposed order," and "a supporting legal memorandum." *See* M.D. Fla. Loc. R. 6.01(a), 6.02(a)(1). Local Rule 6.01(b), in turn, sets out the requirements for the legal memorandum which must establish:

(1) the likelihood that the movant ultimately will prevail on the merits of the claim,
(2) the irreparable nature of the threatened injury,
(3) the harm that might result absent a preliminary injunction, and
(4) the nature and extent of any public interest affected.

*See* M.D. Fla. Loc. R. 6.01(b), 6.02(a)(1).

In the Eleventh Circuit, "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989). Thus, a movant must

---

[4] In fact, in two instances, First Coast wrongfully refers to the Motion as a motion for temporary injunction. [D.E. 51 at 11, 16].

"clearly establish[] all four elements." *Odyssey Marine Expl., Inc. v. The Unidentified*, 2006 WL 3091531, at *2 (M.D. Fla. Oct. 30, 2006). In addition to satisfying the four above requirements, the movant must also strictly comply with the other procedural rules affiliated with obtaining preliminary injunctive relief. S*ee Com. Sec. Bank v. Walker Bank & Tr. Co.*, 456 F.2d 1352, 1354 (10th Cir. 1972) ("Rule 65 must be strictly complied with.").[5]

## ARGUMENT

First Coast's Motion fails for several procedural and substantive reasons. Procedurally, First Coast has not complied with the stringent requirements to obtain a preliminary injunction under local rules. Substantively, First Coast has not established any of the requirements in order to acquire a preliminary injunction.

### A. First Coast has failed to comply with Local Rules

Local Rule 6.02 governs preliminary injunction motions in this district. First Coast's motion contains three principal infirmities in violation of local rules. *First*, First Coast did not verify its Motion, nor did it include any sort of verification in its attachments. *See Crosby v. Florida*, 2022 WL 195312, at *3 (M.D. Fla. Jan. 21, 2022) (denying motion for preliminary injunction in part because motion was not

---

[5] *See also Wicked Grips LLC v. Badaan*, 2021 WL 4710488, at *2 (M.D. Fla. Oct. 8, 2021) ("Courts have instructed parties that they must "strictly comply with the procedures set forth in Middle District of Florida Local Rule 6.02.").

verified).[6] *Second*, the motion does not provide "a precise . . . description of . . . the persons" First Coast seeks to enjoin. M.D. Fla. Loc. R. 6.01(a)(2). In its Motion, First Coast combines its separate requests for injunctive relief in the counterclaim into one blended motion. [D.E. 51 at 11]. Part of its Motion seeks relief solely against Boca Gas, whereas the other part of the motion, which seeks to enforce the terms of the Declarations of Fuel Supply Restriction, requests preliminary injunctive relief against the "Counterclaim Defendants." *Id.* at 1. That First Coast "lumps together" the counter-defendants serves as an additional ground for denial. *See Wicked Grips LLC*, 2021 WL 4710488, at *2 (A plaintiff that "lumps the[ defendants] all together" violates Rule 6.01(a)(2)). *Third*, the motion does not provide "a precise . . . explanation of the amount . . . of the required security." M.D. Fla. Loc. R. 6.01(a)(3). "A failure to address the bond requirements is 'fatal' to a request for a [preliminary injunction]." *See Wicked Grips LLC*, 2021 WL 4710488, at *2.[7] First Court does not suggest a precise amount for the bond, instead maintaining that the bond requirement should be waived or that a minimal bond should be set. [D.E. 51 at 20]. Without giving a sum certain amount, Boca Gas

---

[6] *See also Tyszlak v. Shellpoint Mortgage Servicing LLC*, 2023 WL 3172558 (M.D. Fla. May 1, 2023) (denying motion for temporary restraining order in part for failure to satisfy verification requirement); *Cherdak v. Cottone*, 2022 WL 16908325, at *2 (M.D. Fla. Oct. 14, 2022) (same).

[7] *See Wyndham Vacation Ownership, Inc. v. Montgomery Law Firm, LLC*, 2021 WL 4948151, at *19 & n.11 (M.D. Fla. Oct. 18, 2021) (the movant erred in arguing that it be allowed to post, at most, "a nominal bond"); *Intrepid Glob. Imaging 3D, Inc. v. Athayde*, 2007 WL 4198428, at *1 (M.D. Fla. Nov. 26, 2007) ("Although this Court has broad discretion in determining the amount of the security, and may even waive this requirement in exceptional cases, the complete failure to address security by Intrepid warrants denial without prejudice of motion for a TRO.").

cannot reasonably contest the amount under the circumstances of this case. Failure to articulate a bond amount "could be grounds alone" to deny a motion for preliminary injunctive relief.

Taken together, First Coast's collective failures to abide by local rules in seeking in filing its Motion serves as a sufficient basis for denial. *See Wicked Grips LLC*, 2021 WL 4710488, at *3 ("Because Wicked failed to comply with the Local Rules governing preliminary injunctions in this District . . . [,] this Court denies Wicked's motion for a preliminary injunction.").

### B. Substantive Reasons to Deny the Motion

First Coast is not entitled to injunctive relief because it has not, and cannot, establish any of the Rule 65 requirements. That is, it has not been irreparably harmed, it is not likely to succeed on the merits, the balance of equities does not favor an injunction, and the entry of an injunction would not be in the public's best interest.

    i.    <u>First Coast has not demonstrated or proven by affidavit or other testimony irreparable injury</u>[8]

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."

---

[8] For this factor, First Coast cannot rely on this Court's prior order denying Boca Gas's Section 2805(b) motion for preliminary injunctive relief. That is because "[i]n contrast to Rule 65 of the Federal Rules of Civil Procedure, the PMPA does not require the franchisee to make a showing of irreparable harm or that the injunction, if issued, would not be adverse to the public interest." *Doebereiner v. Sohio Oil Co.*, 880 F.2d 329, 333 (11th Cir. 1989).

*Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 445 F. Supp. 875, 877 (S.D. Fla. 1978), *aff'd*, 626 F.2d 1171 (5th Cir. 1980).[9]

As an initial matter, First Coast's reliance on Section 542.335(1)(j), Florida Statutes, is inapposite. [See D.E. 51 at 16 (citing *Hagan v. Sabal Palms, Inc.*, 186 So. 2d 302 (Fla. 2d DCA 1966)]. Section 542.335(1)(j) is a provision of Florida law that contemplates valid restraints of trade or commerce. As argued by First Coast, in an action concerning enforcement of a restrictive covenant, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." *Id.* § 542.335(1)(j).

The presumption provided under Florida law, however, does not apply to the request for preliminary injunctive relief under Rule 65. *See Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460 (M.D. Fla. 2022) (ruling that Section 542.335(1)(j)'s presumption of irreparable harm does not govern in a federal action for a preliminary injunction because it "clash[es]" with 65's equitable standards); *S. S. Wine & Spirits of Am., Inc. v. Simpkins*, 2011 WL 124631 (S.D. Fla. Jan. 14, 2011) (same).

First Coast also mistakenly presumes irreparable injury because the Parties agreed that in the respective agreements that "any breach of the terms of th[e] Declaration will cause First Coast irreparable injury for which an adequate remedy

---

[9] Indeed, this Court does not need to address the other three elements when "no showing of irreparable injury was made." *Del Monte Int'l, GMBH v. Ticofrut S.A.*, 2017 WL 3610582, at *7 (S.D. Fla. Mar. 7, 2017). Relatedly, the demonstration of a strong likelihood of success on the merits does "not obviate the necessity to show irreparable harm." *Id.*

at law is not available." [D.E. 51 at 15; *see also* D.E. 23-1 at 2]. This argument is unavailing. Indeed, other "courts of appeals have held that a contractual stipulation as to irreparable harm . . . does not relieve the movant's burden of proving that such harm is actually expected to occur." *Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, 2017 WL 1502714, at *5 & n.12 (M.D. Fla. Apr. 27, 2017)[10].

Accordingly, First Coast must offer proof in its Motion that it has been irreparably harmed, a task which it has failed to do. Under the circumstances, because it can obtain monetary remuneration for its supposed injuries, and because it has unduly delayed in seeking preliminary injunctive relief, First Coast cannot show irreparable injury.

    a. First Coast cannot establish irreparable harm because it can be
       fairly compensated for its alleged injuries

It is well established that "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Del Monte Int'l, GMBH v. Ticofrut S.A.*, 2017 WL 3610582, at *7 (S.D. Fla. Mar. 7, 2017). When evaluating a movant's efforts to sufficiently establish this requirement, "the key word in this consideration is irreparable because mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* Put differently, "the alleged injuries must be special or unique to be

---

[10] *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004); *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002); *Smith, Bucklin & Assocs., Inc. v. Sonntagz*, 83 F.3d 476, 481 (D.C. Cir. 1996).

irreparable." *Id.* at *8. Thus, irreparable harm cannot be proven where the alleged harm can be adequately redressed through a monetary award.

In its March 16 Notice of Termination, First Coast informed Boca Gas that the calculated estimate of the purported breach of the franchise relationship under the Supply Agreements and Supplemental Agreements is roughly $46 million. [DE 1-3 at 2]. This amount, according to the Notice of Termination, represents the estimated amount that First Coast would have received during the term of the Supply Agreements and Supplemental Agreements as the exclusive supplier of fuel to the Facilities. Of note, this amount included a calculation of their maximum brand value and other supplemental amounts. Nonetheless, First Coast still seeks to enjoin Boca Gas from contracting with other fuel suppliers during the (terminated) remaining term of the Supply Agreements.

First Coast cannot have its cake and eat it too. If First Coast can be fairly compensated for the breach of the franchise relationship, it cannot also seek to impose an injunction against Boca Gas for the same conduct.[11] *See Datascan Techs., LLC v. Dongfeng Nissan Auto Fin. Co.*, 2008 WL 11405937, at*2 (N.D. Ga. Oct. 15, 2008) ("The Court finds that the Plaintiff has failed to demonstrate an irreparable harm that cannot be compensated by monetary relief.").[12]

---

[11] In making this observation, Boca Gas does not concede to the enforceability of the terms of the Notice of Termination.

[12] *See also B.G.H. Ins. Syndicate, Inc. v. Presidential Fire & Cas. Co.*, 549 So. 2d 197, 198 (Fla. 3d DCA 1989) ("For injunctive relief purposes, irreparable harm is not established where the potential loss can be adequately compensated for by a monetary award. In the instant case, appellees' ability to obtain a money judgment against BGH should a breach of contract be proven, is an adequate remedy at law."); *Abele v. Sawyer*, 750 So. 2d 70, 76 (Fla. 4th DCA 1999) (same).

What's more, in filing this Motion, First Coast has purposefully opted not to pursue less drastic remedies under the Supply Agreements and Supplemental Agreements. Recall that, as of March 2023, Boca Gas owed First Coast the payments under the Real Property Promissory Note for $1.52 million. [D.E. 1-3 at 2]. First Coast, meanwhile, owed, or was holding onto money belonging to, Boca Gas in the form $565,000 in credit card surpluses and an $800,000 fuel security deposit. Ex. A ¶ 5. First Coast thus could have offset the amount due and owing on the Real Property Promissory Note. As a matter of simple arithmetic, then, Boca Gas would have only owed First Coast roughly $135,000. Rather than undergoing this simple resolution of its claims, First Coast instead chose to pursue its remedies through a rampant litigation strategy. *See supra* 5 & n.2.

Nor is there anything special or unique about First Coast's injuries, as plainly evidenced by the stated everyday price that an average person pays for a full tank of gas. It is true that the sale of Shell fuel is "not a fungible commodity" because Shell–like other oil conglomerates–"place[s] additives in the product in an attempt to distinguish their brand from other very similar brands." *Shell Oil Co. v. A.Z. Servs., Inc.*, 990 F. Supp. 1406 (S.D. Fla. 1997). Where, as here, the Supply Agreements did not state that First Coast would only supply the Facilities with Shell gasoline and, rather, said that "First Coast may supply *any* branded or non-branded motor fuels and/or petroleum products to the Facility that First Coast is authorized to supply and shall have the right at any time to change, withdraw, substitute or add brands and grades of petroleum products . . . ." [D.E. 21-1 at 5

(emphasis added)]. By its plain terms, the procurement of a particular kind of motor fuel was interchangeable at the sole discretion of First Cost under the agreements and, therefore, was not unique. Because its injuries for lost profits and brand value are capable of calculation, First Coast was not injured beyond repair by Boca Gas's conduct. [*See* D.E. 1-3 at 1–2].

b. <u>First Coast cannot establish irreparable harm because it has inexplicably delayed in seeking preliminary injunctive relief</u>

Equally important, "[u]nder binding Eleventh Circuit law, '[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm.'" *Del Monte Int'l, GMBH*, 2017 WL 3610582, at *12. "Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on the merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

As exhibited by First Coast's mass filings of preliminary injunction motions in multiple Florida circuit courts, First Coast had the facts ready for its Motion in March and yet waited over two months, without any explanation given, to file the instant motion. *See* supra 5 & n.2. This unexplained delay undercuts any sense of urgency and, therefore, First Coast has failed to demonstrate sufficient need for a preliminary injunction.[13] *See Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 WL

---

[13] Equally as noteworthy is the fact that, with regard to this multiple other lawsuits and motions seeking preliminary injunctive relief, First Coast has not served the vast majority of them. In the one instance where service was actually effectuated, First Coast only did so (untimely) after being ordered.

532299, at *6 (S.D. Fla. Feb. 9, 2017) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months."); *Del Monte Int'l, GMBH*, 2017 WL 3610582, at *13 (same but three month delay).

First Coast analogizes this case to a trademark infringement case where irreparable injury is presumed. [D.E. 51 at 16]. Even if this Court were to accept that argument, "a plaintiff's delay in seeking an injunction in a trademark case 'tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.'" *See Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355–56 (S.D. Fla. 2002).[14]

Assuming for the sake of argument that First Coast's delay of two months does not constitute dilatory tactics, in trademark infringement cases to obtain a preliminary injunction, "a plaintiff must demonstrate a particularly high likelihood of confusion or potential danger to customers' health and safety." *Seiko Kabushiki Kaisha*, 188 F. Supp. 2d at 1355. First Coast does not posit that Boca Gas's alleged conduct poses a potential danger to customers' health and safety. [D.E. 51 at 16–17]. Instead, it maintains that Boca Gas's actions have eroded, and will continue to

---

[14] *See also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)) (finding that unexplained delay of three months between parties' last communication and request for preliminary injunctive relief undercut a finding of irreparable harm); *Triangle Publications, Inc.*, 445 F. Supp. at 875, 877 (finding that a delay of a few months from the infringing conduct to file a motion for preliminary injunctive relief concerning copyright infringement was "an important factor" in the decision to deny a preliminary injunction because "plaintiff has not demonstrated irreparable injury").

erode, First Coast's reputation and goodwill. *Id.* First Coast's position overemphasizes the perception of its product in the marketplace and deemphasizes the quality of the alternative motor fuel that Boca Gas has been supplying to consumers. More specifically, Boca Gas is not using First Coast's product, availing itself of First Coast's brand, or otherwise holding itself out as a trademark holder of First Coast to any consumers. *See* Ex. C (evidence that Boca Gas de-branded the facilities).

In any event, First Coast's allegation of customer confusion is not well-founded. In its Counterclaim, First Coast alleges that, following the termination of the franchise relationship and Boca Gas's subsequent switch over to other suppliers, it "received customer complaints of confusion resulting from Boca's ongoing sale of non-First Coast supplied fuel at its Broward County locations." [D.E. 30 ¶ 67]. Specifically, it points to a single occurrence with a customer in which she complained that her Shell gas card would no longer work to purchase fuel from the [*sic*] one of the facilities operated by Boca [Gas] in Broward County, Florida." [D.E. 19-6]. Not only should this allegation not even be entertained because it occurred outside the Middle District of Florida (and is not verified), [D.E. 18-2 at 2 (listing locations in which First Coast's consultants performed sampling of the facilities, none of which included the facilities at issue here)], it also conflates the timeline of relevant events. After termination, First Coast unilaterally shut off its Shell and other First Coast related brands' credit card network at Boca Gas's facilities.  So, the customer's complaint in this instance

regarding non-acceptance of Shell and others' credit cards was of First Coast's own doing and is not a product of consumer confusion derived from Boca Gas's conduct.

In addition, there is little risk of customer confusion where Boca Gas de-branded all of First Coast's trademarks in compliance with the March 16 Notice of Termination. *See* Ex. C. In the Notice of Termination, First Coast demanded that Boca Gas "remove or paint out all of First Coast's marks, names or colors . . . from its facilities." [D.E. 1-3 at 2]. Boca Gas complied with this requirement from March 22 through March 24–i.e., a month before the commencement of First Coast's Counterclaim. *See* Ex. C. First Coast, meanwhile, averred that it "performed visual inspections of the Facilities and confirmed that Boca [Gas] was . . . continuing to use Shell trademarks . . . , colors, and names to sell adulterated and misbranded gasoline."  [D.E. 30 ¶ 63]. First Coast argues that Boca Gas did not sufficiently remove or paint out First Coast's trademarks, colors, and name, arguing that "trashbags were taped over some (but not all) signs, and see-through tape was used on some (but not all) logos and trademarks."  [D.E. 51 at 11; D.E. 19-4]. A review of the photographs that First Coast appended as exhibits shows that many of First Coast's brands were painted over or removed. Simply because First Coast takes issue with the degree to which Boca Gas has removed the signs does not mean the Boca Gas has not complied with Notice of Termination by "remov[ing] or paint[ing] out" all of First Coast's signs. Such nit-picking over the degree of

removal should not be the subject of an injunctive order.[15]  *See Fusion Oil Co. v. Crescent Petroleum, Inc.*, 2004 WL 7331211, at \*4 (E.D. Mich. Dec. 15, 2004) (In a franchisor's suit seeking preliminary injunctive relief, irreparable injury is not proven where "evidence has been submitted to show that Defendants have removed all of Plaintiffs' identifiers from the station" and so "Plaintiffs cannot now claim that they will suffer loss of goodwill because their identifying marks are no longer present at the station"). In sum, First Coast has not met its burden of showing an irreparable injury where preliminary injunctive relief would be justified.

ii.    <u>First Coast is unlikely to succeed on the merits of its claims</u>

First Coast argues that the "the same facts and reasoning supporting the Court's order denying Boca's motion supports entry of the requests injunctions in favors of First Coast."  [D.E. 51 at 13]. This argument was squarely rejected in the Second Circuit's decision in *Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 361 (2d Cir. 1989), where the franchisor there asserted that it was "automatically entitled to the relief it sought upon the district court's denial of the plaintiffs' motion."  Although it is easier for a franchisee to obtain a preliminary injunction under 15 U.S.C. section 2805(b) than a franchisor who must still satisfy

---

[15] To the extent First Coast still seeks to further delve into this issue later in the case, Boca Gas may, on its own and in a showing of good faith, go out to each of the facilities that First Coast takes issue with and alleviate its concerns. If it does, Boca Gas will submit a subsequent notice of compliance with the Court. *See Fusion Oil Co. v. Crescent Petroleum, Inc.*, 2004 WL 7331211, at \*3 (E.D. Mich. Dec. 15, 2004) (franchisee submitted photographs of the station before between first and second hearing on preliminary injunction motions).

the traditional standards set forth under Rule 65, it is still possible for a franchisee "who has failed to satisfy the requirements of section 2805 to prevail after a full trial on the merits. *Id.* at 364. Inversely stated, "a franchisor's request for relief should not be granted 'automatically' at a preliminary stage if the franchisor does not meet the traditional requirements for a preliminary injunction." *Gurcharan Bros. Oil Co. v. SEI Fuel Servs., Inc.*, 2022 WL 2359597, at *4 n.8 (E.D.N.Y. June 30, 2022). Accordingly, First Coast cannot skirt around its burden of proving each element of Rule 65 and Local Rules 6.01 and 6.02 to obtain a preliminary injunction. At this juncture, instead of Boca Gas having the burden to prove that there exists a serious question that goes to the merits to make such questions a fair ground for litigation under Section 2805(b), First Coast has the more difficult burden of proving that it is likely to succeed on the merits of its claim pursuant to Rule 65 and Local Rules 6.01 and 6.02.

In order to be entitled to injunctive relief stemming from the termination of the franchise relationship, First Coast must first establish that, under the PMPA, First Coast lawfully terminated the franchise relationship. As evinced in its papers to the Court, it has not established that it lawfully terminated Boca Gas.

Section 2802(b)(2) of the PMPA enumerates acceptable grounds for termination or nonrenewal of a franchise relationship. One ground specified is: "The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is

in effect. . . ." 15 U.S.C. § 2802(b)(2)(C). Section 2802(c) follows with an illustrative list of events that qualify under section 2802(b)(2)(C) as "an event which is relevant to the franchise relationship." One such event, of which First Coast based the Notice of Termination upon, is "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled." 15 U.S.C. § 2802(c)(8). The question of "timely payments" under the PMPA must take into account "prevailing commercial or industry trade practices" and, in some instances, "[t]he history of the relationship between the[] parties." *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1573 n.19 (11th Cir. 1987) (quoting S. Rep. No. 95–731, at 38, 1978 U.S. Code Cong. & Admin. News at 896).

Contrary to First Coast's inordinate reliance on the text of the Forbearance Agreement, the parties' dealings through its franchise relationship demonstrates that there were many situations in which the parties agreed to deviate from the rights, duties, and obligations conferred and imposed upon them pursuant to the agreements. What's more, Boca Gas was never delinquent in its payments under the Supply Agreements and Supplemental Agreements. [*See* D.E. 5-1 ¶ 14]. These timely payments of fuel directly relate to the formation and continuation of the franchise relationship, and bear on the issue of whether timely payments were made. The Notice of Termination was not based upon untimely payments under the Supply Agreements and Supplemental Agreements. Rather, it was premised on

the alleged failure to pay sums due under the Promissory Note, which does not involve the supply of fuel.

More importantly, even if First Coast has proven that Boca Gas has defaulted pursuant to Subsection (c)(8), which it has not, it still was statutorily obligated to provide Boca Gas with adequate ninety-days' notice of the termination pursuant to Section 2804(a)(2), which states that:

> (a) General Requirements Applicable to Franchisor
>
>> Prior to termination of any franchisee or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship –
>>
>> (1) In the manner described in subsection (c); and
>>
>> (2) Except as provided in subsection (b), *__not less than 90 days prior to the date on which such termination or nonrenewal takes effect.__*

15 U.S.C. §2804(a) (emphasis supplied). Accordingly, one terminating an agreement subject to the PMPA "must comply with the notice requirements in section 2804." *Zipper v. Sun Co., Inc.*, 947 F. Supp. 62, 68 (E.D.N.Y. 1996). "A franchisor may not terminate or not renew a franchise relationship unless the franchisor does so pursuant to one of the grounds enumerated in §2802(b)(2) *and* meets the notification requirements contained in §2804." *Mendez Fuel Holdings, LLC v. 7-Eleven, Inc.*, 2021 WL 4125362, at *8 (S.D. Fla. Sep. 9, 2021).

Here, if First Coast sought to terminate the franchise relationship with Boca Gas, it was statutorily obligated to provide a 90 days' notice of termination. It did

not, instead opting for termination with less than 24 hours' notice. This is not a circumstance in which an exception to the 90-days' notice requirement applies. Rather, by its plain terms, the Forbearance Agreement required compliance with applicable law.  Thus, Boca Gas was entitled to the requisite 90 days' notice.

### iii.    The balance of hardships militates against the entry of an injunction

First Coast believes the balance of equities favors it because "[t]he Court has already found that First Coast 'easily met' the standard for terminating the franchise, and that proper notice was given to Boca [Gas]." [D.E. 51 at 18]. While it is true that the Court found in its April 26 order that, "[u]nder these circumstances, . . . the balance of hardships [does not] weigh in [Boca Gas]'s favor." [D.E. 29 at 6], however, the remainder of the order was dedicated to determining whether Boca Gas raised any sufficiently serious questions going to the merits to make such questions a fair ground for litigation. *See generally id.* As mentioned in the previous section, this Court's prior order concerning the denial of Boca Gas's injunctive relief motion does not preclude the Court from engaging in hardship analysis under a Rule 65 framework.

Thus, even if the Court were to defer at all to its prior order, that order was a month ago and circumstances have now changed. As Mr. Abbas Jaferi testifies to in his Second Declaration, since First Coast terminated the franchise relationship, "the facilities have been unable to obtain a consistent source of fuel for all 28 stations, nor accept Shell and other First Coast brand credit cards for payment of motor fuel."  Ex. A ¶ 8. The acceptance of these particular types of credits cards

accounts for a significant portion of the facilities' revenues–and in some instances, it accounts for roughly 50% of the facilities' earnings. *See* Ex A ¶ 6. As a result, "[s]ince the Notice of Termination, each facility has been marked by a significant decline in income." Ex A ¶ 10; *see also Gilderhus v. Amoco Oil Co.*, 470 F. Supp. 1302 (D. Minn. 1979) (noting that balance of hardships favored franchisee in part because it "would no longer be able to service customers who use Amoco credit cards, and those customers account for a large portion of plaintiff's business"). As every day passes, Boca Gas grows closer and closer to financial ruin. Boca Gas cannot survive indefinitely under these harsh conditions. *See Fusion Oil Co.*, 2004 WL 7331211, at *5 (finding that balance of equities weighs in favor of franchisee where they "will lose their business and livelihood"). First Coast, moreover, has attempted to accelerate the financial decline of Boca Gas. In particular, "[s]ince the Notice of Termination, First Coast has sent several correspondences to affiliates of Boca Gas and other third parties to deter them from further transacting with Boca Gas for the purposes of purchasing fuel." Ex. A ¶ 9; [*See* D.E. 30 ¶ 64].

Conversely, upon a review of the rights, duties, and obligations of First Coast under the Supply Agreements and Supplemental Agreements, it does not appear that First Coast will incur any hardship in the denial of its Motion.[16] On balance, the equities weigh in favor of Boca Gas.

---

[16] *Cf. Amigo Petroleum Co. v. Equilon Enters. LLC*, 2003 WL 27384829, at *5 (D.N.M. Nov. 26, 2003) (In a similar arrangement as this case, the court found balance of hardships factor tipped in favor of franchisee where the franchisee stated that it will be "unable to supply Texaco-branded gasoline to the 31 Texaco service stations it now supplies" and there was no evidence presented that franchisor would sustain any harm).

     iv.   Entry of a preliminary injunction would disserve the public interest[17]

This suit is between a franchisee who has been unlawfully terminated by a franchisor pursuant to the PMPA. Because the PMPA was promulgated to protect franchisees–like Boca Gas–from unlawful terminations, the public interest would not be served in granting an injunction that effectively eviscerates the livelihood of a franchisee like Boca Gas. *See Shukla v. BP Expl. & Oil, Inc.*, 115 F.3d 849, 852 (11th Cir. 1997) (The PMPA was designed to protect franchisees). Granting the Motion would also have an effect on general consumers in that the number of gas stations available for the purchase of fuel would be diminished.[18]

## CONCLUSION

For the reasons stated above, this Court should deny First Coast's motion for preliminary injunctive relief. If this Court determines that an injunction is warranted, a bond in the amount of $150 million would be appropriate because, based on a review of Boca Gas's 2022 financial data, "Boca Gas would sustain a loss of gross revenue for the lifetime of this case of roughly $150 million." *See* Ex. A ¶ 11.[19]

---

[17] For this factor, First Coast cannot rely on this Court's prior order denying Boca Gas's Section 2805(b) motion for preliminary injunctive relief. *See supra* n.8.

[18] *Cf. Sabal Trail Transmission, LLC v. 7.72 Acres in Lee Cty.*, 2016 WL 8900100, at *12 (M.D. Ala. June 3, 2016) (finding that the public interest would be furthered where the grant of an injunction means "ensur[ing] that consumers would have access to an adequate supply of natural gas at reasonable prices").

[19] A dispute over bond amount can be the proper subject of an evidentiary hearing. *United States v. Diaz*, 811 F.2d 1412, 1413 (11th Cir. 1987). An evidentiary hearing is also warranted where, as here, it is necessary to resolve certain genuine disputes as to material facts and the reasonable inferences drawn from them. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998).

**Weiss Serota Helfman Cole & Bierman**
*Attorneys for Plaintiff/Counter-Defendant*
*Boca Gas Company Holdings 2, LLC,*
2255 Glades Road, Suite 200E
Boca Raton, Florida 33432
Phone: (561) 835-2111

By: /s/ *Howard D. DuBosar*

Howard D. DuBosar
Florida Bar No. 729108
Hdubosar@wsh-law.com
kdoyle@wsh-law.com
Harrison R. DuBosar
Florida Bar No. 1002241
hrdubosar@wsh-law.com
tnovak@wsh-law.com
Jeremy S. Rosner
Florida Bar No. 1018158
jrosner@wsh-law.com